**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PENSKE MEDIA CORPORATION,
11355 W. Olympic Boulevard
Los Angeles, CA 90064

BILLBOARD MEDIA, LLC,                    Civil Action No. 1:25-cv-03192-APM
11355 W. Olympic Boulevard
Los Angeles, CA 90064                    <u>**AMENDED COMPLAINT**</u>

DEADLINE HOLLYWOOD, LLC,                 <u>**JURY TRIAL DEMANDED**</u>
11355 W. Olympic Boulevard
Los Angeles, CA 90064

FAIRCHILD PUBLISHING, LLC,
475 Fifth Avenue
New York, NY 10017

GOLD DERBY MEDIA, LLC,
11355 W. Olympic Boulevard
Los Angeles, CA 90064

THE HOLLYWOOD REPORTER, LLC,
11355 W. Olympic Boulevard
Los Angeles, CA 90064

INDIEWIRE MEDIA, LLC,
11355 W. Olympic Boulevard
Los Angeles, CA 90064

ROLLING STONE LLC,
475 Fifth Avenue
New York, NY 10017

SHEMEDIA, LLC,
475 Fifth Avenue
New York, NY 10017

and

VARIETY MEDIA, LLC,
11355 W. Olympic Boulevard
Los Angeles, CA 90064,

*Plaintiffs*,

v.

GOOGLE LLC,
1600 Amphitheatre Parkway
Mountain View, CA 94043

and

ALPHABET INC.,
1600 Amphitheatre Parkway
Mountain View, CA 94043

*Defendants*.

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 5

III.    THE PARTIES.................................................................................................... 6

IV.     FACTUAL ALLEGATIONS ............................................................................ 8

        A.     Penske Media Corporation and Its Diverse Body of High-Quality
               Content.................................................................................................... 8

        B.     Funding High-Quality Content Through Web Traffic........................... 12

        C.     Distribution of Publisher Content Through Search .............................. 15

               1.     The Content Distribution Relationship Between General Search
                      Services and Publishers................................................................. 16

               2.     The Importance to PMC of Its Content Distribution
                      Relationship with Google .............................................................. 19

        D.     Google's Search Monopoly .................................................................. 22

        E.     Google's Forced Entry into Online Publishing Markets....................... 23

               1.     The Online Publishing Market...................................................... 24

               2.     Google's Transformation from a Search Engine to Web
                      Publisher ....................................................................................... 26

                      a)     Phase I: Google republishes other online publishers'
                             content on its SERP. ........................................................ 27

                      b)     Phase II: Google develops GAI, uses GAI to rewrite
                             other publishers' content, then publishes that derivative
                             content on its SERP. ....................................................... 34

        F.     How Google's GAI Products Work........................................................ 43

               1.     Bard............................................................................................... 45

               2.     Gemini........................................................................................... 46

               3.     Search Generative Experience ...................................................... 50

               4.     AI Overviews and AI Mode........................................................... 52

|   | G. | Google's Unauthorized Use of Publisher Content for AI Training .................... 62 |
|---|---|---|
|   | H. | The Fundamental Threat Google Poses to Online Publishing ............................ 67 |

V.  THE UNLAWFULNESS OF GOOGLE'S MISAPPROPRIATION OF
    DIGITAL PUBLISHERS' CONTENT .......................................................................... 77

    A.  Reciprocal Dealing............................................................................................. 77

    B.  Monopoly Maintenance ..................................................................................... 84

    C.  Tying of AI Overviews to Google's General Search Product ............................. 87

    D.  Unjust Enrichment ............................................................................................. 89

COUNT I: Reciprocal Dealing in Violation of Section 1 of the Sherman Act............................ 91

COUNT II: Reciprocal Dealing in Violation of Section 2 of the Sherman Act ......................... 93

COUNT III: Unlawful Monopoly Leveraging in Violation of Section 2 of the Sherman
    Act .......................................................................................................................... 95

COUNT IV: Unlawful Monopolization in Violation of Section 2 of the Sherman Act ............. 96

COUNT V: Unlawful Tying of AI Overviews to General Search Services in Violation of
    Section 2 of the Sherman Act (15 U.S.C. § 2) ....................................................... 97

COUNT VI: Unlawful Attempted Monopolization in Violation of Section 2 of the
    Sherman Act ........................................................................................................... 100

COUNT VII: Common Law Unjust Enrichment........................................................................ 101

Plaintiffs Penske Media Corporation, Billboard Media, LLC, Deadline Hollywood, LLC, Fairchild Publishing, LLC, Gold Derby Media, LLC, The Hollywood Reporter, LLC, Indiewire Media, LLC, Rolling Stone LLC, SheMedia, LLC, LLC, and Variety Media, LLC (collectively "PMC" or "Plaintiffs"), by their attorneys Susman Godfrey L.L.P., for their complaint against Defendants Google LLC and Alphabet Inc. (together, "Google"), allege as follows:

## I.     NATURE OF THE ACTION

1.      This action challenges Google's abuse of its adjudicated monopoly in General Search Services to coerce online publishers like PMC to supply content that Google republishes without permission in AI-generated answers that unfairly compete for the attention of users on the Internet in violation of the antitrust laws of the United States. This conduct threatens to perpetuate Google's general search monopoly into the era of generative search and to expand it into online publishing, restricting competition in those markets and reducing the production of original content for consumers.

2.      Google's conduct is especially threatening to publishers like PMC. PMC depends on referrals from Google's monopoly search engine for a large portion of the revenue that it devotes to producing original online content through over 25 print and digital properties that include such iconic brands as Billboard, Deadline, Rolling Stone, and Variety, as well as numerous other industry leading publications including Gold Derby, The Hollywood Reporter, Indiewire, *she*knows, WWD (Women's Wear Daily), and many others. PMC's award-winning content attracts a passionate monthly audience of more than 120 million visitors in the United States alone and nearly double that globally. In PMC's own words, "We are a CONTENT company; content is our lifeblood. We must remain dedicated to delivering the most unique and compelling content to our audiences every day, never sacrificing a strong point-of-view for a quick win."

3.      Providing such a broad range and quantity of high-quality content requires enormous ongoing investment in human talent, technology, and infrastructure. Yet much of PMC's digital content—including a remarkable 6.7 million URLs that have been indexed by Google—is free to consumers. A significant portion of PMC's revenue relies on traffic to its websites which allows PMC to earn revenue from digital advertising, affiliate links, and subscriptions to its publications, allowing PMC to provide content to consumers for free.

4.      For example, PMC earns revenue from advertising "impressions" shown to users who visit PMC sites, as well as affiliate commissions when users make purchases after clicking the links found on PMC sites. In some cases, PMC charges subscription fees for its publications, placing content behind a "paywall" that allows PMC to earn sufficient revenue to maintain quality journalism. However, subscriptions for those publications are often reliant on users first reading their content and *then* subscribing for those paid publications. These revenue streams rely on people actually *visiting* PMC sites. Fewer visitors mean lower advertising, affiliate, and subscription revenues, and lower revenues mean less money available to support the generation of news, opinion, investigative journalism, and other content that millions of Americans have come to rely on and enjoy.

5.      PMC allows Google to crawl its websites to index the content on those sites for the limited purpose of generating search referral traffic to PMC's websites. The exchange of access for traffic is the fundamental bargain that supports the production of content for the open commercial Web.

6.      But in recent years, Google has begun to tie its participation in this bargain to another transaction to which PMC and other publishers do not willingly consent. As a condition

of indexing publisher content for search, Google now requires publishers to also supply that content for other uses that cannibalize or preempt search referrals.

7.    These uses include prompting generative artificial intelligence ("GAI") programs running "large language models" ("LLMs") to summarize publisher content that is responsive to user search requests in "AI Overviews" that appear ahead of search results on Google's search engine results page ("SERP"). They also include training the LLMs that Google uses to generate AI Overviews, as well as excerpting key portions of publisher content in "Featured Snippets," including in a format called "Questions and Answers," that appear prominently on Google's SERP.

8.    Because AI Overviews and Featured Snippets often provide the answers to user search queries, and because the answers are featured advantageously on Google's SERP, they generate lower click-through rates to the original sources from which Google generates the answers, if Google provides links to those sources at all. Google uses "Dive deeper in AI Mode" and "Follow up in AI Mode" animations to further encourage users to remain within Google's ecosystem instead of navigating to original sources from which Google generates answers. Google's foray into online publishing is designed to make Google a destination, rather than a search origination point to other websites.

9.    But for the exercise of its monopoly power to tie crawling for these substitutive purposes to crawling for search and high placement on the SERP, Google would pay publishers like PMC separately for the right to republish and train and ground LLMs with their content. If it did not, publishers would limit or block Google from crawling their websites for any purpose.

10.    Because Google does exercise such monopoly power, PMC and other publishers are forced to acquiesce to this misappropriation of their content. Moreover, even if Google did provide a way to separately opt out of republishing in AI Overviews and Featured Snippets,

publishers would be deterred from doing so by the presentation of those features in a way that deprecates search results.

11.    Google's use of its monopoly power to coerce publishers to supply content for other, often competing, purposes as a condition of receiving search referrals from Google amounts to a form of unlawful reciprocal dealing that harms competition in violation of the Sherman Act. In many circumstances, it also constitutes common-law unjust enrichment.

12.    Google's reciprocal dealing reduces publishing output by depriving publishers of the revenues that, in a market that Google had not unlawfully monopolized, they would otherwise earn by either licensing their content for those uses or selling advertising to serve the traffic that those uses commandeer. These uses also unlawfully maintain Google's General Search Services monopoly by raising the costs of rivals who lack its power to coerce publishers to provide their content for free to develop competing products with comparable features.

13.    PMC is particularly affected by Google's coercive practices. PMC writers and editors are focused on delivering unique, compelling content that readers can rely on to be correct, thoughtful, and rigorously reported with the highest journalistic standards: everything from deep-dive think pieces on the entertainment industry (Variety) to advice for parents on which infant formulas are the most nutritious and safest for growing babies (*she*knows). Such informative content is exceptionally valuable to Google for generating AI Overviews and Featured Snippets, and especially subject to diversion of traffic by the answers those features provide. Indeed, Google takes for free this informative content—the product of creativity, time, and labor expended by human journalists.

14.    Google's conduct is already eroding incentives for PMC and other publishers to produce such valuable and useful content. PMC supports fair, sustainable business models for

content publishers in the era of AI, and has and will continue to consider potential agreements to license its content for GAI-related purposes. But if not abated, Google's conduct threatens to leave the public with an increasingly unrecognizable Internet experience, in which users never leave Google's walled garden and receive only synthetic, error-ridden answers in response to their queries—a once robust but now hollowed-out information ecosystem of little use and unworthy of trust.

15.     The law does not permit Google's systematic anti-competitive conduct. By this action, PMC seeks to hold Google responsible for the millions of dollars of harm it is causing and illicit profits it is reaping by misappropriating PMC's unique and valuable works, and to protect the public's continued access to high-quality and trustworthy online information.

## II.     <u>JURISDICTION AND VENUE</u>

16.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 1367, as well as 15 U.S.C. § 15, because this action arises under the laws of the United States, specifically the Sherman Act of 1890, 15 U.S.C. § 1, et seq. and the Clayton Act, 15 U.S.C. §§ 12-27.

17.     Jurisdiction over Google is also proper because it is registered to do business in the District of Columbia and has purposely availed itself of the privilege of conducting business in the District of Columbia. A substantial portion of Google's monopoly maintenance conduct alleged herein occurred in the District of Columbia, including through the employment of engineering and technology personnel for purposes of GAI development and marketing, as well as through the distribution and sale of Google's republishing and GAI products and services to District of Columbia residents. Furthermore, Google maintains large offices in the District of Columbia.

18.     Venue is proper pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) because Google or its agents who participated in its unlawful conduct reside or may be found

in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to PMC's claims occurred in this District, including Google's monopoly maintenance activities and the sales of Google's GAI products based on the commercial exploitation of PMC's content within this District.

## III.    THE PARTIES

19.    Plaintiff Penske Media Corporation ("PMC") is a Delaware corporation with its headquarters and principal place of business at 11355 W. Olympic Boulevard, Los Angeles, CA 90064. PMC is the direct or indirect parent of the other Plaintiffs.

20.    PMC is an American media, publishing, and information services company with over 25 print and digital properties that include such iconic brands as Billboard, Deadline, Rolling Stone, and Variety, as well as numerous other industry leading publications including The Hollywood Reporter, Indiewire, *she*knows, WWD (Women's Wear Daily), and many others. PMC's award-winning content engages a monthly audience of more than 120 million visitors in the United States alone and nearly double that globally.

21.    Plaintiff Billboard Media, LLC ("Billboard") is a Delaware limited liability corporation with its principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064. Billboard publishes the website billboard.com.

22.    Plaintiff Deadline Hollywood, LLC ("Deadline") is a Delaware limited liability corporation with its principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064. Deadline publishes the website deadline.com.

23.    Plaintiff Gold Derby Media, LLC ("Gold Derby") is a Delaware limited liability corporation with its principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064. Gold Derby publishes the website goldderby.com.

24.     Plaintiff Fairchild Publishing, LLC ("Fairchild") is a Delaware limited liability corporation with its principal place of business located at 475 Fifth Avenue, New York, NY 10017. Fairchild publishes the website wwd.com.

25.     Plaintiff The Hollywood Reporter, LLC ("Hollywood Reporter") is a Delaware limited liability corporation with its principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064. Hollywood Reporter publishes the website hollywoodreporter.com.

26.     Plaintiff Indiewire Media, LLC ("Indiewire") is a Delaware limited liability corporation with its headquarters and principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064. Indiewire publishes the website indiewire.com.

27.     Plaintiff Rolling Stone LLC ("Rolling Stone") is a Delaware limited liability corporation with its principal place of business located at 475 Fifth Avenue, New York, NY 10017. Rolling Stone publishes the website rollingstone.com.

28.     Plaintiff SheMedia, LLC ("SheMedia") is a Delaware limited liability corporation with its principal place of business at located at 475 Fifth Avenue, New York, NY 10017. SheMedia publishes the websites sheknows.com, theflowspace.com, and stylecaster.com.

29.     Plaintiff Variety Media, LLC ("Variety") is a Delaware limited liability corporation with its headquarters and principal place of business located at 11355 W. Olympic Boulevard, Los Angeles, CA 90064. Variety publishes the website variety.com.

30.     Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.

31.     Defendant Alphabet Inc. is a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Alphabet Inc. was created as a holding company for Google in late 2015, and Alphabet controls Google's day-to-day operations. Virtually all of Alphabet Inc.'s revenue comes from Google LLC. Since December 2019, Alphabet and Google have had the same Chief Executive Officer. As a result of Alphabet Inc.'s operational control, Google LLC is Alphabet Inc.'s alter ego.

## IV.    FACTUAL ALLEGATIONS

### A.    Penske Media Corporation and Its Diverse Body of High-Quality Content

32.     PMC was founded in 2003 (though many of its brands' legacies extend back much farther), and it has since grown into a global media organization built on superior content from the industry's brightest talent, all while upholding the standards of journalism critical to sustaining the evolution of modern media. Above all, PMC prizes high-quality content for its monthly audience of more than 120 million visitors in the United States alone. PMC's driving purpose is to deliver the most unique and compelling content to its users every day, prioritizing credible point of view over quick wins. To do so, PMC employs nearly 800 individuals focused on publishing, including writers, reporters, and editors. PMC's high-quality content is the direct result of the creativity, time, and labor of these contributors.

33.     Media consumers turn to PMC for reliable journalism, strong perspectives, and compelling storytelling. PMC strives to be on the cutting edge of the news, but never at the expense of accuracy: It's not just about being the first to publish a story, it's also about getting the story right. PMC is committed to thoughtful and thorough reporting that applies the highest journalistic standards—and it invests tremendous resources to ensure that it does so.

34.     PMC's audience consists of the world's top business leaders, creatives, and influencers, as well as millions of ordinary people seeking out the most current news, cultural

8

insights, fashion updates, and product information. PMC's properties range from some of the most well-established media brands to some of the most exciting new offerings, and include the following:

35.    **Rolling Stone**. Founded in 1967, Rolling Stone has been the leading voice of music and popular culture for over 50 years. Rolling Stone generates an average of 87 million page views per month. The multi-media brand features the latest in music reviews, in-depth interviews, hard-hitting political commentary, and award-winning journalism. Rolling Stone's first editor-in-chief, Jan Wenner, explained it as "a new publication reflecting what we see are the changes in rock and roll and the changes related to rock and roll"[1]—and it has since grown into a cultural force.

36.    Rolling Stone's website includes—in addition to the distinctive coverage of current events and political opinion for which Rolling Stone has long been known—iconic photography, world class music coverage, in-depth profiles, and investigative reporting, as well as a "RS Recommends" section providing reviews and recommendations for books, electronics, and lifestyle products. These reviews often link to reviewed products. Rolling Stone receives affiliate commissions for purchases made through those provided links.

37.    **Billboard**. The first issue of Billboard was published in 1894 to cover billboard advertising. Fast forward 130 years, and Billboard has become a leading authority for artists and music industry insiders alike. Billboard features unrivaled reporting on music news, issues and trends, and the industry's definitive charts (including the Billboard Hot 100, the Billboard 200, and the Billboard Global 200), encompassing the most complete and well-respected database of charts across all music genres. Billboard generates 55 million monthly pageviews on average across its offerings of music news, cultural commentary, and industry insights.

---

[1] ROLLING STONE (Nov. 9, 1967).

38.    **Variety**. Since 1905, the most influential leaders and decision makers in entertainment have turned to Variety for timely, credible, and straightforward news, analysis, and perspective. Variety takes its readers behind the cameras, curtains, and screens of film, television, theatre, and digital media with its award-winning combination of breaking-news reporting, insightful deep-dive think pieces, and engaging, must-read feature spotlights. Martin Scorsese described it "the single most formidable trade publication ever."[2] Coinages that have worked their way into the English lexicon such as "payola" and "striptease" are attributed to Variety.[3] Variety.com receives 24 million monthly average visitors and an average of over 78 million monthly pageviews.

39.    **The Hollywood Reporter**. Founded in 1930, The Hollywood Reporter was Hollywood's first daily entertainment industry newspaper. Over the decades since, it has continued as a flagship media publication. The Hollywood Reporter's website, Hollywoodreporter.com, has repeatedly been recognized as best in class, garnering numerous awards for its journalism. The website Hollywoodreporter.com receives more than 14.5 million average unique monthly views.

40.    **Deadline**. In 2006, Deadline's founder, Nikki Finke, realized she needed a quicker way of breaking stories about show business to her audience than print would allow. Deadline Hollywood Daily (now Deadline, or Deadline.com) was thus born. With over 49 million monthly page views, Deadline is the authoritative source for breaking entertainment industry news.

41.    **SheMedia**. SheMedia's flagship websites sheknows.com, stylecaster.com, and the most recent, theflowspace.com, are premier lifestyle sites for women. They inform, inspire,

---

[2] *Variety: An Illustrated History of the World from the Most Important Magazine in Hollywood* (foreword).
[3] Hillard, Gloria. *A Century of 'Variety'-Speak*, NATIONAL PUBLIC RADIO, (June 18, 2005), https://www.npr.org/templates/story/story.php?storyId=4708916.

support, and give voice to women around the world. Their rich editorial ranges from health, food, and family to career and entertainment.

42.  **Gold Derby**. Gold Derby, founded in 2000, is the original awards-show authority, tracking the most competitive races in entertainment with predictions, analysis, and news, including the Academy Awards, Emmys, Golden Globes, Grammys, Tonys, and more. Gold Derby compiles predictions from the industry's top awards pundits alongside editors and users to ensure the highest degree of accuracy for nominations and wins.

43.  **IndieWire**. IndieWire reports on, defines, and elevates the best of film and TV and is a go-to source for creators and consumers to discover new voices. IndieWire champions contenders to the awards-voting community through, among other things, year-round awards coverage and premium editorial franchises. Branded the "online heartbeat of the world's independent film community" by Forbes and dubbed "best indie crossroads" by film critic Roger Ebert, IndieWire launched in July 1996 and joined PMC's portfolio of leading global media brands in January 2016.

44.  **WWD**. Founded in 1910, Women's Wear Daily, now WWD, is the daily media of record and the industry voice of authority for senior executives in the global women's and men's fashion, retail, and beauty communities. Often referred to as "the fashion bible," WWD provides a balance of timely, credible business news and key fashion trends to a dedicated readership of retailers, designers, manufacturers, marketers, financiers, Wall Street analysts, international moguls, media executives, ad agencies, socialites, and trend-makers. WWD's online platform, wwd.com, receives 8.9 million unique monthly visitors. WWD also offers definitive coverage of the Beauty and Footwear industries. Beauty Inc. is the insider's guide to the global beauty

community. Footwear News is the publication of record for senior footwear and fashion executives and a must-read for shoe-obsessed consumers.

        **B.**    **Funding High-Quality Content Through Web Traffic**

      45.    Much of PMC's content is entirely free to users. This is because PMC receives a significant portion of its revenue through digital advertising, commissions when a user purchases a product through an affiliate link on its sites, and subscription fees for certain of its products—all of which depend on user traffic to PMC's websites.

      46.    A substantial portion of PMC's web traffic-based revenue depends on search engines like Google. Because of the vast amount of content available on the Internet, search engines like Google aggregate and index that content, creating a gateway for users to meaningfully engage with online content. PMC, like other publishers, permits Google to access and index its content to enable users to find PMC online content through queries on these search engines.

      47.    For display advertisements, PMC typically earns money based on the total number of ads (or "impressions") that are shown to users. In most cases, PMC earns money based on the number of impressions that are shown to visitors, with an impression equaling one instance in which the advertisement was shown. More visitors mean more ads, which means higher ad impression revenues. Fewer visitors mean fewer ads, which means lower ad impression revenue.

      48.    For example, a user entering a query on Google for "The Real Ozzy Osbourne" will see at the top of the organic search results Rolling Stone's article from July 23, 2025, the day after Ozzy Osbourne's death, entitled: "Ozzy and Me: How I got to Know the Real Ozzy Osbourne," by Kory Grow, a well-known, veteran music journalist with more than 20 years of experience who has been employed by Rolling Stone since January 2014.  Clicking the search result will bring the user to that article on rollingstone.com, which includes insightful details about Ozzy Osbourne based on information learned by Mr. Grow from his more than 20 interviews of Ozzy Osbourne

and the special rapport that he developed with one of the world's most iconic musicians over a 15-year period. This content is free for the user. But Rolling Stone monetizes user traffic to that article—and others—through display advertising.



49.     PMC also earns money through affiliate referral links. For example, certain of PMC's brands, such as Rolling Stone, research and create product reviews such as Rolling Stone's

"RS Recommends" July 15, 2025 article, "The Best Sounding Wireless Earbuds of 2025: Tried and Tested." In addition to providing information about the earbuds, the article contains links to Amazon, BestBuy, and other retailers where the reader can purchase the recommended earbuds. In many cases, PMC will receive a commission when users click on such links and ultimately purchase the item. In effect, PMC receives compensation for having provided its users with useful information that guided their purchases. As more users visit the website to read the article, the likelihood that PMC will receive compensation in the form of commissions—and the amount of that compensation—increases.

50.    Certain of PMC's brands have paid content offerings. PMC brands Billboard, Rolling Stone, The Hollywood Reporter, WWD, and Variety use a combination of dynamic paywalls and fixed paywalls ("hardwalls") on their websites to help generate revenue to support their continued publication of quality content. Users pay subscription fees to access certain content from these brands because they value the content, and PMC in turn uses those fees to continue funding the in-depth, high-quality content that users have come to expect and enjoy. Subscriptions for these publications are driven in large part by traffic to PMC's websites. Consumers often want to read a sampling of the content first before agreeing to subscribe for that site's content.

51.    A user that visits a PMC website from a search query will also be shown links to other PMC content. For example, the Rolling Stone article "The Best Sounding Wireless Earbuds of 2025" includes links to the latest articles published on Rolling Stone. PMC also derives significant revenue from users originating from search engines like Google that go on to explore additional PMC content.

52.    The revenue that PMC receives by reason of user traffic to its websites, whether via display advertising on the sites, links to retailers, subscriptions for its paid content offerings,

or some other arrangement, helps PMC to make the substantial investments in content described above, which in turn ensures PMC is able to continue providing users with the high-quality content they have come to enjoy.

53.     Google is threatening this business model by directly providing users with PMC content, or a close facsimile of it, on a GAI-powered search results page or from some other GAI tool. The resulting decrease in user visits to PMC sites diminishes PMC's revenue, which in turn threatens PMC's ability to continue investing in and producing high-quality content.

54.     PMC has built its business and reputation on its commitment to providing millions of consumers with exceptional, original content that is rigorously reported with the highest journalistic standards. While PMC's websites continues to serve hundreds of millions of visitors annually, PMC's business model is challenged by the appropriation of content that PMC makes available to Google for search indexing, and which Google utilizes for free for separate purposes that unfairly compete with PMC in the market for online publishing while simultaneously reinforcing Google's adjudicated monopoly in General Search Services.[4]

### C.     Distribution of Publisher Content Through Search

55.     Internet search puts libraries of information and content in our pockets and on our desktops. Indeed, there is now so much information available that we seldom ask, "Does the answer to my question exist?" but rather, "Where can I find it?" We turn to search engines— usually Google—to direct us to where on the Internet the answer can be found. It is impossible to overstate the importance of general search engines to the digital information ecosystem, both in terms of helping users find content and in terms of helping online publishers—like PMC—reach

---

[4] PMC uses the term "General Search Services" consistent with the Court's defined market in *United States v. Google LLC*, 747 F. Supp. 3d at 109-13.

audiences. As a result, PMC's business model, like that of almost all other online publishers, depends on search services for distribution.

1. *The Content Distribution Relationship Between General Search Services and Publishers*

56. The role of a search engine is to take in a user's search query and return search results that require users to travel to other webpages to explore information responsive to that query. A search result is thus an informational product that connects users to external webpages containing information or content relevant to their queries. Put differently, a search engine is an ***intermediary*** between users seeking information and web publishers who provide that information. Their purpose is not to serve content, but to connect users to where that content resides online. That is why Google early on defined its search role in this way: "We may be the only people in the world who can say our goal is to have people leave our website as quickly as possible."[5]

57. In performing its intermediary role, a search engine engages in economic transactions with each of three constituencies: users, advertisers, and web publishers. With ***users***, search engines provide search results in exchange for users' attention to the results delivered on the SERP in response to queries. With ***advertisers***, search engines monetize this attention by charging for ads that appear on the SERP alongside or among the search results.

58. User attention is also an input that search engines use to serve their third class of customers: ***web publishers***. Users seeking answers to their search queries click on search results to visit a web publisher's site. The search engine thus converts user attention to search referral traffic, which it "sells" to the publisher ("Search Referral Traffic"). This form of "search distribution" is the single-most important way web publishers reach users. Publishers "pay" for

---

[5] Google, *Ten Things We Know To Be True*, https://about.google/intl/ALL_in/philosophy/ ("We first wrote these '10 things' when Google was just a few years old.") (last accessed Sept. 12, 2025).

search distribution by contributing their websites' contents and associated metadata to the search engines, so that the search engine can use that content to generate search results. For the purposes of this Complaint, we will refer to data contributed by a web publisher to a search engine for search purposes as "Search Index Data."

59.    The graphic below, as illustrated by the Helena World Chronicle in its class action antitrust complaint against Google,[6] demonstrates the traditional relationship search engines have with each of the three classes of customers and the *quid pro quo* that takes place with respect to providing General Search Services.



60.    Search engines store Search Index Data from web publishers in a "search index," which is a database containing copies of that content along with pointers to the location of that content on the web. Search engines generate search results using algorithms to parse the content

---

[6] *See Helena World Chronicle, LLC, et al. v. Google LLC, et al.*, Case No. 1:23-cv-03677-APM, Dkt. No. 27 at 27 (Am. Compl. ¶ 40) (D.D.C. May 13, 2024).

in their indexes and find which content is most relevant to users' queries. The quality of a search engine's results depends on (1) the scope of its search index and (2) the quality of its relevance algorithms.

61.    With respect to Google, publishers contribute Search Index Data to Google's search index by permitting Google to use its "Googlebot" web crawler to crawl and index the publishers' sites. A web crawler is a software program that systematically visits websites and collects information about their contents, such as the titles, headings, pages contents, images, links, and keywords. Googlebot follows the links on each website to discover new pages and add them to Google's search index.

62.    Publishers can block their content from Googlebot through a file on their websites called robots.txt. This file specifies which pages or sections of the website specific web crawlers can access. By editing their robots.txt file, publishers can opt out of Google's search distribution and prevent their websites from appearing in Google's search results. When publishers do not block Googlebot in their robots.txt files, Google includes their content in its search index.

63.    Google claims that publishers who contribute high-quality content to its Search Index are rewarded with search traffic. Google's "Search Essentials" provides publishers with best practices for helping their web-based content "perform well on Google Search."[7] Those best practices include creating "helpful, reliable, people-first content" that demonstrates a depth of knowledge, helps people learn about a topic, and is useful to a specific audience.[8] This is precisely the type of content published by PMC.

---

[7] Google, *Google Search Essentials* (last updated Feb. 4, 2025),
https://developers.google.com/search/docs/essentials.
[8] Google, *Creating helpful, reliable, people-based content* (last updated Feb. 4, 2025),
https://developers.google.com/search/docs/fundamentals/creating-helpful-content.

64.    PMC, like many other publishers, expends considerable resources on optimizing its websites to ensure that Google can index the content for general search purposes and connect search users to that content. "Search Engine Optimization" (SEO) refers to the process of improving a site's visibility to search engines. The better a site's visibility, the more likely the site will be found and visited.

65.    PMC's efforts to optimize for Google's search engine include optimizing the technical aspects of PMC's websites for Google's crawlers (technical SEO) and optimizing website content for Google's search engines (on-site or on-page SEO). PMC devotes substantial resources to technical and on-site SEO, including by maintaining an SEO team to provide advice and guidance to brands regarding SEO; training writers and editors on how to label and tag stories according to Google's requirements so that those stories will be discovered by Google; monitoring and responding to changes to Google's search algorithm; and ensuring that the architecture of PMC websites (including URL structure, navigation, and internal linking) makes it easy for Google's crawlers to discover and access all of PMC's content for indexing for general search purposes. These efforts are intended to ensure that Google search surfaces links to PMC so that users can be connected to PMC's valuable content.

        2.    *The Importance to PMC of Its Content Distribution Relationship with Google*

66.    Success for an online publisher like PMC requires that it generate revenue from online content sufficient to fund continued broad content creation. PMC receives revenue from advertisements, affiliate links, and/or subscriptions only because users visit its websites. PMC's online publishing business depends on users finding it through search, which in turn depends on PMC continually generating helpful content and providing Google with access to that content for search indexing purposes.

67.    Importantly, PMC cannot simply replace search traffic with traffic from other sources. Search traffic is "intentional," meaning it comes from users who are actively seeking out information about a specific topic. If a search engine stops sending search traffic to a PMC site, then that traffic is lost to PMC—there is no practical way to make it up with traffic from other sources, such as social media. This is because, as the District Court for the District of Columbia explained in its liability opinion in *United States v. Google* (the "Government Search Case"), "[n]o user could confuse a [General Search Engine (GSE)] with . . . a social media site. Unlike [social media sites], GSEs are a gateway to the World Wide Web. . . . Search on a GSE therefore is not constrained by subject matter, inventory, or query type."[9]

68.    PMC, like other publishers, permits Google to access its content and include it in Google's search index to generate traffic to PMC's websites via search results. PMC permits Google to use its "Googlebot" web crawler to crawl and index vast swaths of the content on its sites, including paywalled content. Inherent in this value exchange with Google is the expectation that Google's SERPs will direct users to PMC's sites. When users click on a Google search result to visit PMC's sites, PMC can monetize that traffic.

69.    Google understands, recognizes, and encourages this "fundamental fair exchange between Google and the web."[10] In Google's words: "Google crawls, indexes and links to websites in search results, and each search result includes a short preview of what to expect at the site. Websites gain free traffic from users interested in what they have to offer, and each user visit is an opportunity to build a long-term relationship and monetize through advertising, affiliate links, or

---

[9] *United States v. Google*, 747 F. Supp. 3d 1, 110 (D.D.C. 2024) (citations omitted).
[10] Google, *Setting the record straight on news* (June 26, 2020), https://blog.google/outreach-initiatives/google-news-initiative/setting-record-straight-news.

subscriptions."[11] Through this process, Google supposedly supports "a healthy ecosystem of fresh and useful content . . . by sending visitors to websites small and large through our search results."[12] Google has repeatedly reinforced this message over the years, telling the public that it "will continue to prioritize approaches that send valuable traffic and support a healthy, open web."[13] As recently as August 2025, Google reassured the public, including publishers, that "[a]s a search company, we care passionately — perhaps more than any other company — about the health of the web ecosystem."[14] In September 2025, Google's Vice President of Government Affairs and Public Policy called "[t]he 10 blue links" "a simple value proposition. We provided links that directed users free of charge to billions of publications around the world."[15]

70.    The revenue that PMC receives by reason of user traffic to its websites enables PMC to make the continuous and significant investments described above in order to produce timely, engaging, and accurate content.

71.    Because PMC aims to provide its audiences with the best content on the topics it covers, and because users know and trust PMC's brands, user traffic to PMC websites from search engines has been robust. Advertising, affiliate link, and subscription revenue tied to traffic volume and search has made PMC's digital business a success, and, as a result, PMC has been able to employ many journalists, generating high-quality content for readers at great scale.

---

[11] *Id.*

[12] Google, *Our Approach to Search*, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ (last accessed Sept. 12, 2025).

[13] Alphabet Q2 2023 Earnings Call (July 25, 2023), https://abc.xyz/2023-q2-earnings-call/.

[14] Liz Reid, *AI in Search is driving more queries and higher quality clicks* (Aug. 6, 2025), https://blog.google/products/search/ai-search-driving-more-queries-higher-quality-clicks.

[15] Watch Our Livestream Replay: Wired's AI Power Summit, https://www.wired.com/story/wired-ai-power-summit, at 55:00 (accessed Nov. 28, 2025).

72.    PMC's hard-won success, however, is at risk if consumers no longer need to visit PMC's online properties to obtain the benefits of its high-quality content because they can get it— or an apparent facsimile—directly on Google's SERP. More importantly, consumers lose too, as Google erodes the revenue that PMC uses to fund creation of authoritative, original, and trustworthy content—thus undermining publisher incentives to continue to invest in the creation of new content in the future.

### D.    Google's Search Monopoly

73.    Google's search engine business generates annual revenue of nearly $200 billion[16] and, by any metric, it possesses monopoly power in the search engine market. In a landmark decision last year in the Government Search Case, the D.C. District Court found that Google illegally maintained its monopoly power in that market. The court held that:

> (1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements.[17]

74.    Specifically, Google's anticompetitive agreements were "search distribution contracts with two major browser developers (Apple and Mozilla); all major OEMs of Android devices (Samsung, Motorola, and Sony); and the major wireless carriers (AT&T, Verizon, and T-Mobile) in the United States."[18] These distribution agreements were critical to Google's continued monopoly power in search, as evidenced by the fact that "[i]n 2021, Google paid out a total of $26.3 billion in revenue share under these contracts … almost four times more than all other

---

[16] Alphabet 2024 Form 10-K (Feb. 4, 2025), https://abc.xyz/assets/77/51/9841ad5c4fbe85b4440c47a4df8d/goog-10-k-2024.pdf.

[17] *United States v. Google*, 747 F. Supp. 3d at 32.

[18] *Id.* at 88.

search-related costs combined."[19] Google would not have been willing to pay such sums for search distribution if they were not key to maintaining its search monopoly.

75.    Thanks to its anticompetitive search distribution conduct, Google maintains monopoly power with extremely high market share in General Search Services. As the district court explained:

> Plaintiffs easily have demonstrated that Google possesses a dominant market share. Measured by query volume, Google enjoys an 89.2% share of the market for general search services, which increases to 94.9% on mobile devices. This overwhelms Bing's share of 5.5% on all queries and 1.3% on mobile, as well as Yahoo's and DDG's shares, which are under 3% regardless of device type.[20]

76.    Google's monopoly power, in turn, has allowed it to extract monopoly rents. Again, the court explained: "Google has exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."[21]

### E.    Google's Forced Entry into Online Publishing Markets

77.    Charging supracompetitive prices for search ads is not the only way Google reaps enormous profits from its search monopoly. Google has also developed a playbook whereby it exploits its dominance in search to coerce firms operating in adjacent markets to supply it with content. Google then uses that content both (1) to maintain its search monopoly and (2) to compete against the firms that supplied the content to monopolize the online publishing market.[22]

78.    Google is a monopsonist in the input market for publisher content used for search results (the "Input Market"). Monopsony power, or buying power, is the mirror image of monopoly power. A monopsonist is a buyer with sufficient market power to control prices in an input market.

---

[19] *Id.*
[20] *Id.* at 119.
[21] *Id.* at 32-33.
[22] PMC uses the terms "online publishing" and "digital publishing" interchangeably.

Put simply, Google's search monopoly gives it control over online distribution in search results for online publishers. Google uses that buying power to force online publishers to give up access to their content without monetary compensation. Google then itself acts as a publisher, either by republishing portions of other online publishers' content or by using GAI to summarize the content. The end result is that users increasingly consume other web publishers' content on Google's SERP, either in abridged or derivative form, which starves those publishers of traffic and revenue.

79.    This strategy of embrace, absorb, and extinguish does two things. First, it raises further barriers to entry for potential search market entrants, who must then replicate the full stack of Google services to effectively compete. Second, it also ultimately restricts output in the online publishing market where Google competes against web publishers.

1.    <em>The Online Publishing Market</em>

80.    The **online publishing market** consists of websites and apps on which publishers display textual content. Online publishing refers to the market for news articles, periodicals, reports, and other types of information that is made available online. The relevant geographic market for the online publishing market is the United States.

81.    In the earlier days of the Internet, online publishing consisted primarily of websites and apps dedicated to publishing original content. Many such publishers had started out as traditional newspaper or magazine publishers, while others began as "web-native" publications with no offline footprint. Their common characteristic was that they generated original digital content by investing in writers, content creators, and editors.

82.    Unlike content published in physical hard-copy newspapers and magazines, online publishing is consumed on digital devices connected to the Internet. The production of online content requires unique knowledge and skills related to the production and dissemination of digital

24

content via the web, such as experience with website creation, search engine optimization, and content management systems.

83.    Unlike print media, which requires local access to physical content, online publishing content can be accessed by anyone, anywhere, who has an Internet connection and a capable device.

84.    The online publishing market has received robust industry and public recognition. Numerous analyst publications recognize the online publishing market. For example, business intelligence company Statista explains that "The Digital Newspapers & Magazines market encompasses the online distribution and consumption of journalistic and editorial content through digital platforms. It includes digital versions of traditional newspapers and magazines, as well as digital-only publications, accessible through websites, mobile apps, and other digital channels."[23] Universities offer coursework in digital media that include courses such as "Web Creation for Content Management Systems," "Screen-Based Publication Design," and "Search Engine Optimization."[24]

85.    In addition to PMC, participants in online publishing include digital media companies such as Buzzfeed, People Inc. (formerly known as Dotdash Meredith), Hearst, Condé Nast, NewsCorp/Dow Jones, the New York Times, and Ziff Davis. More recently, companies offering generative AI products have begun to compete in the online publishing market, in many instances by republishing content created by original online publishers without permission. For

---

[23] Statista, *Digital Newspapers & Magazines – Worldwide*, https://www.statista.com/outlook/amo/media/newspapers-magazines/digital-newspapers-magazines/worldwide  (last accessed Sept. 11, 2025).
[24] Northeastern University College of Professional Studies Graduate Programs: Digital Media, https://catalog.northeastern.edu/graduate/professional-studies/masters-degree-programs/digital-media-mps/#programrequirementstext (last accessed Sept. 10, 2025).

example, the New York Times's 10-K explains that it "compete[s] for audience, subscribers, licensees and advertising against a wide variety of companies, including" not only "content providers and distributors," but also "search engines" "and products and tools powered by generative artificial intelligence ('AI')."[25]

86.    In addition to generating revenue through advertising, affiliate links, and selling subscriptions to end consumers of the content, online publishing is a critical input to search. Online publishing content is used by search engines such as Google to populate and enhance, through short previews of the content, search results.

2.    *Google's Transformation from a Search Engine to Web Publisher*

87.    At least by the early 2010s, Google decided to enter online publishing by distributing content directly on its SERP. But it did not start hiring writers and editors. It did not even license content from third parties to republish. Instead, Google began repurposing the content that online publishers had created by investing in human talent, technology, and infrastructure. Google crawled publishers' content for Google's search index by displaying that content and its derivatives on its SERP without permission.

88.    In the online publishing context, Google's appropriation of publisher content occurred in two phases. During Phase I, Google displayed increasingly detailed excerpts ("snippets") of other online publishers' content. Now, with the development of sophisticated GAI technologies, Google has entered Phase II, in which it uses other online publishers' content to train and prompt GAI models to generate content that competes with that same publisher content for attention on Google's SERP.

---

[25] New York Times 2024 Form 10-K (Feb. 27, 2025), available at https://nytco-assets.nytimes.com/2025/02/2024-10-K.pdf.

89.     Google's shift to Phase II fundamentally alters the terms in the Input Market. Google now uses the inputs (online publishing content) not only to populate search results, but also as an input for Google to directly compete with online publishers in the relevant output market for online publishing (through Google's AI Overviews). Google's use of online publishing content to compete directly with publishers, without compensation to those publishers, constitutes an underpayment to those online publishers in the Input Market for search.

a)      Phase I: Google republishes other online publishers' content on its SERP.

90.     Phase I of Google's online publishing strategy can be called the "republishing phase." Google simply began republishing portions of others' digital content on its general search and other pages. Over time, this republishing got more extensive, blatant, and egregious.

91.     Google's republishing started with its news search service, Google News, which it has offered since 2002. Google News is a form of specialized search, which is distinct from its general search service. Google introduced the beta version of Google News in September 2002, and it launched the product officially in January 2006. Users access Google News through a unique URL, news.google.com, or by clicking a tab at the top of Google's general search page. Unlike Google's general search SERP, the Google News SERPs exclusively link to news content.

92.     Initially, Google News provided news search results which were distinct from publishing in that their purpose was to guide users to websites containing news content, not for the users to consume the content directly on the SERP. Over time, however, Google began to transition its Google News SERPs away from displaying news search results towards actually publishing news content.

93.     Google began by posting headlines, images, and short snippets from news articles on Google News. By 2005, publishers started to complain that Google was simply republishing

27

their content. For example, Agence France Presse ("AFP") sued Google alleging that this display of its content constituted copyright infringement. The case settled, and Google ultimately agreed to begin licensing that content for a time beginning in 2007.

94.     By May 2012, Google began to port its Google News content to its general search SERP. In that month, Google introduced the "Knowledge Panel" to its SERP. The panel contained rich-text answers to different types of user queries. Google designed the Knowledge Panel to obviate the need for users to leave the SERP page and click Google's search result links to obtain answers to their questions. For example, if a user searched for "Washington's birthday," the Knowledge Panel might simply say "February 22" with a link to a webpage containing that fact.

95.     In response to news- and information-related search queries, Google's Knowledge Panels began to include lengthy snippets of journalistic or informational articles or other webpages, often with accompanying photos. The presentation of such content in Knowledge Panels was similar to the content that appeared on Google News SERPs. Observers began to refer to these snippets on Google's SERP as "Featured Snippets," and Google adopted this title as their official designation as early as 2014. The Knowledge Panels containing Featured Snippets are often labelled "Top Stories." In a 2018 blog post, Google provided the following example of an informational Featured Snippet generated in response to the informational search query, "Why is the sky blue?"



96.     The appearance of Featured Snippets within the Top Stories panels on Google's SERP reduced search traffic to publishers. By publishing other publishers' content directly on the SERP, Google disincentivized users from having to click through to a publisher's website to find the relevant content. While in some cases, users want more information than is available in a Featured Snippet and may click through, in many cases they are satisfied with the content that Google has excerpted and thus stay on Google's SERP. In fact, by 2019, data indicated that less than 50% of Google searches resulted in a click-through to the original source, making Google

more of a walled garden than a traffic director.[26] Digital publishers thus began to complain again about Google's expanding misuse of their content.[27]

97.     In 2015, Google introduced another publishing element to its SERP called "People Also Ask." The People Also Ask panel contains a list of questions about a user's search topic, with drop-downs containing Featured Snippets chosen by Google to answer those specific questions. Below is an example of a People Also Ask feature and several of its Featured Snippets:



98.     The Featured Snippets in Google's People Also Ask feature are even more diversionary than those shown elsewhere on Google's SERP because they are tailored to the

---

[26] Fishkin, R., *Less than half of Google searches now result in a click*, SPARKTORO (Aug. 13, 2019), https://sparktoro.com/blog/less-than-half-of-google-searches-now-result-in-a-click/.

[27] *See, e.g.*, Essers, L., *German publishers start legal action against Google over news snippets*, PCWORLD (June 18, 2014), https://www.pcworld.com/article/439881/german-publishers-start-legal-action-against-google-over-news-snippets.html.

questions chosen by Google. While a Featured Snippet in a "Top Stories" panel (the label often applied to a Knowledge Panel containing journalistic content) will often include general summaries of an article's content, a user may nevertheless click through to the underlying story to answer more detailed questions. But with the People Also Ask panel, Google pulls out the specific part of an article that is relevant to answering a particular question, discouraging users from navigating away from Google's SERP to the pages containing the underlying content. The screenshot below shows a snippet displayed on the SERP in response to a user's click on one of the People Also Ask questions.



99.     Whereas before a user might click through for additional information on Google's previous CEOs, in the example above, Google has attempted to answer all related questions on the SERP page itself, obviating the need to click through.

100.     Google refers to Featured Snippets, Top Stories, and People Also Ask as "search features." But they are separate and distinct products from search results. These features reflect Google acting as an answer engine—not a search engine. They constitute a form of publishing because they display informational and other content to be consumed *directly on the SERP* rather than sending users to third-party websites. Though Google's publishing elements contain links to the underlying articles, the click-through rate on those links is extremely low. A 2024 study by Rand Fishkin, based on clickstream data from Datos, found that nearly 60% of visits to Google SERPs result in *no clicks*.[28] The reason for these "zero-click" searches is that users can consume enough republished content directly on Google's SERP to obviate any need to click through to the original publishers' pages.

101.     Google has thus been republishing digital publishers' content in publishing elements on its SERP for more than a decade. Republication in itself is not necessarily a problem— authorized republication of other creators' content is a common business model. Reuters, for example, has built a business around generating news content and licensing it to third parties for republishing. The non-profit Associated Press has a similar model.

---

[28] Goodwin, D., *Nearly 60% of Google searches end without a click in 2024*, SEARCHENGINELAND (July 2, 2024), https://searchengineland.com/google-search-zero-click-study-2024-443869; *see also* Sullivan, L., *Nearly Two- Thirds Of Clicks On Google Search Remain Within Its Ecosystem*, MEDIAPOST (July 5, 2024), https://www.mediapost.com/publications/article/397414/nearly-two-thirds-of-google-searches-stay-within-i.html.

102.    The problem is that the creators whose content Google republishes are not willing suppliers. Google forces them to supply digital content for republishing as a condition of obtaining Search Referral Traffic, of which Google is the monopolist supplier to end users (and is the monopsony buyer for publishers).

103.    Google sources the content it uses to populate its publishing elements from the data that it crawls for its search index. In other words, Google repurposes the Search Index Data digital publishers provide as republishing content. As discussed below, Google has now doubled down on this unauthorized conduct not only for Featured Snippets, Top Stories, and People Also Ask but also for its GAI products, including AI Overviews and AI Mode. Google's unauthorized republication of digital publishers' content for its GAI products is uniquely harmful for publishers at least because the GAI products more comprehensively republish content—rather than providing merely a preview or, in its own words, a "snippet"—thus obviating the need for users to click on the publishers' website links at all.

104.    Until 2019, the only way for digital publishers to prevent Google from republishing their content was to prevent Google from indexing their content for search at all by blocking Googlebot in robots.txt. Then, in response to the passage of the EU Copyright Directive that year, Google introduced the "nosnippets" meta-tag to allow publishers to direct that snippets of their content not be shown on Google's SERP.

105.    However, while setting the "nosnippets" tag would prevent site content from being republished as Featured Snippets, it would also prevent snippets from being shown as previews in search results. This and the preeminent placement of Featured Snippets ahead of search results on the SERP meant that publishers who used the nosnippets tag to stop Google from republishing

33

their content experienced an even greater reduction in search referrals than they did by allowing republication.

106.    The decision to opt out of republishing by disallowing snippets or withholding Search Index Data is a Hobson's choice. Virtually no digital publishers can afford to take such drastic action, because withholding data from Google's search index means demotion on the SERP or disappearing from Google's organic search results entirely, and as outlined above, appearing prominently in Google's SERP is an essential means of generating traffic and revenue for digital publishers.

> b)    Phase II: Google develops GAI, uses GAI to rewrite other publishers' content, then publishes that derivative content on its SERP.

107.    Phase II of Google's strategy to dominate online publishing centers around GAI. Google has seized on recent developments in that field to take its misappropriation and republication of online publishers' content to the next level, further imperiling their ability to survive. Once again, Google's actions are possible only because of its entrenched monopoly in General Search Services.

108.    Google has long developed artificial intelligence for search and other purposes. In 2011, Google launched Google Brain to capitalize on machine learning research and Google's enormous computing power.[29] In January 2014, Google purchased London-based AI company DeepMind for more than $500 million.[30]

109.    Around 2018, Google developed DeepRank, which was based on a second-generation deep learning model called BERT. According to Dr. Eric Lehman, formerly a

---

[29] Wikipedia, *Google Brain*, https://en.wikipedia.org/wiki/Google_Brain (last accessed Sept. 12, 2025).
[30] Shu, C., *Google Acquires Artificial Intelligence Startup DeepMind For More Than $500M*, TECHCRUNCH (Jan. 26, 2014), https://techcrunch.com/2014/01/26/google-deepmind/.

Distinguished Software Engineer at Google, BERT was a "transformational" technology, that "radically increased the ability of deep learning systems to understand language."[31] At that point, it became clear that Google was "looking at a change that would kind of knock all the pieces off the board of search probably at some point within the next few years."[32]

110.    Dr. Lehman and others were aware that the development of a similar technology outside of Google could have profound implications. As Dr. Lehman wrote concerning BERT in 2018, "One consideration is that such a deep ML [machine learning] system could well be developed outside of Google—at Microsoft, Baidu, Yandex, Amazon, Apple, or even a startup… The risk that Google could … be beaten in relevance by another company is highlighted by a startling conclusion from BERT: Huge amounts of user feedback can be largely replaced by unsupervised learning from raw text. That could have heavy implications for Google."[33]

111.    In 2021, Google completed a third generational LLM—a powerful neural network trained on vast amounts of text capable of generating human-like responses—called T5 (later, MUM). This system "achieved essentially human-level performance."[34]

112.    In late 2022, a newer company, OpenAI, announced a chat-based AI product called "ChatGPT," which could engage in natural conversations, answer questions, and even assist with tasks like coding and creative writing. The AI technology underlying ChatGPT is also an LLM.

113.    ChatGPT quickly captured the public's imagination and sparked a frenzy among tech giants to develop their own LLMs and LLM-based products. In the "exuberance of someone

---

[31] *U.S. v. Google*, Tr. Trans. (Lehman) 1843:11-1846:22.
[32] *Id.* at 1910:3-22.
[33] *Id.* at 1922:22-1923:12.
[34] *Id.* at 1915:17-20.

who has like 3 percent share that maybe I'll have 3.5% share," Microsoft CEO Satya Nadella predicted that ChatGPT would "make Google dance."[35]

114.    And dance Google did. Google recognized the disruptive threat posed by OpenAI and other LLM providers and accelerated its own efforts to catch up. Those efforts led to Google releasing two LLM-based products over the course of the next year. The first was "Bard," now known as "Gemini," which is a standalone, LLM-based chat product similar to ChatGPT. The second Google LLM-based product was "Search Generative Experience" or "SGE," now known as "AI Overviews," which Google deploys directly on its SERP.

115.    Both Bard/Gemini and SGE/AI Overviews constitute forms of online publishing. Google trained the models underlying those products on digital publishers' content and uses that content as inputs to prompt outputs from those products as well, which means that Google once again is using digital publishers' own content to compete against them.

116.    By 2023, Google had tacitly recognized that the "fundamental fair exchange" that had previously sustained the web would require a rethink for the AI era. As Google acknowledged, "existing web publisher controls were developed before new AI and research use cases," and "a vibrant content ecosystem" demands that "web publishers hav[e] choice and control over their content, and opportunities to derive value from participating in the web ecosystem."[36] Despite this acknowledgment, Google proceeded to deprive PMC (and countless other publishers) of choice and control over its content, by conditioning PMC's appearance in search results on PMC permitting Google to use its content to feed Google Search's artificial intelligence features. This coercive "deal"—the opposite of choice and control—was made possible only by Google's

---

[35] *U.S. v. Google*, Tr. Trans. (Nadella) 3532:5-11.
[36] Google, *A principled approach to evolving choice and control for web content* (July 6, 2023), https://blog.google/technology/ai/ai-web-publisher-controls-sign-up.

overwhelming monopoly power in search. Google itself recognized the coercive nature of this deal, explaining in internal documents publicly produced in the Government Search Case that it "is considered a forced choice" for publishers.[37] Put simply, Google's monopoly power in search gives it monopsony power in the Input Market for publishing content that drives search results—content which Google secures at below competitive rates.

117.    PMC's Terms of Use expressly prohibit Google's unlawful conduct. Under PMC's Terms of Use, users of PMC websites are prohibited from using the websites' content to train artificial intelligence, machine learning models, automated processing tools, or other algorithms or software systems. PMC's Terms of Use also prohibit users from using artificial intelligence systems, machine learning models or tools, software robots, spider, crawlers, or other data gathering, analysis or extraction tools, to access, acquire, copy, monitor, scrape or aggregate PMC's content "except for a public search engine's use of spiders solely for creating search indices that surface links to our Services."[38]

118.    In the Government Search Case, Google competitor Microsoft predicted during the liability trial that LLMs would complete a merging between search and online publishing in which Google would dominate:

> Q:  And is there any expectation, at least in the foreseeable future, that these LLMs, these ChatGPT products, are going to replace Internet search?
>
> A:  . . . I believe the search category by itself will fundamentally change, because there's a new way to think about answering questions using LLMs versus sort of just giving you the 10 blue links . . . .[39]

119.    However, one crucial difference has emerged between Google and products on the competitive fringe that seek to merge search results into AI-generated answers in this way: the

---

[37] PXR0026 at -303-304, *U.S. v. Google* (Remedies Hearing Exhibits).
[38] PMC, Terms of Use, https://www.pmc.com/terms-of-use (May 2, 2023).
[39] *U.S. v. Google*, Tr. Trans. (Nadella) at 3529:10-17.

non-monopolists are paying for at least some publisher content. Other GAI companies have announced licensing deals in which they pay some (but not all) publishers for this use.[40] Google, by contrast, through the exercise of its monopoly power in General Search Services, avoids this cost of acquiring publisher content and gains an unfair commercial advantage over new entrants in order to extend and entrench Google's General Search Services monopoly in the potentially competitive new age of AI-assisted search.

120.    For example, during the remedies phase of the Government Search Case, OpenAI's Head of Product for ChatGPT testified that OpenAI lacks the "leverage" that Google has "over the ecosystem because we provide less traffic" to publishers.[41] This restricts OpenAI's ability to effectively compete with Google.

121.    The D.C. District Court recognized in the Government Search Case remedies opinion that Google's monopolistic leverage has contributed to "an increasingly existential problem faced by publishers and digital content creators: diminishing traffic to their websites."[42] As the Court explained:

> With Google specifically, publishers are caught between a rock and a hard place. Because publishers rely heavily on Google to drive traffic to their sites, they have little choice but to allow Google to crawl their content for inclusion in Google's search index. Publishers, however, might want to deny Google permission to use its content to train and appear in its GenAI offerings, like AI Overviews, unless compensated. But Google does not offer such full optionality.

If a publisher does not want Google to display its content in AI Overviews, the court explained, "it could accomplish that under Google Extended only by opting out of being crawled altogether.

---

[40] Harmon, G., *OpenAI, Perplexity secure more publisher licensing deals*, EMARKETER (Dec. 5, 2024), https://www.emarketer.com/content/openai--perplexity-secure-more-publisher-licensing-deals.
[41] *U.S. v. Google*, Remedies Hr'g Tr. (Turley) 461:20-462:5.
[42] *United States v. Google LLC*, No. 20-CV-3010 (APM), 2025 WL 2523010, at *97 (D.D.C. Sept. 2, 2025) (citations omitted).

But that is not a tenable choice, as it may mean the publisher's absence from Google's search index and its non-appearance on the SERP, which is critical to directing user traffic to their site."[43] The "rock and a hard place" described by the court is paradigmatic coercion. Publishers are caught between either permitting Google's underpayment or suffering existential search traffic declines.

122.    As the CEO of publisher People Inc. Neil Vogel explained in September 2025: "The fundamental thing that Google is doing right now is using their market power to make sure we can't take back leverage. . . . What Google does, and this is fundamental and everybody needs to know this, is Google uses one crawler. They use one crawler for search and AI, so it makes it unblockable for us. We can block everybody else, take back leverage, say, 'You know what? You don't want to pay us? Great. You don't have to. Godspeed. Live without us. We don't care.' Google doesn't let you do that. . . .  [W]hat they do is, it's one crawler, so if we block them, we then block search also. And even in a depleted state, search is still obviously material to us like it is to everybody else here."[44] Chairman and CEO of Vox Media, Jim Bankoff, agreed: "[Google] has a dominant position in search, and that dominant position gives them the leverage that [People Inc. CEO] Neil [Vogel] is talking about."[45]

123.    As Adam Gallagher of the recipe website Inspired Taste explained in November 2025: "[W]e can't block Google. We can't be a martyr. They're holding us hostage. There's not much we can do, honestly. . . . [T]here's not much we can do unless the big gatekeeper like Google

---

[43] *Id.*
[44] Watch Our Livestream Replay: Wired's AI Power Summit, *supra*, at 1:12:21.
[45] *Id.* at 1:14:25.

changes their ways because we actually currently right now, we block ChatGPT, Perplexity, and all of those other answer engines because for us there's zero benefit. . . . [46]

124.    Google's coercive power over publishers is a result of Google's unlawful maintenance of its search monopoly. To address the harmful effects of Google's exercise of this coercive power, in the Government Search Case, the Government sought to have the court require Google to provide greater flexibility to publishers to opt out of Google's use of their content or domain to develop a Google product (the "publisher opt out remedy").

125.    The district court declined to impose this so-called "publisher opt-out remedy" proposed by the Government. The court justified its decision on the lack of a developed factual record regarding "enhancing publisher control" over Google's use of indexed content and the court's view that the proposed remedy "does not fit the wrong" stemming from "Google's contractual arrangements with GSE distributors."[47] As the Court put it: "The court does not doubt that publishers face new challenges because of GenAI technologies, but there can be no cure without evidence to support it."[48]

126.    The court later observed that AI search has the potential to dynamically compete with and replace Google's existing search monopoly.[49] But that robust competition cannot happen if Google's leverage over publishers from traditional search gives it an unlawful advantage over

---

[46] Marketing O'Clock Episode #409: Brand Query Filters in SC (Nov. 24, 2025), available at d3ctxlq1ktw2nl.cloudfront.net/staging/2025-10-22/412974947-44100-2-fa5503f70b8e9.mp3, at 57:30-59:04.

[47] *United States v. Google*, 2025 WL 2523010, at *97-98.

[48] *Id.*

[49] *Id.* at *61 ("[T]oday, established technology companies are making, and start-ups are receiving, hundreds of billions of dollars in capital to develop GenAI products that pose a threat to the primacy of traditional internet search. . . . These companies already are in a better position, both financially and technologically, to compete with Google than any traditional search company has been in decades (except perhaps Microsoft).").

its AI search competitors. The only way to rectify this competitive imbalance is to hold Google accountable for exploiting its monopoly power to take publisher content for free.

127.    Web ecosystem participants have repeatedly recognized that Google's refusal to permit publishers to opt out of Google using their content for AI purposes gives Google an unlawful advantage over other potential competitors. As the CEO of Internet security company Cloudflare has explained, "With no action, you're going to slow down AI innovation by all of the other AI companies. You're going to hand Google a unique advantage that nobody else has, and you're going to kill new potential startups from getting involved."[50]

128.    The value of publisher content for republishing and for use in training and grounding LLMs (like the Gemini technology that powers Google's AI Overviews embedded in Google's General Search Services) is concrete, not hypothetical. There are numerous real-world examples confirming the value of online publishing content for republishing and for use in training and grounding LLMs.[51]

129.    For example, online publisher Wiley has reached content licensing deals for its online offerings with Perplexity, Amazon Web Services, Potato, and other undisclosed large technology companies.[52] Online news publishers have entered into a host of content licensing

---

[50] Jessica Davies, *Cloudflare CEO Matthew Prince on why Google must 'play by the same rules' as other AI companies*, DIGIDAY (Oct. 27, 2025), https://digiday.com/media/cloudflare-ceo-matthew-prince-on-why-google-must-play-by-the-same-rules-as-other-ai-companies.

[51] Charlotte Tobitt, *Who's suing AI and who's signing: Brazilian newsbrand sues OpenAI and Japanese newspaper sues Perplexity*, PRESSGAZETTE (Aug. 29, 2025), https://pressgazette.co.uk/platforms/news-publisher-ai-deals-lawsuits-openai-google.

[52] John Wiley & Sons, Inc., Wiley and Perplexity Announce New AI Search Partnership (May 8, 2025), https://newsroom.wiley.com/press-releases/press-release-details/2025/Wiley-and-Perplexity-Announce-New-AI-Search-Partnership/default.aspx; John Wiley & Sons, Inc., *Wiley Announces Collaboration With Amazon Web Services (AWS) to Integrate Scientific Content Into Life Sciences AI Agents* (May 5, 2025), https://newsroom.wiley.com/press-releases/press-release-details/2025/Wiley-Announces-Collaboration-With-Amazon-Web-Services-AWS-to-Integrate-Scientific-Content-Into-Life-Sciences-AI-Agents/default.aspx; Milliot, J., *Wiley Creates AI*

agreements with LLM companies.[53] And the New York Times has entered into a licensing agreement with Amazon permitting Amazon to use the Times's material to train Amazon's proprietary AI models.[54]

130.    The Association of American Publishers has identified over 50 AI licensing deals for textual works entered into by Amazon, Dow Jones, LexisNexis, Meta, Microsoft, OpenAI, Perplexity, Potato, ProRata.ai.[55] Several of these deals were entered into with participants in the online publishing market, such as Buzzfeed, Condé Nast, and Forbes.

131.    Google itself is in talks with news publishers to license content for AI training[56] and recently hired a "Head of News Product" tasked with "lead[ing] AI and content licensing deals" with publishers.[57]

---

*Partnership Program*, PUBLISHERS WEEKLY (OCT. 17, 2024),
https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/96248-wiley-creates-ai-partnership-program.html; Milliot, J., *Wiley Wraps Up Divesture Program, Looks at AI Opportunities*, PUBLISHERS WEEKLY (Sept. 5, 2024),
https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/96248-wiley-creates-ai-partnership-program.html.

[53] For example, OpenAI entered into licensing agreements with Axel Springer, the Associated Press, Condé Nast, News Corp, The Atlantic, Vox Media, and Dotdash Meredith; Perplexity entered into licensing agreements with Time, Der Spiegel, The Los Angeles Times, Fortune, Entrepreneur, The Texas Tribune, and Automattic; and Prorata.ai entered into licensing agreements McClatchy, MIT Technology Review, Lee Enterprises, The Financial Times, Fortune, Axel Springer, and The Atlantic. *See U.S. v. Google*, Case No. 20-cv-03010 (D.D.C.), Dkt. 1327 at 13-14.

[54] Grynbaum, M. & Metz, C., *The Times and Amazon Announce an A.I. Licensing Deal*, N.Y. TIMES (May 29, 2025), https://www.nytimes.com/2025/05/29/business/media/new-york-times-amazon-ai-licensing.html.

[55] *See* Brief of Amicus Curiae Association of American Publishers in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 535, *Kadrey v. Meta*, 3:23-cv-3417-CV (Apr. 11, 2025), at 12.

[56] Julia Love, *Google in Licensing Talks With News Groups, Following AI Rivals*, BLOOMBERG (July 22, 2025), https://news.bloomberglaw.com/ip-law/google-in-licensing-talks-with-news-groups-following-ai-rivals.

[57] https://www.linkedin.com/in/alykhan-kurji-6ba96526/.

132.    Google's use of publisher content to drive its generative AI models benefits Google in multiple ways. Google gets valuable AI training and grounding content for free. This perpetuates Google's unlawful monopoly in search by putting it at a competitive advantage over emerging AI-powered search alternatives. Google also benefits by retaining user attention (which would otherwise go to publishers), which Google can monetize for its own benefit through advertising to users. The cycle is self-perpetuating: When Google keeps users inside its own products, it has the opportunity to collect more information on those users, enabling Google to further target them through personalized advertising placements.

F.    **How Google's GAI Products Work**

133.    The LLMs at the heart of Google's GAI products are called "generative" AI because they are capable of generating content, such as text, images, audio, or other data, rather than simply analyzing existing data. An LLM works by predicting words that are likely to follow a given string of text based on the potentially billions of examples used to train it. They use algorithms to weigh the relevance of different parts of the input data when generating text. LLM operators "train" their models on vast datasets of written material, allowing them to encode patterns and relationships between words and sentences.

134.    Once trained, LLMs can generate human-like text by taking a seed input (*e.g.*, a question or prompt) and iteratively predicting the most likely next word based on the patterns it has learned. Through this process, LLMs can generate answers to questions about information that is included in their training data. They are also capable of taking documents as input, then summarizing or answering questions about those documents. The quality of the output depends on the size of the model, the diversity of training data, and the specific architecture and training techniques used.

135.    To develop its LLMs, Google must first select a training dataset (i.e., a massive collection of works) upon which to train the models. Google included PMC's proprietary works in the training datasets for its models, including by scraping works from PMC's websites.

136.    Next comes model training, which means the process of encoding the information from the training corpus that they use to make predictions as numbers called "parameters." Training involves storing encoded copies of the training works in computer memory, repeatedly passing them through the model with words masked out, and adjusting the parameters to minimize the difference between the masked-out words and the words that the model predicts to fill them in.

137.    After being trained on a general corpus, models may be further subject to "fine-tuning" by, for example, performing additional rounds of training using specific types of works to better mimic their content or style, or providing them with human feedback to reinforce desired or suppress undesired behaviors.

138.    Models trained in this way are known to exhibit a behavior called "memorization."[58] That is, given the right prompt, they will repeat large portions of many materials they were trained on. This phenomenon shows that LLM parameters encode retrievable copies of many of those training works.

139.    In addition to "memorization," once trained, LLMs may also be deployed in conjunction with a technique called "retrieval-augmented generation" ("RAG"). RAG, also known as "grounding," refers to a technique or process that involves connecting an LLM to external sources of information, such as live search results, to improve the quality of its outputs. Using this method, Google's GAI products: (1) receive a prompt from a user, such as a question; (2) obtain

---

[58] Van den Burg, G., *et al.*, *On Memorization in Probabilistic Deep Generative Models*, NEURIPS (2021), available at https://proceedings.neurips.cc/paper/2021/file/eae15aabaa768ae4a5993a8a4f4fa6e4-Paper.pdf.

and copy content from its search index relating to the prompt; (3) combine the original prompt with the retrieved copied content in order to provide additional context; and (4) provide the combined data to an LLM, which generates a natural-language response.

140.    In simpler terms, RAG consists of finding relevant content online ("retrieval") and paraphrasing that content using GAI ("generation"). Google then publishes the "new" derivative content to the user, sometimes in boxes on its SERP. But while Google's RAG-generated content may appear on its SERP, it should not be confused with a search result, because the intent is not for users to navigate to the original sources of the information. Rather, like all publications, the intent is simply for users to consume the content where it is displayed.

1.    *Bard*

141.    In February 2023, Google unveiled "Bard," its response to ChatGPT. Bard is an advanced chatbot that responds, in a human-like manner, to user questions and prompts. According to Google, "Bard seeks to combine the breadth of the world's knowledge with the power, intelligence and creativity of our large language models" and "draws on information from the web to provide fresh, high-quality responses."[59] Google released Bard publicly on May 10, 2023. That same month, Bard's website had 142.6 million visits.[60]

142.    Bard was originally powered by an LLM known as Language Model for Dialogue Applications ("LaMDA"). In May 2023, Google unveiled a new LLM called PaLM 2, which uses

---

[59] Pichai, S., *An important next step on our AI journey*, GOOGLE (Feb. 6, 2023), https://blog.google/technology/ai/bard-google-ai-search-updates/.
[60] Carr, D., *As ChatGPT Growth Flattened in May, Google Bard Rose 187%*, SIMILARWEB (June 5, 2023), https://www.similarweb.com/blog/insights/ai-news/chatgpt-bard/.

nearly five times the amount of text data for training—over 3.6 trillion tokens.[61] PaLM 2 was then thought to be the most powerful LLM in existence.

2.    *Gemini*

143.    On December 6, 2023, Google announced Gemini, a multimodal AI system that Google called "its most capable and general model yet," able to "generalize and seamlessly understand, operate across and combine different types of information including text, code, audio, image and video."[62] Google also announced that Gemini would be used to power Bard, marking "the biggest upgrade to Bard since it launched."[63]

144.    Google continued to rapidly develop and expand Gemini in 2024. On February 8, Google announced that the Bard chatbot product would be rebranded as "Gemini" to reflect Gemini's status as "our most capable family of models."[64] Google on the same day unveiled Gemini Advanced, which was powered by Gemini Ultra 1.0, Google's "largest and most capable state-of-the-art AI model."[65] Google promoted Gemini Advanced as "far more capable at highly complex tasks like coding, logical reasoning, following nuanced instructions and collaborating on creative projects."[66] Google has since updated the model powering Gemini Advanced multiple

---

[61] Elias, J., *Google's newest A.I. model uses nearly five times more text data for training than its predecessor*, CNBC (May 16, 2023), https://www.cnbc.com/2023/05/16/googles-palm-2-uses-nearly-five-times-more-text-data- than-predecessor.html.

[62] Pichai, S. & Hassabis, D., *Introducing Gemini: our largest and most capable AI model*, GOOGLE (Dec. 6, 2023), https://blog.google/technology/ai/google-gemini-ai/#introducing-gemini.

[63] *Id.*

[64] Hsiao, S., *Bard becomes Gemini: Try Ultra 1.0 and a new mobile app today*, Google (Feb. 8, 2024), https://blog.google/products/gemini/bard-gemini-advanced-app/.

[65] *Id.*

[66] *Id.*

times. On December 11, 2024, Google released Gemini 2.0, which it billed as its "most capable model yet."[67] Google currently bills Gemini 2.5 pro as its "most capable model."[68]

145.    Outside observers specifically cited Google's monopoly in search as contributing to Gemini's superiority to ChatGPT, in terms of the former's ability to integrate information from the live web into outputs. One article explained that, while many websites blocked OpenAI's web crawlers, Google's web crawlers remain largely free to index the web, "likely due to its position as the most popular search engine."[69] Another article similarly explained how "Gemini proves to be slightly more adept than ChatGPT when it comes to online searching and integrating the information it finds into its responses," including because of Google's superior access to the web "from day one."[70] Gemini thus relies on and benefits from Google's monopoly in the General Search Services market.

146.    Google has also incorporated Gemini into Chrome's omnibox (i.e., the address bar), providing users with quick and easy access to the chatbot.[71] A May 2024 article described this

---

[67] Pichai, S., Hassabis, D., & Kavukcuoglu, K., *Introducing Gemini 2.0: our new AI model for the agentic era*, GOOGLE (Dec. 11, 2024), https://blog.google/technology/google-deepmind/google-gemini-ai-update-december-2024/#ceo-message.

[68] Gemini landing page, https://gemini.google/advanced/ (last accessed Sept. 12, 2025).

[69] Edwards, B., *Google debuts more powerful "Ultra 1.0" AI model in rebranded "Gemini" chatbot*, ARSTECHNICA (Feb. 8, 2024), https://arstechnica.com/information-technology/2024/02/google-debuts-more-powerful-ultra-1-0-ai-model-in-rebranded-gemini-chatbot/.

[70] Marr, B., *AI Showdown: ChatGPT Vs. Google's Gemini – Which Reigns Supreme?*, FORBES (Feb. 13, 2024), https://www.forbes.com/sites/bernardmarr/2024/02/13/ai-showdown-chatgpt-vs-googles-gemini--which-reigns-supreme.

[71] Chen, J., *Chrome's New Built-In AI Is the Biggest Update to the Browser in Over 15 Years*, INVERSE (May 1, 2024), https://www.inverse.com/tech/google-chrome-gemini-ai-browser.

change as "the first step towards AI Search."[72] In November 2025, Google announced that it would begin using Gemini 3 in AI Mode and AI Overviews.[73]

147.     Gemini resembles OpenAI's ChatGPT. It contains a box at the bottom of the screen that invites users to input "prompts." Gemini then generates textual or image-based responses that appear directly below the user's prompt. When a user inputs a prompt, Gemini generates content summarizing relevant information. For example, the below screenshot shows that in response to a February 2025 prompt, "Tell me about the history of baseball," Gemini generated a 353-word response summarizing baseball's history:

---

[72] *Id.*
[73] Elizabeth Reid, *Google brings Gemini 3 AI model to Search and AI Mode* (Nov. 18, 2025), https://blog.google/products/search/gemini-3-search-ai-mode.

Tell me about the history of baseball



The history of baseball is rich and complex, with roots that stretch back centuries. Here's a breakdown of key aspects:

**Early Origins:**

- **Ancient Roots:**
  - Games involving bats and balls have existed in various forms throughout history.
  - Games similar to baseball can be traced to earlier games like rounders and cricket in England.
- **19th Century Development:**
  - In the early 19th century, variations of these games were played in the United States.
  - The New York Knickerbockers, formed in 1845, played a crucial role in standardizing the rules of baseball.
  - Alexander Joy Cartwright is credited with codifying many of the rules that shaped modern baseball.

**Growth and Popularization:**

- **Mid-19th Century:**
  - Baseball's popularity surged in the mid-1800s, especially in urban areas.
  - The National Association of Base Ball Players (NABBP) was formed, establishing organized play.
- **The Civil War:**
  - The Civil War helped spread baseball's popularity as soldiers from different regions played the game.
- **Professional Leagues:**
  - The first professional baseball teams emerged in the late 1860s.
  - The National League was founded in 1876, marking a significant step in the development of professional baseball.
  - The American League was founded in 1901, and shortly there after, the world series began.

**Key Developments:**

- **The Color Line:**
  - For much of its history, baseball was segregated.
  - Jackie Robinson's breaking of the color barrier in 1947 was a landmark moment in sports and American history.
- **The 20th Century:**
  - Baseball became known as "America's pastime," with iconic figures like Babe Ruth, Lou Gehrig, and Joe DiMaggio.
  - The sport has faced challenges, including scandals and labor disputes, but has maintained its popularity.
- **The Negro Leagues:**
  - It is very important to remember the Negro Leagues, that produced some of the best baseball players in history. Due to segregation, these players were unable to play in the Major Leagues until Jackie Robinson broke the color barrier.

**Modern Baseball:**

- Baseball continues to evolve, with changes in rules, technology, and player development.
- It remains a popular sport in the United States and has gained international recognition.

I hope this overview of baseball's history is helpful.

👍 👎 C ↗ ⋮

＋  Ask Gemini                                                          🎤

Gemini can make mistakes, so double-check it

148.    Gemini thus generates and publishes "original" content in response to certain prompts. Notably, this example contains zero links to third-party content.

### 3.    *Search Generative Experience*

149.    In May 2023, Google unveiled its Search Generative Experience ("SGE") (later rebranded as "AI Overviews") product, which integrates generative artificial intelligence into Google's search functionality.[74] Google's announcement promised that "we're taking more of the

---

[74] Reid, E., *Supercharging Search with generative AI*, GOOGLE (May 10, 2023), https://blog.google/products/search/generative-ai-search/.

work out of searching, so you'll be able to understand a topic faster, uncover new viewpoints and insights, and get things done more easily."[75]

150.    SGE is designed to "show an AI-powered snapshot" in response to user queries, "help[ing] people quickly get an overview on a topic."[76] While the results of an SGE search will include links to content on the web, the interface is designed to keep users within SGE, as opposed to exploring the web. SGE invites users "to ask follow-up questions" and provides specific suggestions for such follow-up questions. Clicking them "takes you to a new conversational mode, where you can ask Google more about the topic you're exploring."[77] Google also promises that context is "carried over from question to question; to help you more naturally continue your exploration."[78] All the while, users remain within Google's SGE system, where Google will continue displaying Search ads, giving advertisers "the opportunity to reach potential customers along their search journeys."[79] Google specifically touts SGE's impact on online shopping, promising that SGE will deliver "product descriptions that include relevant, up-to-date reviews, ratings, prices and product images."[80]

151.    Initially, SGE was released in an experimental phase. To access it, most users needed to opt in through the "Search Labs" portion of their Google Account, as shown in the below image:

---

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*



152.    In March 2024, Google began testing SGE on users who did not opt in. This limited rollout impacted "a subset of queries, on a small percentage of search traffic in the U.S, beginning with queries for which Google "thinks generative AI can be especially helpful."[81] Outside commentators at the time predicted that Google might launch SGE for all users that May during its annual I/O developer conference.[82]

4.    *AI Overviews and AI Mode*

153.    They were right. On May 14, 2024, in connection with its annual I/O develop conference, Google announced the roll-out of SGE, rebranded as "AI Overviews," to everyone in the United States, with additional countries to follow shortly thereafter. This launch immediately provided AI Overviews to "hundreds of millions of users," with Google expecting to reach "over a billion people by the end of the year."[83] A Google blog post summarizing these developments touted how "Now, with generative AI, Search can do more than you ever imagined. So you can ask whatever's on your mind or whatever you need to get done — from researching to planning to

---

[81] Schwartz, B., *Google starts testing AI overviews from SGE in main Google search interface*, SEARCHENGINELAND (Mar. 22, 2024), https://searchengineland.com/google-starts-testing-ai-overviews-from-sge-in-main-google-search-interface-438680.

[82] Schwartz, B., *Google still has not announced a launch date for SGE*, SEARCHENGINELAND (Mar. 28, 2024), https://searchengineland.com/google-still-has-not-announced-a-launch-date-for-sge-438862.

[83] Reid, L., *Generative AI in Search: Let Google do the searching for you*, GOOGLE (May 14, 2024), https://blog.google/products/search/generative-ai-google-search-may-2024/.

brainstorming — and Google will take care of the legwork."[84] As one example, "with just one search, you'll be able to ask something like 'find the best yoga or pilates studios in Boston and show me details on their intro offers, and walking time from Beacon Hill,'" without having to navigate to any actual website.[85]

154.    Google's AI Overviews rely on a "new Gemini model customized for Google Search," which "brings together Gemini's advanced capabilities — including multi-step reasoning, planning and multimodality — with our best-in-class Search systems."[86]

155.    By August 15, 2024, Google made AI Overviews available for all users in the United States, even those who are not signed into Google accounts.[87]

156.    In March 2025, Google announced that it had expanded AI Overviews and introduced a new, experimental "AI Mode."[88] In AI Mode, a user query results in an AI-generated answer only and no SERP is provided at all. As for AI Overviews, Google began to show AI Overviews in response to user search queries even more often, and the overviews went even further in answering user queries and reducing user incentives to click through to publishers' websites.

157.    In May 2025, Google announced that it was making AI Mode available to all U.S. users, regardless of whether they are signed into Google. Google's CEO described the change as a "total reimagining of search."[89]

---

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] Schwartz, B., *Google AI Overviews now show for signed-out users in the US*, SEARCHENGINELAND (Aug. 15, 2024), https://searchengineland.com/google-ai-overviews-now-show-for-signed-out-users-in-the-us-445232.

[88] Google, *Expanding AI Overviews and introducing AI Mode* (Mar. 5, 2025), https://blog.google/products/search/ai-mode-search/.

[89] Google, *Google I/O 2025: From research to reality* (May 20, 2025), https://blog.google/technology/ai/io-2025-keynote/.

158.    The resulting product all but completes Google's evolution from a "search engine" to an "answer engine" that publishes answers to user's queries. Its formerly symbiotic and complementary relationship with publishers has now become overwhelmingly parasitic and competitive. The top of the SERP no longer presents the most relevant links to publishers that have allowed Google to crawl and copy the contents of their sites in exchange for Search Referral Traffic. Instead, pride of place goes to a machine-made essay consisting of multiple paragraphs purporting to provide the information that a user is searching for generated by an AI model from the very same publisher content that the user otherwise might have visited to learn the answer.

159.    Google's transition from a search engine to an answer engine is reflected in Google's own internal documents, made public in the Government Search Case. One email shows a Google product manager imagining Google's CEO in 2035 reflecting on the past decade and remarking, "We thought we were in the finding business. Little did we know, we were also in the corpus business."[90]

160.    Indeed, Google admits in AI Overviews that Google's GAI products, such as Featured Snippets, "are designed to answer a search query directly in the search results, without needing to click through to a website"—a stark departure from Google's founding principle.

---

[90] PXR0105 at -304, *U.S. v. Google* (Remedies Hearing Exhibits).



161.    Even more tellingly, the AI Overview itself confirms that its purpose is to "deliver a fast and easy way to access relevant information at a glance" by "allowing [users] to grasp complex subjects without needing to click through multiple websites to find the answer." In other words—Google's goal is for users not to leave the Google search ecosystem by exploring organic search results because it provides "key information directly on the search results page."



55

162.    Google similarly describes AI Mode as providing "comprehensive" responses to and "expand[ing] on AI Overviews" by "offering detailed, fact-based summaries" from "high-quality web based sources."



163.    In the example below, Google's AI Overview paraphrases the first organic search result from wwd.com without providing any attribution or link to WWD.



164.    Only by expanding the AI Overview—which also expands the information provided directly on the SERP in response to the user's query—would a user find the original source that Google mined from its search index to generate its answer. But a user who is satisfied with the AI Overview answer will have little reason to click on the link card.



165.    Even a user who does click on a link card will first be presented with snippets from the source webpages on Google's SERP. Only by drilling down with still more clicks will the user navigate to an original source. And even when AI Overviews provide links, they do not always provide attribution to the sources from which Google derived the content. This cannibalization of user attention, of click-through rates, and of search referrals breaks the fundamental bargain that sustains the Internet.

166.    The example below similarly shows Google's AI Overviews paraphrasing the first organic search result, this time from Rolling Stone's website, rollingstone.com. Again, a user satisfied with the AI Overview answer will have little reason to click through to the original source.



167.    Like AI Overviews, Google's AI Mode uses publishers' own content to compete against them. In the example below, Google's AI Mode paraphrases a Hollywood Reporter article about the winners of the MTV Video Music Awards, obviating the need for a user to click through to obtain the information from the original source.



168.    In another example, asking AI Mode about Deadline's June 26, 2025 article "Tastemade Launches Exclusive Smokehouse Channel With Pluto TV" serves the user a response parroting the article. The link to Deadline's article appears next to the AI Mode response, but there is little reason for the user to click through to deadline.com because the article's content largely appears in the AI Mode response.



169.    Each of these four examples are articles which human writers, reporters, and editors spent their time, labor, and creativity to create. Google takes all of this content for free, without compensating them for their research and writing.

170.    Google exacerbates the self-preferencing effects of AI Overviews by presenting users with "Dive deeper in AI Mode" or "Follow up in AI Mode" buttons. These buttons are larger and more visible than the icons Google uses to link to websites from which AI Overviews are sourced. Users who click on these prominent buttons are directed to Google's AI Mode, with the effect of further encouraging users to remain within Google's ecosystem rather than navigate to original content on publishers' sites.

171.    The above examples also illustrate how Google's AI Overviews and AI Mode responses compete directly with online publishers. This is consistent with data on the types of search queries that Google receives, which show users overwhelmingly searching for

informational content of the type PMC provides. In a study published in May 2025, content marketing platform Semrush found that nearly 90% of the queries that trigger an AI Overview are informational.[91] The D.C. District Court similarly found in the Government Search Case that 80% of Google's queries are noncommercial in nature.[92] Instead of responding to users' informational queries by directing users to PMC's or another publisher's website, Google serves the user content directly, in an AI Overviews or AI Mode response based on content lifted from online publishers, including PMC.

### G.    Google's Unauthorized Use of Publisher Content for AI Training

172.    Google's abuse of its General Search Services monopoly to suborn publisher content for its own purposes is not limited to forcing publishers to acquiesce to the republication in AI Overviews of works that they are compelled to allow to be indexed in exchange for Search Referral Traffic. As noted, Google also uses that same content without permission to train the AI models that it uses to generate those AI Overviews.

173.    Google has been intentionally vague in identifying the precise data sets used to train the LLMs underlying Gemini and AI Overviews.[93] But third-party research and Google's own public statements show that a huge number of PMC works were included in data sets used to train its earlier models. Inasmuch as the enhanced capability of subsequent models depends in large part on the quantity of data used to train them, the training sets of Google's current models are an

---

[91] *Semrush AI Overviews Study: What 2025 SEO Data Tells Us About Google's Search Shift*, SEMRUSH BLOG (May 4, 2025), https://www.semrush.com/blog/semrush-ai-overviews-study.
[92] *United States v. Google LLC*, 747 F. Supp. 3d at 40.
[93] Wiggers, K., *Google's Gemini isn't the generative AI model we expected*, TECHCRUNCH (Dec. 6, 2023), https://techcrunch.com/2023/12/06/googles-gemini-isnt-the-generative-ai-model-we-expected/ ("Google repeatedly refused to answer questions from reporters about how it collected Gemini's training data, where the training data came from and whether any of it was licensed from a third party.").

aggregation of the earlier training sets that have been shown to include large quantities of PMC works.

174.    According to Google, 12.5% of the training data for its LaMDA model came from a "C4" dataset, a specially filtered version of Common Crawl—a "copy of the Internet" made available by an eponymous 501(c)(3) organization run by wealthy venture capital investors. Google developed C4, which stands for "Colossal Clean Crawled Corpus," in 2020.[94]

175.    A 2023 report from the News Media Alliance ("NMA") states:

> [S]tudies show that news and digital media ranks third among all categories of sources in Google's C4 training set, which was used to develop Google's GenAI-powered search capabilities and products like Bard. Half of the top ten sites represented in the training set are news outlets.

176.    A 2024 study by Ziff Davis[95] found that PMC domains (represented in the chart below by reference to Penske) were among the largest news and media publishers represented in Google's C4 training dataset:

---

[94] https://www.searchenginejournal.com/google-bard-training-data/478941/#close.
[95] Wukoson & Fortuna, *The Predominant Use of High-Authority Commercial Web Publisher Content to Train Leading LLMs*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5009668.

| Publisher | Common Crawl | C4 | OpenWebText | WebText top 1000 | OpenWebText 2 |
|---|---|---|---|---|---|
| News Corp | 0.040% | 0.132% | 1.067% | 1.131% | 1.929% |
| The NY Times Co. | 0.005% | 0.048% | 1.242% | 1.737% | 1.287% |
| Advance | 0.030% | 0.108% | 0.940% | 1.222% | 1.236% |
| Vox Media | 0.007% | 0.023% | 0.743% | 0.905% | 1.210% |
| Gannett | 0.121% | 0.346% | 0.936% | 0.910% | 1.142% |
| Axel Springer | 0.053% | 0.053% | 0.562% | 0.791% | 0.809% |
| Ziff Davis | 0.033% | 0.134% | 0.539% | 0.877% | 0.656% |
| Alden Capital | 0.018% | 0.123% | 0.617% | 0.814% | 0.647% |
| Hearst | 0.048% | 0.130% | 0.504% | 0.431% | 0.573% |
| Penske | 0.016% | 0.068% | 0.343% | 0.552% | 0.561% |
| Washington Post | 0.002% | 0.022% | 0.933% | 1.645% | 0.556% |
| Buzzfeed, Inc. | 0.007% | 0.042% | 0.825% | 1.405% | 0.551% |
| Future | 0.031% | 0.154% | 0.296% | 0.383% | 0.420% |
| IAC | 0.022% | 0.134% | 0.311% | 0.602% | 0.387% |
| Bustle Digital Group | 0.006% | 0.039% | 0.056% | 0.064% | 0.082% |
| **Total** | **0.441%** | **1.555%** | **9.913%** | **13.470%** | **12.047%** |

177.    Google's LLMs also regurgitate publisher content on which they were trained in generating outputs. The LLMs can reproduce the content on which they were trained, demonstrating that the models retain and can memorize the expressive content of the training works.[96]

---

[96] News Media Alliance, *White Paper: How the pervasive copying of expressive works to train and fuel generative artificial intelligence systems is copyright infringement and not a fair use* at 1-2 (Oct. 20, 2023), https://www.newsmediaalliance.org/wp-content/uploads/2023/10/AI-White-Paper-with-Technical-Analysis.pdf) ("NMA White Paper").

178.    Google's Terms of Service indicate that it uses all the information that it collects

for search indexing, including PMC's data, to train its LLMs. On July 1, 2023, Google updated its

privacy policy to expressly state that it was using content it crawls from the web to train the models

that it uses to generate AI Overviews that compete with that same content for attention on the web:



publicly accessible sources

For example, we may collect information that's publicly available online or from other
public sources to help train Google's ~~language~~AI models and build products and features
like Google Translate, Bard, and Cloud AI capabilities. Or, if your business's information
appears on a website, we may index and display it on Google services.

179.    In response to media inquiries, Google made clear that this change in language did

not reflect a change in its practices, but was merely meant to clarify what it had been doing all

along:

> "Our privacy policy has long been transparent that Google uses publicly
> available information from the open web to train language models for
> services like Google Translate," said Google spokesperson Christa
> Muldoon to The Verge. "This latest update simply clarifies that newer
> services like Bard are also included."[97]

180.    In September 2023, Google purported to respond to publishers' concerns over the

use of their search content for AI-training purposes. Google announced a tool called "Google-

Extended," which effectively amounted to a tag publishers could implement in robots.txt.[98] Google

claimed that by implementing the Google-Extended control, publishers could choose whether their

---

[97] Weatherbed, J., *Google confirms it's training Bard on scraped web data, too*, THE VERGE
(July 5, 2023), https://www.theverge.com/2023/7/5/23784257/google-ai-bard-privacy-policy-train-web-scraping.

[98] Romain, D., *An update on web publisher controls*, GOOGLE (Sep. 28, 2023),
https://blog.google/technology/ai/an-update-on-web-publisher-controls/. *See also* Roth, E.,
*Google adds a switch for publishers to opt out of becoming AI training data*, THE VERGE (Sep.
28, 2023), https://www.theverge.com/2023/9/28/23894779/google-ai-extended-training-data-toggle-bard-vertex.

content could be used to "help improve Bard and Vertex AI generative APIs, including future generations of models that power these products."[99] But Google later clarified that this control prevented content indexed for search only from being used to improve models, not from being used to train them in the first place, or to generate the RAG answers that the models produce.[100]

181.    Regulators have likewise confirmed that Google trains its AI models using online publisher content. For example, the French competition agency, the Autorité de la Concurrence, issued a decision in March 2024 fining Google €250 million for training Bard and Gemini on online publishers' content without compensation. The press release accompanying the decision confirms the findings of the News/Media Alliance and Ziff Davis reports that Google misused publishers' content without permission or even notification:

> The Autorité found during its investigation that Google used content from the domains of press publishers and news agencies when training the foundation model of its artificial intelligence service and for the grounding (the sending of a query by the artificial intelligence service to Google Search, in order to provide an answer to the question posed by the user) and display (the displaying of the answer to the user) stages, without either the press agencies and publishers or the Autorité being informed of these uses.[101]

182.    Documents made public in connection with the Government Search Case show that in April 2024, Google considered how granular it would make publishers' ability to opt out of Google using their content for SGE training and grounding. Google drew a "hard red line" at

---

[99] Romain, D., *An update on web publisher controls*, GOOGLE (Sep. 28, 2023), https://blog.google/technology/ai/an-update-on-web-publisher-controls/.

[100] Monti, R., *Google Clarifies the "Google-Extended" Crawler Documentation*, SEARCH ENGINE JOURNAL (Feb. 9, 2024), https://www.searchenginejournal.com/google-clarifies-the-google-extended-crawler-documentation/507645/.

[101] https://www.autoritedelaconcurrence.fr/en/press-release/related-rights-autorite-fines-google-eu250-million-non-compliance-some-its.

permitting publishers to opt out of their data being used for grounding.[102] Why? Google recognized that grounding was "evolving into a space for monetization."[103]

183.    Google ultimately chose to give publishers no new options beyond the Google-Extended control. Tellingly, Google sought to avoid drawing attention to the ways in which it was using publisher content by recommending that Search "silently updat[e]" with "no public announcement" and not "get into the details" of training its models.[104] Google wanted to protect, and continue to add to, the golden corpus that it had obtained from publishers. Google also confirmed in the Government Search Case that even if publishers opt out of AI training through the Google-Extended program, Google *Search* still trains its AI models on the publishers' content. The Google-Extended Program does not apply to Google Search or AI Overviews. Even when publishers have chosen to opt out of training Google's AI products through Google-Extended, Google still trains its search-specific AI products, including AI Overviews, on their content.

## H.    The Fundamental Threat Google Poses to Online Publishing

184.    Traffic generated by search results is critical for PMC's business model. In recent years, almost all search referral traffic to PMC websites came from Google, and roughly half of all traffic to PMC websites came from Google. Google's misappropriation of PMC's content to train and ground its AI models, and the way that misappropriation allows Google to publish its own content—which in turn diminishes traffic to PMC's and other publishers' sites—threatens the very core of PMC's online publishing business.

185.    It is reasonably foreseeable that Google's forced entry into the online publishing output market will result in less traffic to other online publishers, less revenue to the online

---

[102] PXR0026 at -286, *U.S. v. Google* (Remedies Hearing Exhibits).
[103] *Id.* at -290.
[104] *Id.*

publishers that actually generate their own content, and, as a result, less online publishing content for consumers. As explained by analysts from S&P Global: "The rollout of AI Overviews could reduce traffic to [] websites if Google's AI engine provides an overview that fully covers the searched topic and therefore negates the need for the consumer to directly access the data on the publisher's website."[105]

186.    AI Overviews are "designed to streamline information retrieval, allowing users to quickly understand complex topics without navigating away from their initial search query."[106] Aptly summarized by a CNN reporter, "users will soon no longer have to click on the links displayed in search results to find the information they are seeking."[107] That day has arrived.

187.    Google itself admits that GAI-generated content cannibalizes publishers' search referral revenue because it diverts users' attention from the search results on the SERP. In a July 2023 presentation called "Generative Information Retrieval," Marc Najork, Distinguished Research Scientist at Google DeepMind, describing the "[e]ffects of Generative AI on web and search ecosystems," acknowledged: "Direct answers reduce search referral traffic."[108] He identified this reduction as "[m]ostly affecting informational queries."[109] "Direct answers" to such

---

[105] S&P Global, *Credit FAQ: U.S. Digital Publishers have Cause For Concern Over Google's AI Overviews* (May 23, 2024), https://www.spglobal.com/ratings/en/research/articles/240523-credit-faq-u-s-digital-publishers-have-cause-for-concern-over-google-s-ai-overviews-13118837.
[106] Mendes, L., *Google AI Overviews: Everything You Need to Know (and Think About)*, ROCKCONTENT (May 21, 2024), https://rockcontent.com/blog/google-ai-overviews/.
[107] Darcy, O., *News publishers sound alarm on Google's new AI-infused search, warn of 'catastrophic' impacts*, CNN (May 15, 2024), https://www.cnn.com/2024/05/15/media/google-gemini-ai-search-news-outlet-impact/index.html?utm_medium=email&utm_source=rasa_io&utm_campaign=newsletter.
[108] Marc Najork, *Generative Information Retrieval*, ACM DIGITAL LIBRARY (July 24, 2023), https://dl.acm.org/doi/abs/10.1145/3539618.3591871.
[109] *Id.*

queries, he confirmed, "reduce referrals to content providers hurting their ability to monetize" and "[p]ressure" publishers to "develop alternative revenue streams."[110]

188.    A February 2024 study conducted by Gartner, Inc., a research and consulting company, found that by 2026, traditional search engine volume will drop 25%.[111] And a March 2024 study conducted by Raptive, a company that provides services to online content creators, concluded that SGE, when fully rolled out, could result "in a substantial loss of advertising revenue for publishers," with declines in search traffic ranging from 20% to 60%.[112]

189.    These pronouncements are consistent with research on the effect of Google's "answer box"—a Featured Snippet precursor to AI Overviews—on Search Referral Traffic. A 2017 study analyzing two million answer box snippets found that they cause a significant drop in the click-through rate to websites appearing in regular, "organic" search results.[113]

190.    Outside observers have recognized the risks posed by GAI-assisted search to online publishers like PMC, focusing on how it diminishes user traffic to websites. For example, a January 2024 article addressing generative search warned that "[i]f you implement a new way that

---

[110] *Id.*

[111] Gartner, *Gartner Predicts Search Engine Volume Will Drop 25% by 2026, Due to AI Chatbots and Other Virtual Agents* (Feb. 19, 2024), https://www.gartner.com/en/newsroom/press-releases/2024-02-19-gartner-predicts-search- engine-volume-will-drop-25-percent-by-2026-due-to-ai-chatbots-and-other-virtual-agents#.

[112] Agius, N., *Google SGE could cost publishers $2 billion in ad revenue*, SEARCHENGINELAND (Mar. 14, 2024), https://searchengineland.com/googles-sge-publishers-ad-revenue-438411.

[113] *See* Soulo, T., *Ahrefs' Study of 2 Million Featured Snippets: 10 Important Takeaways*, AHREFS BLOG (May 30, 2017), https://ahrefs.com/blog/featured-snippets-study/; *see also* Schwartz, B., *Another study shows how featured snippets steal significant traffic from the top organic results*, SEARCHENGINELAND (May 30, 2017), https://searchengineland.com/another-featured-snippet-study-shows-steal-significanttraffic-first-organic-result-275967 (summarizing Ahrefs' study).

impacts the traffic coming to the site, it has dire consequences for the performance of a business entirely."[114] "[B]rands risk losses of 20% to 36% of total organic traffic."[115]

191.    Marc McCollum, chief innovation officer at Raptive, warned that "This change could put the future of the open Internet in danger."[116] As Kevin Roose, a technology journalist for the New York Times, similarly put it: "If A.I. search engines can reliably summarize what's happening in Gaza, or tell users which toaster to buy, why would anyone visit a publisher's website ever again? Why would journalists, bloggers and product reviewers continue to put their work online if an A.I. search engine is just going to gobble it up and regurgitate it?"[117]

192.    Google's misconduct has and will continue to divert user traffic away from PMC's websites, thereby reducing PMC's advertising, affiliate, and subscription revenue associated with website visits. If individuals can obtain PMC's highly valuable content directly through use of Google's products, without having to navigate to PMC websites, a substantial percentage of them will not visit those sites. PMC has seen significant declines in clicks from Google searches since Google started rolling out AI Overviews.

193.    Google wielded and will continue to wield its monopoly to coerce PMC into permitting Google to republish PMC's content in AI Overviews, and to use PMC's content for training and grounding its AI models. Google's conditioning of search traffic on the use of PMC's content for republishing, training, and grounding, has deprived and will continue to deprive PMC

---

[114] Ostwal, T., *Google's Gen-AI Search Is Powering 84% of Queries, Study Finds*, ADWEEK (Jan. 18, 2024), https://www.adweek.com/media/googles-gen-ai-search-is-powering-84-of-queries-study-finds/ (addressing Google's generative AI search feature).
[115] *Id.*
[116] https://www.cnn.com/2024/05/15/media/google-gemini-ai-search-news-outlet-impact/index.html?utm_medium=email&utm_source=rasa_io&utm_campaign=newsletter
[117] *Can This A.I.-Powered Search Engine Replace Google?*, N.Y. TIMES (Feb. 1, 2024), https://www.nytimes.com/2024/02/01/technology/perplexity-search-ai-google.html.

of the opportunity to make meaningful choices about how its content is used. PMC's only option is to opt out entirely from Google search, which would mean complete elimination from the SERP. But that would be devastating for PMC, which generates a material portion of its digital revenue (in the form of advertising, affiliate and subscription revenue) from search referrals.

194.    Since making AI Overviews broadly available to search users, Google has significantly increased its "coverage" of topics that are addressed on PMC's websites. Coverage refers to Google's use of AI Overviews to respond to queries of the sort posed by readers of PMC publications which typically return links to PMC websites in the organic search results on Google's SERP. Coverage measures how often Google generates AI Overviews in response to queries involving a given set of keywords within a specified time frame. From late 2024 through early 2025, the percentage of searches that both returned links to PMC websites in Google's organic search results and generated AI Overviews dramatically increased to approximately 20%, and that number is likely to increase further as Google expands its GAI search offerings.

195.    As Google has expanded the use of AI Overviews, PMC has experienced declines in search impressions and declines in search referral traffic. A material portion of PMC's revenue from its digital publications comes from digital advertising, and PMC's ability to attract advertisers and to earn advertising revenue from impressions is directly tied to the visitor traffic PMC receives. Search referral traffic to PMC content that contains affiliate links has dropped dramatically, resulting in decreased PMC affiliate revenues. Compared to PMC's peak, organic affiliate revenues across the portfolio have declined by more than a third by the end of 2024. This was a result of decreased referrals from Google Search. In short, Google Search now generates less traffic and fewer opportunities for PMC to convert site visits into advertising, affiliate, and subscription revenue.

196.    Google's rollout of AI Overviews has also increased the prevalence of "zero-click" searches on Google, impacting traffic to PMC's and other publishers' websites. Internet security company Cloudflare, which is used by roughly 20% of all websites on the Internet,[118] has reported that in its "dataset of news-related customers (spanning the Americas, Europe, and Asia), Google's referrals have been clearly declining since February 2025," a drop that coincides with Google's broad rollout of AI Mode in the United States.[119] Another study from April 2025 shows that Google's AI Overviews reduce click-through rates for publishers by as much as 34.5% for the top organic search result.[120] Bain and Company concluded in February 2025 that 60% of searches terminate without the user clicking through to another website.[121] According to the digital intelligence platform Similarweb, among searches with AI Overviews, the average zero-click rate is 83%.[122]

197.    Google's placement of AI Overviews above organic search results exacerbates the likelihood of zero-click searches. High placement on Google's SERP is a crucial component of driving traffic to online publishers' websites. Search users focus on the portion of the SERP that they can see without scrolling down, so a top-ranked search result is far more likely to receive

---

[118] W3Techs - World Wide Web Technology Surveys, *Usage statistics and market share of Cloudflare*, https://w3techs.com/technologies/details/cn-cloudflare (last accessed Nov. 28, 2025).
[119] Cloudflare, *The crawl-to-click gap: Cloudflare data on AI bots, training, and referrals* (August 29, 2025), https://blog.cloudflare.com/crawlers-click-ai-bots-training.
[120] Ahrefs, *AI Overviews Reduce Clicks by 34.5%* (April 17, 2025), https://ahrefs.com/blog/ai-overviews-reduce-clicks.
[121] Bain & Company, *Consumer reliance on AI search results signals new era of marketing* (Feb. 19, 2025), https://www.bain.com/about/media-center/press-releases/20252/consumer-reliance-on-ai-search-results-signals-new-era-of-marketing--bain--company-about-80-of-search-users-rely-on-ai-summaries-at-least-40-of-the-time-on-traditional-search-engines-about-60-of-searches-now-end-without-the-user-progressing-to-a.
[122] Limor Barenholtz, Zero-Click Searches And How They Impact Traffic, SIMILARWEB (May 22, 2025), https://www.similarweb.com/blog/marketing/seo/zero-click-searches.

clicks than a lower-ranked result.[123] Customers also tend to trust Google's positioning of search results, believing that higher-ranked results are more likely to be accurate and trustworthy than lower-ranked results.[124]

198.    Google's response to the widespread consensus that AI Overviews and AI Mode send less traffic to publishers than the previous search engine results page has been to assert that this consensus is based on "inaccurate" reporting.[125] But Google has offered no credible competing information regarding search referral traffic. Google has refused to break out click-through rate data for AI Overviews or AI Mode.

199.    Tellingly, Google's CEO was unable in a May 2025 interview to identify any public data "show[ing] that AI overviews and AI mode actually send more traffic out than the previous search engine results page."[126] In an August 2025 blogpost, Google's head of Search Elizabeth Reid claimed that AI is making search better, traffic to sites is "relatively stable," and the web is entering its "most exciting era yet"—but offered no facts or statistics to support these self-serving assertions.[127] Instead, Reid made vague claims about "organic click volume" being "relatively stable" over years and "click quality increasing."[128]

200.    Major publishers have challenged Google's unsupported assertions that AI Overviews have improved search referral traffic. Mike Reed, the Chairman and CEO of USA

---

[123] Lewandowski et al., *The influence of search engine optimization on Google's results: A multi-dimensional approach for detecting SEO*, WebSci '21, June 21-25, 2021, at 13-14, available at https://searchstudies.org/wp-content/uploads/2021/08/3447535.3462479.pdf (last accessed Dec. 1, 2025).
[124] *Id.*
[125] Reid, *AI in Search*, *supra*.
[126] Nilay Patel, Decoder, *Google CEO Sundar Pichai on the future of search, AI agents, and selling Chrome* (May 27, 2025), https://www.theverge.com/decoder-podcast-with-nilay-patel/673638/google-ceo-sundar-pichai-interview-ai-search-web-future.
[127] Reid, *AI in Search*, *supra*.
[128] Reid, *AI in Search*, *supra*.

Today Co., which owns national newspaper USA Today and has a portfolio of over 200 local media outlets across the nation, explained that Google's "insinuation . . . that AI Overview is not getting in the way of the ten blue links and the traffic going back to creators and publishers is just 100% false. . . . All of the information is out there about how reduced the flow of people is back to sites. I mean, they are reading the overview and stopping there. . . . We see it."[129]

201.    Vox Media CEO and Chairman Jim Bankoff similarly explained: "One thing that Google said recently—I think [Google CEO] Sundar [Pichai] said this on the Vergecast but also a Google representative said it in light of the Penske suit—which is that 'we are sending a more qualified audience than ever to publishers.' And that's just simply not true. The irony is we have Google Analytics that shows us that the traffic is less engaged, spending less time on the site, and of course there's a lot less of it."[130]

202.    The reality is that AI Overviews have led to dramatic declines in publisher traffic. Recent estimates indicate that many publisher websites are experiencing click-through traffic losses in the 10-25% range year-over-year since the introduction of AI Overviews.[131]

203.    Pew Research Center studies have concluded that Google users who encounter an AI Overview are less likely to click on links to other websites than users who do not see one, and that Google users are more likely to end their browsing session entirely after visiting a search page with an AI summary than on pages without a summary.[132] According to March 2025 data collected

---

[129] Watch Our Livestream Replay: Wired's AI Power Summit, *supra*, at 1:10:50.
[130] *Id.* at 1:24:33.
[131] Jessica Davies, *Google AI Overviews linked to 25% drop in publisher traffic, new data shows*, DIGIDAY (Aug. 15, 2025), https://digiday.com/media/google-ai-overviews-linked-to-25-drop-in-publisher-referral-traffic-new-data-shows.
[132] Pew Research Center, *Google users are less likely to click on links when an AI Summary appears in the results* (July 22, 2025), https://www.pewresearch.org/short-reads/2025/07/22/google-users-are-less-likely-to-click-on-links-when-an-ai-summary-appears-in-the-results/.

by Pew, users who encountered an AI Overview clicked on a traditional search result link in just 8% of all visits.[133] By comparison, Pew's data showed that users who receive a traditional search result page without an AI Overview click through nearly twice as often.[134]

204.    The Pew Research Center study also showed that AI Overviews appear in 60% of search queries that began with question words such as "who," "what," "when" or "why," and 36% of searches that include both a noun and a verb.[135]

205.    Google's cannibalization of search traffic to PMC's and other publishers' websites has a significant impact on these publishers' revenue and, ultimately, their ability to generate high-quality original content. Every point of search traffic that PMC loses to Google's AI Mode or to AI Overviews squeezes the budgets that fund PMC's reporting.

206.    Google itself recently admitted in briefing to the District Court for the Eastern District of Virginia that "today, the open web is already in rapid decline."[136] Google later attempted to retract this statement, claiming that it was discussing open web *display advertising* rather than the open web generally. But open web display advertising depends on the open web traffic; the decline of one is intrinsically linked to the decline of the other. Google is driving that decline, by siphoning referral traffic with AI Overviews.

207.    Siphoning and discouraging user traffic to PMC's and other publishers' websites in this manner will have profoundly harmful effects on the overall quality and quantity of the information accessible on the Internet. If Google is allowed to continue training LLMs by copying the original content of publishers without permission or payment, and then allowed, again without

---

[133] *Id.*
[134] *Id.*
[135] *Id.*
[136] Google LLC's Memorandum Addressing the Legal Framework Applicable to Remedies, *United States v. Google*, Dkt. 1664, 23-cv-108 (E.D. Va. Sept. 5, 2025), at 5.

permission or payment, to use that very content to generate outputs that divert users from original sources, the economic incentives necessary for the creation and publication of high-quality original content will evaporate. If unchecked, these anticompetitive practices will destroy the business model that supports independent journalism. As traffic levels to PMC and publisher websites are reduced, the revenue generated by those visits will decline, which means insufficient funds to employ reporters, writers, and editors and other vital roles for operating a media business. Fewer stories mean less information for businesses and consumers to make informed choices about the world we live in. Less content of poorer quality will reduce website traffic, resulting in reduced revenue (e.g., as advertisers pay less to reach a smaller audience), and thus less spending on content creation, spawning even less content of even poorer quality and even less revenue, and so on in a downward spiral for content creators and publishers alike.

208.    Caught in such a spiral, both the scope of PMC's publishing efforts and the utility of its publications for its users would erode. Whether the user is checking Deadline for breaking entertainment business news, consulting Variety for its award winning editorial content and video franchises such as its Actors on Actors series, or reading Rolling Stone's latest in-depth political profile, the user experience will be degraded, because that is the inevitable result of the reduced investment in quality content that shrinking revenue begets. Shrinking revenue may also force PMC to make hard choices of its operations; for example, it may no longer make economic sense to send writers around the world to cover events and produce the content that millions have come to rely on from PMC's publications.

209.    Google's unlawful conduct has thus put reputable publishers like PMC in a catch-22. PMC's broad portfolio of carefully researched, expertly written, and thoughtfully curated publications has driven its commercial success even in the age of the Internet. But now, with every

article it publishes on its websites, PMC is forced to provide Google with more training and grounding material for its GAI systems to generate AI Overviews or refine its models, adding fuel to a fire that threatens PMC's entire publishing business, the viability of many other online publishers, and the public's access to high-quality content across the Internet. Google's unlawful conduct cannot be permitted to continue.

## V.    THE UNLAWFULNESS OF GOOGLE'S MISAPPROPRIATION OF DIGITAL PUBLISHERS' CONTENT

### A.    Reciprocal Dealing

210.    By coercing publishers to supply content to be used for other purposes as a condition of being included in its search index at all, Google is engaged in an unlawful course of reciprocal dealing. Reciprocal dealing occurs when a firm with market power refuses to sell product X to a customer unless that customer agrees to sell (or give) product Y to it. Similar to a tying claim, a claim of coercive reciprocal dealing involves a party's leveraging of its market power to force another party to purchase from or sell to it, thus gaining competitive advantage from market power rather than competitive merit.

211.    In this case, the product Google is selling to (and threatening to withhold from) digital publishers is Search Referral Traffic (the "Tying Product" for Counts I and II). Google's coercive reciprocal dealing leverages its monopoly power over Search Referral Traffic to obtain Republishing Content, GAI Training Content, and RAG Content (the "Tied Products" for Counts I and II) for free.

212.    There is a distinct relevant antitrust market for Search Referral Traffic. Other forms of referral traffic or online distribution are not viable substitutes for Search Referral Traffic. Direct navigation requires the user to know both a publisher's specific URL and that the publisher offers relevant content. And while users may navigate to a publisher's website via links on other

publishers' pages or social media, those pages do not deliver the same type of traffic that search provides. While users may happen to see links on other publishers' sites or in social media posts, they go to search engines when they are specifically looking for information. Digital publishers cannot replicate that intentional search traffic through other means.

213.    As discussed above, the market for Search Referral Traffic is just one component of the cluster of interrelated markets that comprise the overarching market for General Search Services that Google monopolizes. In the same way Google delivers search results to users and search ad impressions to advertisers, it delivers Search Referral Traffic to digital publishers—and it possesses the same monopoly power over publishers as it does in the General Search Services and general search text advertising markets.

214.    As a condition to selling publishers Search Referral Traffic, Google requires publishers to acquiesce in the use of their content for three purposes that are unrelated to providing search results. First, publishers must let Google republish their content through snippets ("Republishing Content"). Second, publishers must let Google use their content for GAI training ("GAI Training Content"). Third, publishers must let Google use, repackage, and republish their content via RAG ("RAG Content"). Content supplied for each of these uses constitutes a separate product sold in a separate relevant product market: (1) the Republishing Content market; (2) the GAI Training Content market; and (3) the RAG Content market. Online publishing content with appropriate associated rights can satisfy at least some demand for content in each of these markets. Google uses its Search Referral Traffic monopoly to force digital publishers, such as PMC, to supply it in each of those three content markets *free of charge*. No other search engine or GAI company has sufficient market power or monopoly power to compel this exchange.

215.    The Republishing Content market refers to the supply of access to certain content for the purpose of republishing.

216.    The GAI Training Content market refers to the exchange of the supply of access to certain content for the purpose of GAI Training, as that term is defined above.

217.    The RAG Content market refers to the exchange of the supply of access to certain content for the purpose of RAG, as that term is defined above.

218.    Providing access to content for each of these distinct purposes has independent value. In some instances, access to the same content can be allowed for all of these purposes. In other instances, access may be allowed only on the condition that its use is restricted to a subset of them.

219.    Public reporting has described AI content markets as "opaque" because participating companies generally do not disclose the details of their content licensing agreements, but analysts have estimated that the value of the overarching AI content market could grow close to $30 billion by 2034.[137]

220.    Available information shows that participants in the AI content market recognize that republishing, training, and retrieval-augmented generation are separate use cases with independent value.

221.    For example, some AI companies have proposed sharing a percentage of revenue with publishers whose answers are cited in response to a user query.[138] This pricing is consistent

---

[137] Katie Paul & Anna Tong, *Inside Big Tech's underground race to buy AI training data*, REUTERS (Apr. 5, 2025), https://www.reuters.com/technology/inside-big-techs-underground-race-buy-ai-training-data-2024-04-05.

[138] Perplexity, *Introducing the Perplexity Publishers' Program* (July 30, 2024), https://www.perplexity.ai/hub/blog/introducing-the-perplexity-publishers-program.

with republishing and retrieval-augmented generation usage, which lends itself more readily to per-query pricing. In contrast, other deals have involved flat fees for use of content for training.[139]

222.    Technologists and web publishers have developed a technical protocol intended to allow publishers to define specific machine-readable licensing terms for content within their robots.txt file.[140] Publishers can define terms including free, attribution, pay-per-crawl, and pay-per-inference.[141]

223.    In April 2025, the Washington Post announced a partnership with OpenAI, in which "ChatGPT will display summaries, quotes, and links to original reporting from The Post in response to relevant questions."[142] The Post's description of the deal indicates that it agreed to permit OpenAI to use its content for republishing and retrieval-augmented generation. But it says nothing about permitting OpenAI to use the Post's content for training.

224.    In November 2025, People Inc., USA Today Co., and the Associated Press announced that that they signed deals with Microsoft to serve as launch partners in Microsoft's forthcoming pay-per-use publisher content marketplace, a platform intended to compensate online publishers for use of their content by artificial intelligence systems including Microsoft CoPilot.[143] The precise terms of the deals are confidential.

---

[139] Patterson, J., *AI content licensing lessons from Factiva and TIME*, DIGITAL CONTENT NEXT (Mar. 6, 2025), https://digitalcontentnext.org/blog/2025/03/06/ai-content-licensing-lessons-from-factiva-and-time.

[140] Russell Brandon, TECHCRUNCH (Sept. 10, 2025), https://techcrunch.com/2025/09/10/rss-co-creator-launches-new-protocol-for-ai-data-licensing.

[141] RSL Standard, *What is RSL?*, https://rslstandard.org/guide/what-is-rsl.

[142] WASHINGTON POST, *The Washington Post partners with OpenAI on search content* (Apr. 22, 2025), https://www.washingtonpost.com/pr/2025/04/22/washington-post-partners-with-openai-search-content.

[143] Jessica Davies, *People Inc. strikes Microsoft AI licensing deal as Google's AI Overviews hit programmatic ad revenue*, DIGIDAY (Nov. 4, 2025), https://digiday.com/media/people-inc-strikes-microsoft-ai-licensing-deal-as-googles-ai-overviews-hit-programmatic-ad-revenue; Jessica Davies & Sara Guaglione, *Media Briefing: Associated Press deal cements Microsoft's*

225.    Courts have also recognized emerging markets for republishing, training, and grounding uses. As one federal judge has explained, "Five years from now, [a market for licensing one's books for AI training] may be as 'normal' a market as the market for licensing books for movies or television shows."[144] The District Court for the Northern District of California has similarly recognized that evidence exists to support the existence of "an emerging market for licensing [authors'] works for the narrow purpose of training LLMs."[145]

226.    Google's own Vice President of Government Affairs and Public Policy has admitted that publishers should "have the tools to control how their publications are used in AI," and that there is a "nascent," "developing" marketplace for content licensing deals in the AI context.[146]

227.    The relevant geographic market for each relevant product market is the United States. In the Government Search Case, the D.C. District Court found, and the parties did not dispute, the geographic market for General Search Services to be the United States. The relevant geographic market for the specific services that make up General Search Services, including Search Index Data and Search Referral Traffic, is accordingly also the United States. The same holds true for the markets for Republishing Content, GAI Training Content, RAG Content, and online publishing.

228.    Google provides a local domain website for users in the United States, delivering search results, which include its AI Overviews and other republishing products, tailored to the

*quiet rise in AI licensing*, DIGIDAY (Nov. 6, 2025), https://digiday.com/media/media-briefing-associated-press-deal-cements-microsofts-quiet-rise-in-ai-licensing.
[144] *In re Mosaic LLM Litig.*, No. 24-CV-01451-CRB (LJC), 2025 WL 2294910, at *4 (N.D. Cal. Aug. 8, 2025).
[145] *Bartz v. Anthropic PBC*, No. C 24-05417 WHA, 2025 WL 1741691, at *17 (N.D. Cal. June 23, 2025).
[146] Watch Our Livestream Replay: Wired's AI Power Summit, *supra*, at 46:26.

users' specific location within the country. Moreover, digital informational publishers (and republishers using digital informational content) target U.S. consumers with digital informational publishing.

229.    Upon information and belief, Google evaluates search market shares on a country-by-country basis, including the United States. These search services, including the component inputs, and online publishing available outside the United States are not reasonable substitutes for those offered in the United States. A hypothetical monopolist in the United States of any of these products would be able to engage in anticompetitive conduct, including by raising price, reducing output, or maintaining quality below the level that would exist in a competitive market.

230.    Google exercises its coercion through its web crawler and its search index. Google's crawler collects Search Index Data from digital publishers in order to ensure that the most useful content appears on its SERP for search users. But Google uses the same index data for Republishing Content, GAI Training Content, and RAG Content. The only way for online publishers to opt out completely is to block Google's crawlers, which effectively means forgoing Google Search Referral Traffic. In other words, there is no way for publishers to tell Google, "You may buy my content to generate search results, but you do not have my permission to use my content for other purposes."

231.    Even if Google offered digital publishers the ability to opt-out of Google using their Search Index Data for Republishing Content, GAI Training Content, and/or RAG Content, the coercion would persist so long as Google preferences AI Overviews and Featured Snippets on its SERP—or, when it comes to AI Mode, so long as Google republishes content from online publishers like PMC without offering a SERP at all. Google's AI Overviews boxes often include

source links embedded within them, alongside or below the RAG-generated content. The same is true of Google's Top Stories and People Also Ask features.

232.    The presence of these links and the fact that Google automatically places the elements that feature them at or near the top of the SERP create an impossible dilemma for online publishers. Even if they could opt out of Google republishing their content, doing so would mean demotion on the SERP and thus less Search Referral Traffic, or becoming entirely invisible to users that search using AI Mode. So long as other online publishers know that they can artificially elevate their own search results by permitting Google to use their content for Republishing, GAI Training, and RAG, there will be a race to the bottom whereby virtually all publishers opt in, even though the only beneficiary in the end is Google.

233.    By using reciprocal dealing to get free Republishing Content, GAI Training Content, and RAG Content, Google restricts competition in the downstream online publishing market, where it competes against other online publishers like PMC. The more users consume Google's derivative, regurgitated content on its SERP, the less they click through to other publishers' original content. That means less revenue for those original publishers, which in turn undermines their ability to invest in new content. In short, while Google's reciprocal dealing increases its share of the online publishing market, it does so at the expense of reducing the output of original content across the entire market.

234.    The effects of the output restriction attributable to Google's reciprocal dealing are difficult to overstate. Not only does it affect billions of dollars of online publisher investment in content, but it also undermines the public's ability to gain access to original content and information. If allowed to persist, the full extent of the consequences of Google's assault on online publishing ultimately may be impossible to quantify.

B.    **Monopoly Maintenance**

235.    As a supplier of content that is indexed by Google for search, PMC participates in the Input Market for General Search Services. In this input market, Google accesses PMC's content through an exchange whereby PMC permits Google to index its content for the purpose of including PMC in links published on Google's SERP, which leads to search referral traffic for PMC—and which PMC then converts to advertising, affiliate, and subscription revenue.

236.    Historically, publishers like PMC permitted Google to access their content for an access price of zero because the publishers at least received something of value as a result: links to their websites on the SERP that resulted in traffic to their websites. That is, publishers like PMC allowed Google to access their content for free in exchange for the clicks generated by prominent placement on Google's SERP. In this ecosystem, web publishers had (in Google's words) "opportunities to derive value from participating in the web ecosystem."[147]

237.    Google's ability to extract a zero access price—when Google was benefiting tremendously through the receipt of advertising revenue generated as a result of this exchange— already evinced Google's monopsony power in the Input Market. In a competitive input market, there would be no obvious reason for PMC to agree to permit Google to access its content for a zero price.

238.    Now, Google has ratcheted up the abuse of its monopoly power in search (and monopsony power in the Input Market) by forcing PMC to allow its content to be used to generate AI Overviews, including through republishing the content itself, using the content to train its models, and using the content for RAG. Google's use of PMC's content for this purpose is demonstrably harmful to PMC. Google's AI Overviews *reduce*, rather than increase, click-

---

[147] Google, *A principled approach to evolving choice and control for web content* (July 6, 2023), https://blog.google/technology/ai/ai-web-publisher-controls-sign-up (accessed June 9, 2025).

throughs from search results and thus traffic to PMC's websites. The result is that the exchange between Google and PMC now results in a suppressed value for PMC. That is, the value that PMC expects to receive by granting Google access to its content has gone from barely tolerable to intolerably exploitative. But for Google's ill-gotten monopoly in General Search Services, Google would never be able to coerce this exchange at below competitive levels in the Input Market.

239.    Google's conduct harms competition in the Input Market by pushing the compensation for PMC below competitive levels, which will suppress the volume of new publisher content in the Input Market. Google's conduct also entrenches its ill-gotten monopoly in General Search Services. Google's ability to access PMC's content for below-competitive levels puts competitor search platforms, some of whom must pay a significantly higher price for the same content, at a competitive disadvantage. The result is that Google's rivals are further disadvantaged in attempting to compete against Google, and Google is thus able to further entrench its general search monopoly. With AI Overviews, Google is also positioning itself to suppress dynamic competition in the next frontier in search powered by generative artificial intelligence.

240.    Google's conduct also harms consumers in the General Search Services market. Google's promise to help users find relevant and reliable information relies on the existence of high-quality websites that provide original and accurate content. By starving those websites of search traffic, Google is eliminating their publishers' ability to earn revenue and causing their demise. If those websites go out of business, fully disappear behind paywalls, or are stripped of the financial incentives to maintain existing content or generate new content, search users will be left without relevant and reliable information to answer their queries. The value to consumers of search is built on the content provided by publishers like PMC. In the absence of that content, search users will suffer because it will become more difficult, if not impossible, to find relevant

and reliable information on the Internet. Google's extraction of monopoly rent in the form of a suppressed access price in the Input Market degrades quality in the General Search Services market.

241.    Put another way, Google's reciprocal dealing practices also further its monopoly maintenance strategy in the General Search Services market in at least two ways. First, Google's extraction of Republishing Content, GAI Training Content, and RAG Content free-of-charge constitutes a form of monopoly rent extraction. It is akin to Google charging supracompetitive prices for search ads to advertisers.[148] But instead of raising prices as a monopolist, Google is artificially decreasing the prices it would otherwise pay online publishers for Republishing Content, GAI Training Content, and RAG Content. As discussed above, other republishers and GAI companies who lack monopoly power have been willing to pay for each of those forms of content. Google can refuse to pay because it is a monopolist, and as the D.C. District Court found, Google maintained that monopoly power through illegal search distribution deals. PMC has thus suffered an antitrust injury as a result of Google's illegal monopoly maintenance in the General Search Services market.

242.    Second, Google's reciprocal dealing itself is another strategy to maintain its primary monopoly in General Search Services. In that market, Google's AI products, including its AI Overviews, will increase user reliance on the search engine as a source of quick and easy information as compared to rivals who cannot exercise monopoly power to obtain source content from publishers for free. Thus, by virtue of its illegally maintained monopoly position over web publishers' Search Referral Traffic, Google will be able to entrench its general search monopoly

---

[148] *United States v. Google*, 747 F. Supp. 3d at 177-80.

by maintaining an advantage in obtaining the key inputs of Republishing Content, GAI Training Content, and RAG Content.

C.     **Tying of AI Overviews to Google's General Search Product**

243.    Google uses its monopoly power in general search services (the "Tying Product" for Count V) to compel users to use Google's AI Overviews (the "Tied Product" for Count V). Google does this by designing its SERP so that users who seek to use Google's general search product are served AI Overviews directly on the SERP. Search users have no choice but to consume the AI Overviews on the SERP, where Google can serve advertisements to those users.

244.    Users of Google's general search product cannot choose whether they will be served an AI Overview. Google does not provide any opportunity to opt out of being served AI Overviews, and Google's Terms of Service prohibit users from modifying any part of Google's services or software when they use Google's general search services.[149]

245.    In effect, Google exercises its monopoly power to force users of its general search product to also "purchase" Google's AI Overviews. In a competitive market for general search, consumers would be able to choose to "purchase" these different products—general search and AI Overviews—separately. Instead, users of Google's general search product are forced to consume AI Overviews when Google chooses to serve them in response to search queries.

246.    The effect of Google's conduct is to deprive users of valuable organic search results (the "10 blue links"). Google designs its SERP so that users are served its AI Overviews above organic search results. This prioritization results in zero-click searches in which users remain on Google's SERP and do not visit online publishers' content. As a result of Google's conduct, nearly

---

[149] *See* Google Terms of Service – Privacy & Terms, https://policies.google.com/terms ("You may not copy, modify, distribute, sell, or lease any part of our services or software.") (accessed Nov. 21, 2025).

60% of all Google searches are now zero-click. Searches that result in AI Overviews are more likely to be zero-click searches than searches that do not result in AI Overviews. Among searches that result in AI Overviews, over 80% are now zero-click.

247.    Google's own advertisements emphasize that Google has designed AI Overviews to result in zero-click searches. In the Google video "Trying Something New? Just Ask Google,"[150] a user searches using a photo of a painting and the question, "What brushes do I use to get that effect?" In response, Google serves an AI Overview that purports to answer the question. The process is then repeated with another question and another AI Overview. There is never any suggestion that the user will navigate away from Google's SERP.

248.    With zero-click searches, Google is no longer serving as the gateway to the Internet, but is instead furnishing its "own" content—which is content Google has unlawfully taken from publishers. By preferencing AI Overviews above organic search results, Google drives traffic and revenue to itself and away from online publishers. Google's tying conduct thus restricts output and reduces the quality of online publishing by diverting traffic that would otherwise go to original content publishers.

249.    In addition to harming consumers in the form of decreases in the quantity of quality online publishing material, Google's tying conduct ultimately decreases the quality of Google's search product. Starving PMC and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet over

---

[150] *Trying Something New? Just Ask Google*, Google, https://www.youtube.com/watch?v=h-AkoDlQ0L0 (last accessed Dec. 1, 2025).

time because publishers like PMC will no longer have sufficient resources to continually invest in updating and expanding their content.

### D. <u>Unjust Enrichment</u>

250.    Google has been unjustly enriched by its uses of PMC's works. First, Google has avoided the cost of paying for valuable content that other companies pay for. Numerous publishers have entered into content licensing deals with generative AI companies. For example, OpenAI has entered into commercial agreements with at least several content owners, including an agreement with Axel Springer ballparked at "tens of millions" of dollars, as well as an agreement with the Associated Press.[151] Relatedly, in response to the New York Times's lawsuit against Microsoft and OpenAI, OpenAI CEO Sam Altman stated publicly that OpenAI wanted to pay the New York Times "a lot of money to display their content."[152] Yet Google is commercially exploiting content, and has exploited content—created through years of time, labor, and financial investment—for which it has not paid anything.

251.    Google has also benefited directly from its wrongful conduct. Google announced the launch of Bard on February 6, 2023.[153] The very next day, the share price of its parent, Alphabet Inc., increased by approximately 4.6%.[154] Though Alphabet's stock price briefly dipped thereafter

---

[151] Cullen, A. & Davalos, J., *OpenAI to Pay Axel Springer Tens of Millions to Use News Content*, BLOOMBERG (Dec. 1, 2023), https://www.bloomberg.com/news/articles/2023-12-13/openai-axel-springer-ink-deal-to-use-news-content- in-chatgpt; *see also* O'Brien, M., *ChatGPT-maker OpenAI Signs Deal with AP to License News Stories*, AP NEWS  (July 13, 2023), https://apnews.com/article/openai-chatgpt-associated-press-ap-f86f84c5bcc2f3b98074b38521f5f75a.

[152] Browne, R. & Sigalos, M., *OpenAI CEO Sam Altman Says ChatGPT Doesn't Need New York Times Data Amid Lawsuit*, CNBC (Jan. 18, 2024), https://www.cnbc.com/2024/01/18/openai-ceo-on-nyt-lawsuit-ai-models-dont-need- publishers-data-.html.

[153] Pichai, S., *An important next step on our AI journey*, GOOGLE (Feb. 6, 2023), https://blog.google/technology/ai/bard-google-ai-search-updates/.

[154] Macrotrends, *Alphabet - 21 Year Stock Price History | GOOGL*, https://www.macrotrends.net/stocks/charts/GOOGL/alphabet/stock-price-history (last accessed Sept. 12, 2025).

because Bard shared inaccurate information in a promotional video, after Google announced a revamped AI-powered search engine on May 10, 2023, Alphabet's share price surged even further, rising 8.6% in the two days following that announcement.[155] Google's stock price closed 5% higher after its Gemini announcement.[156]

252.    Google also benefits through the monetization of AI Overviews and products grounded on Google Search. For example, Google's service Vertex AI (which it sells to third parties), offers the option of grounding responses with information from Google Search. Moreover, Google has stated publicly that it is monetizing AI Overviews at the same rate as traditional search results.[157]

253.    The value of Google's models and AI products is directly related to the quality of the works that it acquires to train them and ground their outputs. In this respect, PMC's content is a "golden corpus" that is particularly valuable to Google. PMC's content is meticulously researched, carefully written, thoroughly edited, and highly accurate, making it ideal for training and grounding the outputs of GAI systems.

254.    The value of PMC's works for republishing, training, and RAG purposes is made possible only by the enormous investment PMC puts into them. PMC content represents the work of hundreds of PMC employees and other contributors, the employment of and contracting with

---

[155] Coulter, M. & Bensinger, G., *Alphabet shares dive after Google AI chatbot Bard flubs answer in ad*, REUTERS (Feb. 8, 2023), https://www.reuters.com/technology/google-ai-chatbot-bard-offers-inaccurate-information-company- ad-2023-02-08/; Carson, B., *Google Co-Founders Gain $18 Billion as AI Boost Lifts Stock*, BLOOMBERG (May 12, 2023), https://www.bloomberg.com/news/articles/2023-05-12/google-co-founders-gain-17-billion-as-ai-boost-lifts- stock#xj4y7vzkg.
[156] Capoot, A., *Google shares pop 5% after company announces Gemini AI model*, CNBC (Dec. 7, 2023), https://www.cnbc.com/2023/12/07/google-shares-pop-after-company-announces-gemini-ai-model.html#.
[157] Alphabet, Q1 2025 Earnings Call (Apr. 24, 2025), https://abc.xyz/2025-q1-earnings-call.

whom costs PMC tens of millions of dollars per year. Google has benefitted—for free—from the labor and effort invested in many thousands of works produced by these individuals for PMC. By outright taking that extraordinary volume of content, Google has avoided the enormous costs PMC expended to create or acquire that content, ranging into the hundreds of millions of dollars, and created billions more in enterprise value for Google at PMC's expense.

### COUNT I: Reciprocal Dealing in Violation of Section 1 of the Sherman Act

255.    PMC incorporates by reference and realleges the preceding allegations as though fully set forth herein.

256.    Google engaged in illegal reciprocal dealing in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

257.    Google conditions the sale of Search Referral Traffic (the "Tying Product" for Counts I and II) to PMC on PMC giving Google Republishing Content, GAI Training Content, and RAG Content (the Tied Products for Counts I and II) for free.

258.    In all instances, the Tying and Tied Products are distinct and separate products. They are sold in different markets; serve different functions; have separate demand; have separate customer sets; and are treated by Google and others as separate products.

259.    Google has market power in the General Search Services market, and accordingly also in the Search Referral Traffic market, and has used this market power to condition the sale of the Tying Product to PMC on PMC selling Google the Tied Products for free.

260.    Google's conduct has harmed competition in General Search Services. Forcing online publishers to provide Republishing Content, GAI Training Content, and RAG Content for free effectively lowers Google's costs. Moreover, Google's underpayments to PMC reduce the volume of publishing content in the Input Market for General Search Services. GAI search results

have already become an important component of SERPs, and Google's conduct serves to maintain its General Search Services monopoly.

261.    Google's conduct has also restricted output and reduced quality in online publishing markets by diverting traffic that would otherwise go to original content publishers without compensation. As a direct and proximate result, digital publishers have been forced to lay off staff. Other digital publishers have gone out of business, all of which has resulted in a reduction in the output and quality of original content.

262.    In addition to harming consumers in the form of decreases in the quantity of quality online publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving PMC and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet over time because publishers like PMC will no longer have sufficient resources to continually invest in updating and expanding their content.

263.    A substantial amount of interstate commerce for the Tied Products is affected.

264.    Google's anticompetitive reciprocal dealing is per se illegal, or in the alternative illegal under the Rule of Reason or "quick look" analytical framework. There are no legally cognizable procompetitive effects of or justifications for Google tying the sale of Search Referral Traffic to its purchase of the Tied Products, which was not reasonably related to, or reasonably necessary for, any procompetitive objectives. Alternatively, there are no legally cognizable procompetitive effects of or justifications for the reciprocal dealing arrangement that outweigh its substantial anticompetitive effects or that could not be achieved through less restrictive means.

265.    As a result of the foregoing illegal conduct by Google, PMC has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. PMC was paid less (i.e., nothing) for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. PMC has also lost revenues as a result of Google diverting traffic from PMC's websites in the form of lost advertising, affiliate, and subscription revenue from users' visits to its sites. PMC is entitled to receive treble damages for its injuries.

266.    Google's anticompetitive reciprocal dealing arrangement is ongoing, and PMC is entitled to injunctive relief and other equitable remedies.

267.    PMC is also entitled to attorneys' fees and costs of suit.

## COUNT II: Reciprocal Dealing in Violation of Section 2 of the Sherman Act

268.    PMC incorporates by reference and realleges the preceding allegations as though fully set forth herein.

269.    Google engaged in illegal reciprocal dealing in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

270.    Google conditions the sale of Search Referral Traffic (the Tying Product for Counts I and II) to PMC on PMC giving Google Republishing Content, GAI Training Content, and RAG Content (the Tied Products for Counts I and II) for free.

271.    In all instances, the Tying Product and Tied Products are distinct and separate products. They are sold in different markets; serve different functions; have separate demand; have separate customer sets; and are treated by Google and others as separate products.

272.    Google has monopoly power in the General Search Services market, and accordingly also in the Search Referral Traffic market, and has used this monopoly power to

condition the sale of the Search Referral Traffic to PMC on PMC selling Google the Republishing Content, GAI Training Content, and RAG Content for free.

273.    Through its anticompetitive conduct described herein, namely reciprocal dealing, Google has willfully acquired and maintained its monopoly power in General Search Services in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Forcing online publishers to provide Republishing Content, GAI Training Content, and RAG Content for free effectively lowers Google's costs. GAI search results have already become an important component of SERPs, and Google's conduct serves to maintain its General Search Services monopoly.

274.    Google's conduct has also restricted output and reduced quality in the online publishing market, by diverting traffic that would otherwise go to original content publishers without compensation. As a direct and proximate result, digital publishers have been forced to lay off staff. Other digital publishers have gone out of business, all of which has resulted in a reduction in the output and quality of original content.

275.    In addition to harming consumers in the form of decreases in the quantity of quality online publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving PMC and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet.

276.    As a result of the foregoing illegal conduct by Google, PMC has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. PMC was paid less (i.e., nothing) for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. PMC has also lost revenues as a result of

Google diverting traffic from PMC's websites in the form of lost advertising, affiliate, and subscription revenue from users' visits to its sites. PMC is entitled to receive treble damages for its injuries.

277.    Google's anticompetitive reciprocal dealing arrangement is ongoing, and PMC is entitled to injunctive relief and other equitable remedies.

278.    PMC is also entitled to attorneys' fees and costs of suit.

**COUNT III: Unlawful Monopoly Leveraging in Violation of Section 2 of the Sherman Act**

279.    PMC incorporates by reference and realleges the preceding allegations as though fully set forth herein.

280.    Google has monopoly power in the General Search Services market. Through its anticompetitive conduct described herein—including forcing PMC to provide content at no cost for AI model training and grounding and republishing—Google has unlawfully leveraged its monopoly power in General Search Services into other markets, including the online publishing market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

281.    Google's conduct has restricted output and reduced quality in online publishing markets, by diverting traffic that would otherwise go to original content publishers without compensation. As a direct and proximate result, digital publishers have been forced to lay off staff. Other digital publishers have gone out of business, all of which has resulted in a reduction in the output and quality of original content.

282.    In addition to harming consumers in the form of decreases in the quality and quantity of online publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving PMC and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their

queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet.

283.    As a result of the foregoing illegal conduct by Google, PMC has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. PMC was paid less (i.e., nothing) for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. PMC has also lost revenues as a result of Google diverting traffic from PMC's websites in the form of lost advertising, affiliate, and subscription revenue from users' visits to its sites. PMC is entitled to receive treble damages for its injuries.

284.    Google's anticompetitive conduct is ongoing, and PMC is entitled to injunctive relief and other equitable remedies.

285.    PMC is also entitled to attorneys' fees and costs of suit.

**COUNT IV: Unlawful Monopolization in Violation of Section 2 of the Sherman Act**

286.    PMC incorporates by reference and realleges the preceding allegations as though fully set forth herein.

287.    Google has monopoly power in the General Search Services market. Through its anticompetitive conduct described herein—including forcing PMC to provide content at no cost for AI model training and grounding and republishing—Google has willfully acquired and maintained its monopoly power in General Search Services in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

288.    Google's conduct has also restricted output and reduced quality in the online publishing market, by diverting traffic that would otherwise go to original content publishers without compensation. As a direct and proximate result, digital publishers have been forced to lay

off staff. Other digital publishers have gone out of business, all of which has resulted in a reduction in the output and quality of original content.

289.    In addition to harming consumers in the form of decreases in the quantity of quality online publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving PMC and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet.

290.    As a result of the foregoing illegal conduct by Google, PMC has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. PMC was paid less (i.e., nothing) for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. PMC has also lost revenues as a result of Google diverting traffic from PMC's websites in the form of lost advertising, affiliate, and subscription revenue from users' visits to its sites. PMC is entitled to receive treble damages for its injuries.

291.    Google's anticompetitive conduct is ongoing, and PMC is entitled to injunctive relief and other equitable remedies.

292.    PMC is also entitled to attorneys' fees and costs of suit.

## COUNT V: Unlawful Tying of AI Overviews to General Search Services in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

293.    PMC incorporates by reference and realleges the preceding allegations as though fully set forth herein.

294.    Google has monopoly power in the General Search Services market.

295.    Google engaged in illegal tying in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

296.    Google ties its general search product (the Tying Product for Count V) to AI Overviews (the Tied Product for Count V).

297.    Google's general search product and its AI Overviews are distinct and separate products. They are sold in different markets; serve different functions; have separate demand; have separate customer sets; and are treated by Google and others as separate products.

298.    Google has used its monopoly power in the General Search Services market to tie the sale of the AI Overviews to the sale of its general search product. Google does this by designing its SERP so that users are served its AI Overviews above organic search results. This prioritization results in zero-click searches in which users remain on Google's SERP and do not visit online publishers' content.

299.    Users are compelled to consume Google's AI Overviews when they use Google's general search product. Users cannot opt out of AI Overviews when they use Google's general search product. Moreover, Google's Terms of Service prohibit users from modifying Google's services or software when using Google's general search product. As a result of Google's conduct, users of Google's general search services must accept and consume Google's AI Overviews.

300.    Google's tying conduct restricts output and reduces the quality of online publishing by diverting traffic that would otherwise go to original content publishers. As a direct and proximate result, online publishers have been forced to lay off staff. Other digital publishers have gone out of business, all of which has resulted in a reduction in the output and quality of original content.

301.    In addition to harming consumers in the form of decreases in the quantity of quality online publishing material, Google's anticompetitive conduct further harms consumers by decreasing the quality of Google's search product. Starving PMC and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet over time because publishers like PMC will no longer have sufficient resources to continually invest in updating and expanding their content.

302.    Google's anticompetitive conduct affects a substantial volume of commerce, because PMC and other online publishers depend heavily on traffic from Google's general search. As a result of Google's conduct, nearly 60% of Google searches are now zero-click. Among searches that result in AI Overviews, over 80% are now zero-click.

303.    Google's anticompetitive tying is per se illegal, or in the alternative illegal under the Rule of Reason or "quick look" analytical framework. There are no legally cognizable procompetitive effects of or justifications for Google's tying AI Overviews to general search. The tie is not reasonably related to, or reasonably necessary for, any procompetitive objectives. Alternatively, there are no legally cognizable procompetitive effects of or justifications for the tie that outweigh its substantial anticompetitive effects or that could not be achieved through less restrictive means.

304.    As a result of the foregoing illegal conduct by Google, PMC has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. PMC was paid less (i.e., nothing) for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. PMC has also lost revenues as a result of Google diverting traffic from PMC's websites in the form of lost advertising, affiliate, and

subscription revenue from users' visits to its sites. PMC is entitled to receive treble damages for its injuries.

305.    Google's anticompetitive tying is ongoing, and PMC is entitled to injunctive relief and other equitable remedies.

306.    PMC is also entitled to attorneys' fees and costs of suit.

## COUNT VI: Unlawful Attempted Monopolization in Violation of Section 2 of the Sherman Act

307.    PMC incorporates by reference and realleges the preceding allegations as though fully set forth herein.

308.    Google has monopoly power in the General Search Services market. Through its anticompetitive conduct described herein—including forcing PMC to provide content at no cost for AI model training and grounding and republishing—Google has willfully acquired and maintained its monopoly power in General Search Services in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

309.    Google has also engaged in the above anticompetitive conduct with the specific intent of creating monopolies in the online publishing market.

310.    Google's conduct gives it a dangerous probability of acquiring monopoly power in the online publishing market by restricting output and reducing quality of content supplied in that market. It has diverted traffic that would otherwise go to original content publishers without compensation. As a direct and proximate result, digital publishers have been forced to lay off staff. Other digital publishers have gone out of business, all of which has resulted in a reduction in the output and quality of original content.

311.    In addition to harming consumers in the form of decreases in the quantity of quality online publishing material, Google's anticompetitive conduct further harms consumers by

decreasing the quality of Google's search product. Starving PMC and other publishers of search traffic will ultimately leave search users without relevant and reliable information to answer their queries. It will become more difficult, if not impossible, for users to find relevant and reliable information on the Internet.

312.    As a result of the foregoing illegal conduct by Google, PMC has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. PMC was paid less (i.e., nothing) for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct. PMC has also lost revenues as a result of Google diverting traffic from PMC's websites in the form of lost advertising, affiliate, and subscription revenue from users' visits to its sites. PMC is entitled to receive treble damages for its injuries.

313.    Google's anticompetitive conduct is ongoing, and PMC is entitled to injunctive relief and other equitable remedies.

314.    PMC is also entitled to attorneys' fees and costs of suit.

### COUNT VII: Common Law Unjust Enrichment

315.    PMC incorporates by reference and realleges the preceding allegations as though fully set forth herein.

316.    The training process for Google's LLMs involves storing encoded copies of the training works in computer memory, repeatedly passing them through the model with words masked out, and adjusting the parameters to minimize the difference between the masked-out words and the words that the model predicts to fill them in. After being trained on a general corpus, models may be further subject to "fine-tuning" by, for example, performing additional rounds of training using specific types of works to better mimic their content or style, or providing them with human feedback to reinforce desired or suppress undesired behaviors.

317.    At all relevant times, Google included PMC's works within the training corpuses for its LLMs.

318.    Google is liable under common law principles of unjust enrichment for its reliance on PMC's works to train its models.

319.    On information and belief, at all relevant times, Google has been enriched through its reliance on PMC's works for model training. PMC makes enormous investments in human talent, technology, and infrastructure to produce high-quality content. Yet without paying anything to PMC, Google exploited PMC's content for commercial purposes, thereby benefiting from PMC's extensive production efforts.

320.    These Google models (which were developed with PMC's works) now power lucrative user-facing products and features that Google continues to develop—namely, the Gemini chatbot, AI Overviews, and AI Mode—which are critical for Google's ongoing success. Google has already begun monetizing these products. For example, Google charges subscription fees to users to access Gemini products. Google also generates advertising revenues through users' engagement with the Gemini chatbot and through Google's SGE search feature. Google's ongoing development of these products is critical to Google's goal of maintaining its dominance in the General Search Services market.

321.    Google's enrichment has come at PMC's expense. Google's conduct diminishes user traffic on PMC's websites, which in turn diminishes PMC's revenues. Google's conduct relatedly diminishes the value of PMC's content. If Google can exploit PMC's content for commercial purposes without paying a dime to PMC, other companies will have less incentive to pay PMC a fair price for that content.

322.    While models may in some instances "memorize" training works by encoding retrievable copies in their parameters, many training works are not memorized in this way. Likewise, while model outputs presented as AI Overviews often may be substantially similar to works on which they are grounded, often they are not. The tuning of models that does not result in the creation of memorized copies of training works in the model parameters and the presentation of model outputs that are not substantially similar to works on which those outputs are grounded are distinct acts of exploitation that are not preempted by the Copyright Act.

323.    Given these circumstances, equity and good conscience require restitution to PMC. Google should be ordered to pay PMC a fair price for using PMC's content to train and ground its models and/or disgorge to PMC the profits that Google earned from its misconduct.

324.    Google's conduct has injured PMC, and PMC is entitled to restitution and/or disgorgement of profits and other remedies provided by law.

## PRAYER FOR RELIEF

WHEREFORE, PMC demands judgment against Google as follows:

1.    Awarding PMC compensatory damages, restitution, disgorgement, and any other relief that may be permitted by law or equity;

2.    Permanently enjoining Google from engaging in the unlawful and unfair conduct alleged herein;

3.    Awarding PMC costs, expenses, and attorneys' fees as permitted by law; and

4.    Awarding PMC such other or further relief as the Court may deem just.

## DEMAND FOR JURY TRIAL

PMC hereby demands a jury trial for all claims so triable.

Dated: December 4, 2025              */s/ Ian Crosby*_____
                                     Ian Crosby (Bar ID: WA0036)

SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com

Davida Brook (Bar ID: CA00117)
Halley Josephs (Bar ID: CA00217)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com
hjosephs@susmangodfrey.com

Geng Chen (*pro hac vice application forthcoming*)
Y. Gloria Park (Bar ID: NY0615)
Elizabeth Aronson (Bar ID: NY0645)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
gchen@susmangodfrey.com
gpark@susmangodfrey.com
baronson@susmangodfrey.com

*Attorneys for Plaintiffs Penske Media Corporation,
Billboard Media, LLC, Deadline Hollywood, LLC,
Fairchild Publishing, LLC, Gold Derby Media,
LLC, The Hollywood Reporter, LLC, Indiewire
Media, LLC, Rolling Stone LLC, SheMedia, LLC,
and Variety Media, LLC*