## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PENSKE MEDIA CORPORATION, et al.,

*Plaintiffs*,

v.

GOOGLE LLC and ALPHABET INC.,

*Defendants*.

Case No. 1:25-cv-03192-APM

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................4

I.  Google's Search Engine ..............................................................................................4

II.  PMC's Lawsuit ...........................................................................................................6

ARGUMENT .........................................................................................................................7

I.  PMC Fails To Plead A Valid Claim For Reciprocal Dealing (Counts I-II)........................7

    A.  Google's Conduct Constitutes A Lawful Refusal To Deal On PMC's
    Preferred Terms, Not Reciprocal Dealing ................................................................8

    B.  PMC Fails To Allege A Viable Reciprocal Dealing Claim ...................................13

        1.  PMC Fails To Plausibly Allege A Reciprocal Dealing
        Claim Under The Rule Of Reason .........................................................15

            a.  The allegedly tied markets are implausible ...................................15

            b.  PMC does not allege any competitive harm in the
            tied markets ..................................................................................18

            c.  The alleged harms in other markets are both irrelevant
            and implausible .............................................................................20

                i.  The alleged search engine "Input Market" is
                implausible .....................................................................20

                ii.  The alleged "Online Publishing" market is
                implausible .....................................................................21

                iii.  PMC does not plausibly allege harm to
                competition in any of the three non-tied markets .............22

        2.  *Per Se* Treatment Is Inappropriate .............................................................24

        3.  PMC Fails To Plausibly Allege The Tying Market ...................................26

        4.  PMC Fails To Allege Coercion....................................................................28

    C.  PMC Lacks Antitrust Standing On Its Reciprocal Dealing Claims.....................29

II.  PMC Fails To Plead Unlawful Monopoly Maintenance (Count IV)................................30

    A.  PMC Has Not Alleged Exclusionary Conduct In The GSS Market .....................30

    B.  PMC Lacks Antitrust Standing To Bring An Unlawful Monopoly
    Maintenance Claim ...............................................................................................33

III.  PMC Fails To Plead A Valid Claim For Unlawful Tying (Count V)...............................34

    A.  PMC Does Not Plausibly Allege The Existence Of A Tie ...................................34

|  | 1. | AI Overviews And Google Search Are Not Separate Products | 34 |
|  | 2. | There Is No Coercion Alleged | 37 |
| B. | | The Tying Claim Is Subject To The Rule Of Reason, Which It Fails | 38 |
| C. | | PMC Lacks Antitrust Standing To Bring A Tying Claim | 39 |

IV.   PMC Fails To Plausibly Plead Monopoly Leveraging (Count III) And Attempted Monopolization Of The Online Publishing Market (Count VI) ........................40

    A.   There Is No Claim For Monopoly Leveraging Under The Sherman Act .............40

    B.   PMC Fails To Plausibly Plead Attempted Monopolization .................................41

        1.   PMC Fails To Allege Anticompetitive Conduct In The Relevant Market ................................................................................41

        2.   PMC Fails To Allege Google's Specific Intent To Monopolize Online Publishing ..............................................................42

        3.   PMC Fails To Allege Google Has A Dangerous Probability Of Achieving Monopoly Power In Online Publishing ...........................42

V.   PMC Fails To Plead A Viable Unjust Enrichment Claim (Count VII) ...........................43

    A.   California Law Applies To PMC's Unjust Enrichment Claim .............................43

    B.   PMC Fails To Allege Facts That Would Support A Quasi-Contractual Claim For Restitution................................................................................45

CONCLUSION ........................................................................................................................45

# TABLE OF AUTHORITIES[*]

**Page(s)**

**CASES**

*Abuelhawa v. Santa Clara Univ.*,
    529 F. Supp. 3d 1059 (N.D. Cal. 2021) ............................................................43

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ...................................................................32

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ........................................................................37

*AliveCor, Inc. v. Apple Inc.*,
    2026 WL 61304 (9th Cir. Jan. 8, 2026) ....................................................10, 31

*\*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ..........................................................................31

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
    256 F.3d 799 (D.C. Cir. 2001) ........................................................................29

*Arcell v. Google LLC*,
    744 F. Supp. 3d 924 (N.D. Cal. 2024) ............................................................23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................32, 34, 37

*Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*,
    635 F. Supp. 534 (D.D.C. 1986) ....................................................................43

*Astiana v. Hain Celestial Grp., Inc.*,
    783 F.3d 753 (9th Cir. 2015) ..........................................................................44

*Athos Overseas, Ltd. v. YouTube, Inc.*,
    2022 WL 910272 (S.D. Fla. Mar. 29, 2022)..................................................28

*Atl. Richfield Co. v. USA Petrol. Co.*,
    495 U.S. 328 (1990)........................................................................................29

*Blough v. Holland Realty, Inc.*,
    574 F.3d 1084 (9th Cir. 2009) ........................................................................15

---

[*] Authorities principally relied upon are marked with an asterisk.

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ................................................................19, 34

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ....................................................................................14, 25

*\*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
  140 F.3d 494 (3d Cir. 1998) ..............................................8, 13, 14, 15, 16, 18, 24

*Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*,
  2003 WL 22797730 (E.D. Pa. Nov. 18, 2003) ...............................................18

*\*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ..................................................................................16, 21

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
  239 F. Supp. 2d 550 (E.D. Pa. 2002) ............................................................10

*\*Campfield v. State Farm Mut. Auto. Ins. Co.*,
  532 F.3d 1111 (10th Cir. 2008) ..................................................................18, 21

*Carpenter Tech. Corp. v. Allegheny Techs., Inc.*,
  646 F. Supp. 2d 726 (E.D. Pa. 2009) ............................................................43

*Cavalleri v. Hermes Int'l*,
  2025 WL 2662897 (N.D. Cal. Sept. 17, 2025) .........................................16, 38, 39

*Choh v. Brown Univ.*,
  753 F. Supp. 3d 117 (D. Conn. 2024) .........................................................24, 38

*City of Almaty v. Sater*,
  503 F. Supp. 3d 51 (S.D.N.Y. 2020) .............................................................43

*City of Moundridge v. Exxon Mobil Corp.*,
  471 F. Supp. 2d 20 (D.D.C. 2007) ................................................................42

*Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*,
  833 F.3d 399 (3d Cir. 2016) ..........................................................................23

*Dream Big Media Inc. v. Alphabet Inc.*,
  2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ...............................................28

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ........................................................................32

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) .................................................................25, 26, 34

iv

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ........................................................30

*Flegel v. Christian Hosp., Ne.-Nw.*,
    4 F.3d 682 (8th Cir. 1993) ...........................................................................27

*\*Fotobom Media, Inc. v. Google LLC*,
    719 F. Supp. 3d 33 (D.D.C. 2024) ....................................29, 30, 33, 39, 40, 43

*Fresh Made, Inc. v. Lifeway Foods, Inc.*,
    2002 WL 31246922 (E.D. Pa. Aug. 9, 2002) ................................................22

*FTC v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021) ..................................................................12

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986)......................................................................................25

*\*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ...................................................25, 30, 40, 42

*GEICO v. Fetisoff*,
    958 F.2d 1137 (D.C. Cir. 1992) ....................................................................43

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
    433 F. App'x 598 (9th Cir. 2011) .................................................................22

*\*Great Escape, Inc. v. Union City Body Co.*,
    791 F.2d 532 (7th Cir. 1986) .........................................................................9

*Gross v. Wright*,
    185 F. Supp. 3d 39 (D.D.C. 2016) ................................................................22

*Hourani v. Mirtchev*,
    943 F. Supp. 2d 159 (D.D.C. 2013) ..............................................................13

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006)........................................................................................15

*In the Matter of Diamond Shamrock Corp.*,
    113 F.T.C. 316 (1990)....................................................................................8

*\*Intergraph Corp. v. Intel Corp.*,
    195 F.3d 1346 (Fed. Cir. 1999)....................................................................25

*Iron Vine Sec., LLC v. Cygnacom Sols.*,
    274 A.3d 328 (D.C. 2022) ............................................................................44

*It's My Party, Inc. v. Live Nation, Inc.,
    811 F.3d 676 (4th Cir. 2016) ..................................................................37

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,
    466 U.S. 2 (1984)...........................................................................14, 19, 39

Kartell v. Blue Shield of Mass., Inc.,
    749 F.2d 922 (1st Cir. 1984) ..........................................................11, 31

Kaufman v. Time Warner,
    836 F.3d 137 (2d Cir. 2016).................................................................39

Krukas v. AARP, Inc.,
    376 F. Supp. 3d 1 (D.D.C. 2019) .......................................................45

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,
    551 U.S. 877 (2007)........................................................................14, 24

Margolis v. U-Haul Int'l, Inc.,
    818 F. Supp. 2d 91 (D.D.C. 2011) ....................................................44

Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,
    924 F.2d 1484 (9th Cir. 1991) ...........................................................27

*New York v. Facebook, Inc.,
    549 F. Supp. 3d 6 (D.D.C. 2021), aff'd sub nom.
    New York v. Meta Platforms, Inc., 66 F.4th 288 (D.C. Cir. 2023) ...................................11

News World Commc'ns, Inc. v. Thompsen,
    878 A.2d 1218 (D.C. 2005) ...............................................................43

*Ohio v. Am. Express Co.,
    585 U.S. 529 (2018)..............................................15, 16, 20, 23, 24

Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.,
    920 F. Supp. 455 (S.D.N.Y. 1996) ...............................................37, 38

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,
    555 U.S. 438 (2009).............................................................8, 10, 11

Peart v. D.C. Hous. Auth.,
    972 A.2d 810 (D.C. 2009) ..................................................................44

*PhantomALERT v. Apple, Inc.,
    762 F. Supp. 3d 8 (D.D.C. 2025)............................16, 17, 18, 21, 26, 27, 38

Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.,
    886 F.3d 332 (3d Cir. 2018)..........................................................31, 42

*Philips Int'l Invs., LLC v. Pektor*,
    117 A.D.3d 1 (N.Y. App. Div. 2014) ...............................................................44

*\*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)...........................................................16, 17, 28

*Rick-Mik Ents., Inc. v. Equilon Ents. LLC*,
    532 F.3d 963 (9th Cir. 2008) ...............................................................35, 37

*Robinson v. HP, Inc.*,
    2025 WL 2802077 (N.D. Ill. Sept. 30, 2025) .................................................37

*Rock v. NCAA*,
    928 F. Supp. 2d 1010 (S.D. Ind. 2013) ........................................................22

*Russell v. Walmart, Inc.*,
    680 F. Supp. 3d 1130 (N.D. Cal. 2023) ........................................................45

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) ....................................................16, 39

*SigmaPharm, Inc. v. Mut. Pharm. Co.*,
    772 F. Supp. 2d 660 (E.D. Pa. 2011), *aff'd*, 454 F. App'x 64
    (3d Cir. 2011)...........................................................................................33

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
    947 F. Supp. 2d 88 (D.D.C. 2013) .......................................................16, 26

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)............................................................................40, 41

*Stallard v. Goldman Sachs Grp., Inc.*,
    2024 WL 4903783 (D.D.C. Nov. 27, 2024) ...................................................34

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997)......................................................................................24

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ....................................................................17

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)......................................................................................24

*Therapearl, LLC v. Rapid Aid Ltd.*,
    2014 WL 4794905 (D. Md. Sept. 25, 2014) ..................................................43

*\*Times-Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953)..................................................................................22

*TKO Energy Servs., LLC v. M-I L.L.C.*,
    539 F. App'x 866 (10th Cir. 2013) ........................................................42, 43

*Tremblay v. OpenAI, Inc.*,
    716 F. Supp. 3d 772 (N.D. Cal. 2024) ...................................................45

*United States v. Airco, Inc.*,
    386 F. Supp. 915 (S.D.N.Y. 1974) .........................................................9

*United States v. Empire Gas Co.*,
    393 F. Supp. 903 (W.D. Mo. 1975) ....................................................9, 10

*United States v. Google LLC*,
    2025 WL 2523010 (D.D.C. Sept. 2, 2025) .......................6, 12, 25, 31, 35, 36

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) .............................4, 5, 11, 12, 27, 35

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).............................................................................30

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .........13, 14, 15, 18, 19, 23, 25, 26, 30, 31, 33, 34, 36, 38, 42

*Uniwill L.P. v. City of Los Angeles*,
    124 Cal. App. 4th 537 (2004) ..............................................................45

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
    2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ......................................11

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..........................................................8, 11, 12, 40

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010)...................................................................33

*Washkoviak v. Student Loan Mktg. Ass'n*,
    900 A.2d 168 (D.C. 2006) ...................................................................44

*Wu v. Stomber*,
    750 F.3d 944 (D.C. Cir. 2014) .............................................................44

## DOCKET CASES

*Chegg, Inc. v. Google, LLC*,
    No. 1:25-cv-00543-APM (D.D.C. June 9, 2025).................................22

*United States v. Google LLC*,
    No. 20-cv-3010 (D.D.C.) ......................................................................36

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW
    (4th & 5th eds. 2024) ...................................................................................8, 19, 23, 24, 32

U.S. Dept. of Justice, Fed. Trade Comm'n, Merger Guidelines § 4.3 (2023) ...............................21

# INTRODUCTION

Google has now thrice explained why the claims at issue in this case, based on Google's addition of helpful generative AI features to its search engine, fail as a matter of law. Nearly a year ago, the online learning company Chegg, Inc., filed suit against Google, alleging on various attenuated bases that Google's provision of AI-generated content on its search engine results page violated the antitrust laws. Rather than opposing Google's motion to dismiss, Chegg amended its complaint. Shortly before briefing was complete on Google's second motion to dismiss, Plaintiff Penske Media Corporation, together with several of its direct and indirect subsidiaries (collectively, "PMC")—represented by the same lawyers as Chegg—filed this action, alleging the exact same claims in nearly verbatim language. Google moved to dismiss, and, like Chegg before it, PMC again chose to amend its complaint rather than oppose. All told, PMC and its counsel are now on their fourth complaint challenging the same alleged conduct based on substantially the same legal theories. PMC's Amended Complaint addresses *none* of the dispositive defects Google has repeatedly highlighted across its two motions to dismiss in *Chegg* and prior motion to dismiss here. PMC and its counsel have been on notice of these defects for almost a year. That they have made no attempt to cure them only confirms that they cannot do so. PMC has now had multiple opportunities to plead its best case, and it remains legally defective in every way.

The core of PMC's case, like *Chegg*, is based on Google's alleged "refusal to permit publishers to opt out of Google using their content for AI purposes" if publishers wish for the same content to be indexed by Google's search engine. Am. Compl. ("AC") ¶127. A "refusal to permit" is squarely a refusal to deal on PMC's preferred terms for which there can be no antitrust liability.

This case is a good illustration of why. PMC faults Google for introducing generative AI features on its search engine that more efficiently provide users with the information they seek.

PMC claims that Google Search now designs its search results page *too well*. In PMC's preferred world, Google Search must be frozen in time, requiring users to speculatively visit websites like PMC's to access their desired information—if it is found there at all. It is for good reason that no antitrust law supports this theory, regardless of whether it is labeled as "reciprocal dealing," "monopoly maintenance," "tying," "monopoly leveraging," or "attempted monopolization." PMC's scattershot claims that describe identical, lawful conduct—spread across half a dozen supposed markets—fail on every level.

*First*, as before, PMC's lead claim is that Google has engaged in "reciprocal dealing" by "threatening" to withhold "Search Referral Traffic" from PMC and other publishers unless they "sell" Google the content they already provided it for indexing on its search engine for the purpose of providing AI Overviews as part of Google's search results. But what the Amended Complaint calls "reciprocal dealing" is nothing more than a claim that Google is refusing to deal with PMC on PMC's preferred terms. Google is not obligated to include PMC's or any other publisher's content in its search engine. Having chosen to do so, Google is free to set the terms on which it will engage with PMC and other publishers.

Even if this were considered a reciprocal dealing claim (and even assuming that reciprocal dealing remains a viable antitrust theory), PMC's claims still fail as a matter of law. Reciprocal dealing is potentially of antitrust concern only if it forecloses competition in the markets for the products the plaintiffs are "coerced" into providing—here, content for use in AI products that PMC labels "Republishing Content," "[Generative AI] Training Content," and "[Retrieval-Augmented Generation] Content." But the premise of PMC's case is that competition among firms seeking that content is robust, and that Google simply should have "paid" them more in accordance with prevailing competitive rates. PMC does not and cannot allege that the purported reciprocal dealing

excluded other buyers for its content or prevented publishers from licensing content elsewhere. Its allegations are admissions that the challenged conduct had *no effect* on competition for AI content whatsoever. Any reciprocal dealing claim therefore necessarily fails.

PMC's claims continue to fail other requirements for reciprocal dealing too. Reciprocal dealing requires a defendant to condition purchases in one market on purchases in another market. Google does not "purchase" content for its search engine from PMC or "sell" it "Search Referral Traffic," so there is no transaction upon which a reciprocity condition could be placed. PMC's theory of coercion is likewise implausible. Google obtains web content for its search index based on publishers' own choices to make such content available. Publishers maintain discretion over which portions of their websites are available to be indexed on Google and can opt out of indexing entirely. Publishers who allow Google to index their sites do so not because of coercion, but because of the visibility and discoverability benefits indexing provides.

*Second*, PMC continues to allege that Google's introduction of new search features unlawfully maintained its alleged monopoly in the GSS market. But as before, PMC does not have antitrust standing to bring claims about its alleged GSS market, since it is not a participant in that market. And PMC's theory that Google's new AI-powered search features are anticompetitive because they make Google's products better would condemn conduct that is encouraged, not prohibited, under the antitrust laws.

*Third*, PMC's tying claim—the only substantive addition to its Amended Complaint— fares no better. The Amended Complaint asserts that Google forces users to "purchase" AI Overviews by displaying them on the search results page. But this supposed tie is nothing more than Google displaying AI Overviews on its search results page. There is no tie. AI Overviews are, as the name implies, summaries of information responsive to a user's query. They are not a separate

product from Google's general search engine. And displaying an AI Overview does not deprive users of alternatives or require them to ***use*** it to access other results. Providing users with the choice to use an additional feature cannot be coercive tying.

*Fourth*, PMC persists in its claim that Google is using its alleged monopoly power in GSS to obtain a monopoly in a purported market for all "Online Publishing." The contours of that market, which according to PMC includes all text information published on the Internet in the United States, are massively overbroad and implausible. But even if it were a cognizable market, Google has not engaged in any anticompetitive conduct in that so-called market merely by providing users with information on its search engine results page. Nor does Google (or any firm) have any prospect of monopolizing a market so unimaginably broad.

*Fifth*, PMC still alleges none of the facts required to support an unjust enrichment theory that Google has misappropriated content generated by PMC and other publishers.

PMC's Amended Complaint should be dismissed with prejudice.

## BACKGROUND

### I.    GOOGLE'S SEARCH ENGINE

Google's search engine uses automated software—referred to as web crawlers—to collect information about what pages exist and what they contain. *United States v. Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. 2024) ("*Google Search*"). PMC calls this information "Search Index Data." AC ¶58. The results are then organized into an index, which is searched whenever a user enters a query into the search engine. *Id.* ¶60. Website developers maintain control over what content Google collects for its index through a file called robots.txt, which specifies the parts of a website Google can crawl. *Id.* ¶62. Using robots.txt, website developers can opt out of Google crawling completely, or they can do so selectively, deciding for themselves which sections of their website can be indexed. *See id.* When a user enters a query into Google, the search engine runs the query

against Google's index, and the results are listed in the order that Google believes most relevant to the user. The results page may also display additional content, including advertisements, related searches, and excerpts of relevant webpages. *See id.* ¶57.

Google's search engine is "widely recognized as the best [search engine] available in the United States." *Google Search*, 747 F. Supp. 3d at 56. Rather than resting on its laurels, Google has repeatedly sought to introduce enhancements to its search engine to more efficiently provide its users with the information they seek. Features that PMC protests—the Knowledge Panel, Featured Snippets, the People Also Ask panel—are illustrative. The Knowledge Panel presents users with the answer to a simple query, such as the example PMC provides regarding a search for "Washington's birthday." AC ¶94. Meanwhile, the Featured Snippets feature—introduced in 2014—provides excerpts from search results that Google believes to be especially relevant to a user's search. *Id.* ¶¶95-96. PMC's Amended Complaint characterizes these excerpts as "Republishing Content." *Id.* ¶214. Likewise, the People Also Ask panel builds upon the Featured Snippet feature, offering additional Featured Snippets that may be relevant to a user's query based on similar searches made by other users. *Id.* ¶¶97-98. PMC does not claim that these features were introduced for any reason other than to improve the overall search experience.

The rise of generative AI has provided Google with further opportunities to improve the search experience. Generative AI—so called because it generates natural language in response to a prompt—can allow users to engage in conversation, ask detailed questions, and even produce work product, such as computer code or an essay. AC ¶¶133-134. Generative AI has been incorporated into a variety of products, including, among others, "a chat-based AI product called 'ChatGPT.'" *Id.* ¶112. A fundamental technology underlying text-based generative AI is the large language model or LLM. The Amended Complaint refers to the datasets on which LLMs are

trained as "GAI Training" content. *Id.* ¶¶214, 216. PMC also claims that, "once trained," an LLM can use a technique called "retrieval-augmented generation" ("RAG") to "connect[] an LLM to external sources of information, such as live search results, to improve the quality of its outputs." *Id.* ¶139. The Amended Complaint refers to these external sources as "RAG Content." *Id.* ¶214.

Among Google's new AI-based features are AI Overviews, which use generative AI to provide search results. *See* AC ¶¶153-157. AI Overviews augment Google Search by parsing more complex questions, providing an overview summary of the topic of the query and corroborating links for users to learn more. *Id.* ¶¶149, 164-165. Google's introduction of AI Overviews "has had a generally positive effect on Search—Google has seen an increase in both consumer satisfaction and volume of queries." *United States v. Google LLC*, 2025 WL 2523010, at *10 (D.D.C. Sept. 2, 2025) ("*Google Search Remedies*"). "'[W]hen AI Overviews appear, pages that appear as a corroborating link [in AI Overviews] get more clicks than if the page had appeared as a traditional 'blue link' listing for that query.'" *Id.* (alterations in original).

## II.    PMC's Lawsuit

PMC is a media company that operates a portfolio of publications, including Billboard, Deadline, Rolling Stone, and Variety. AC ¶20. PMC's monetization strategy for the segment of its business involving digital content allegedly involves attracting users to its websites, where it earns revenue through several channels. First, PMC sells digital advertising, earning revenue based on the number of impressions shown to visitors. *Id.* ¶47. More traffic means more impressions, which translates into higher advertising revenue. *Id.* Second, PMC uses affiliate links embedded in editorial content. *Id.* ¶45. For example, Rolling Stone's "RS Recommends" section includes product reviews with links to retailers like Amazon and Best Buy. *Id.* ¶49. When users click those links and make purchases, PMC earns commissions. *Id.* This model relies on users visiting PMC's sites and engaging with its content. *Id.* Third, PMC offers paid subscriptions for certain

publications, including Billboard, Rolling Stone, and Variety. *Id.* ¶50. Subscriptions are often driven by initial exposure to free content: users typically read articles before deciding to subscribe. *Id.* These revenue sources are the result of user action: users independently decide whether to visit a website, use an affiliate link, and subscribe. *Id.* ¶¶47, 49-50.

According to PMC, this ecosystem of free content supported by advertising, affiliate revenue, and subscriptions relies on referral traffic from search engines. AC ¶¶2-5, 68. PMC acknowledges that it voluntarily permits Google to crawl and index its content for the purpose of generating search referral traffic. *Id.* ¶¶5, 68. It describes this arrangement as a "fundamental bargain" in which publishers allow access to their content for visibility in search results. *Id.* ¶5.

PMC now alleges that its business model cannot compete with GAI content, like the content that Google displays on its search engine results page ("SERP"), because users have access to "PMC content, or a close facsimile of it, on a GAI-powered search results page or from some other GAI tool." *Id.* ¶53. Rather than adapting to advances in technology, PMC filed this lawsuit.

## ARGUMENT

### I.    PMC FAILS TO PLEAD A VALID CLAIM FOR RECIPROCAL DEALING (COUNTS I-II)

PMC has not plausibly alleged that Google engaged in reciprocal dealing (to the extent it is even a viable antitrust theory), either in violation of Section 1 (Count I) or Section 2 of the Sherman Act (Count II). To start, PMC fails to allege a reciprocal dealing claim of any kind. PMC alleges that Google engaged in conduct that, at its core, is based on a supposed refusal to deal with PMC on PMC's preferred terms. But that is not prohibited under the antitrust laws. Nor do PMC's allegations constitute a reciprocal dealing violation. PMC does not and cannot allege harm to competition in the supposed tied markets (or at all), which in any event are implausibly alleged. That forecloses any rule of reason theory. And the *per se* rule is not applicable here, so those claims

fail. Moreover, PMC has failed to plausibly plead that the alleged tying product market exists, or that Google engaged in any coercion, as required to state a reciprocal dealing claim. Finally, PMC lacks antitrust standing to raise these claims, because its alleged injuries have no relationship to the supposed competitive harms upon which its claims are based.

### A.    Google's Conduct Constitutes A Lawful Refusal To Deal On PMC's Preferred Terms, Not Reciprocal Dealing

PMC has no cognizable reciprocal dealing claim. If it exists as a valid antitrust theory at all, "reciprocal dealing exists where … ['o]ne party offers to buy the other party's goods, but only if the second party buys other goods from the first party.' More colloquially, reciprocal dealing exists when one party tells the other: 'I'll buy from you, if you buy from me.'" *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (3d Cir. 1998). Reciprocal dealing has been at issue only in a few cases, and it is a disfavored theory of liability whose "harms have been exaggerated without adequate appreciation of likely benefits to competition." PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶1775 (4th & 5th eds. 2024). No appellate court has recognized a viable reciprocal dealing claim after the Supreme Court's decision in *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), which confirmed that, absent an antitrust duty to deal, firms have broad latitude to set the terms on which they will do business with others, *see Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009) (*Trinko* "ma[de] clear that if a firm has no antitrust duty to deal with its competitors …, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous.").

Even if it were a valid basis for liability, the arrangement PMC alleges looks nothing like reciprocal dealing. A reciprocity agreement is a threshold requirement for a reciprocal dealing claim. *In the Matter of Diamond Shamrock Corp.*, 113 F.T.C. 316, at *3 (1990) ("Coercive reciprocal dealing" requires "an actual agreement between the parties to make reciprocal

8

purchases"); *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 537 (7th Cir. 1986) (reciprocal dealing can exist "when a buyer … conditions its purchases on an agreement or contract that the seller … will make reciprocal purchases from it"); *United States v. Empire Gas Co.*, 393 F. Supp. 903, 915 (W.D. Mo. 1975) ("there must be some form of understanding between seller and buyer to reciprocate"). No such agreement is alleged, nor would one even make sense.

The Amended Complaint explains that Google "crawls, indexes and links to websites in its search results" and that "[w]ebsites gain free traffic from users interested in what they have to offer." AC ¶69; *see also id.* ¶63. These allegations—even if taken as true—would not establish that Google agreed to provide any referral traffic based on its indexing or any reciprocal dealing. At best, they show that there is a mutual benefit to the way search engines work. And of course, the "[m]ere unilateral conduct" by Google in indexing content and by publishers in allowing their content to be indexed is not indicative of a reciprocal dealing *agreement* "even though it may involve some degree of reciprocity." *Great Escape*, 791 F.2d at 537; *see also United States v. Airco, Inc.*, 386 F. Supp. 915, 918 (S.D.N.Y. 1974) ("'unilaterally decid[ing] to purchase [a] product[]'" cannot establish the existence of a reciprocity agreement). PMC's characterization of these activities as an "exchange," AC ¶68—and conclusory allegation that "[p]ublishers 'pay' for search distribution" and referral traffic by providing content for indexing, *id.* ¶58—is an attempt to invent a transaction where none exists. PMC does not, and could not, allege that Google has promised to deliver any amount of referral traffic, or any traffic at all, to PMC's websites in exchange for its content, or any facts suggesting "that a quid pro quo was demanded or understood to be an integral part of the [alleged] reciprocal" activity. *Empire Gas*, 393 F. Supp. at 915. By that logic, Google has an agreement with virtually every website operator on the internet to deliver traffic to every website it has indexed for search. If that is the inference that PMC asserts from its

allegations, it is miles away from plausible. And because Google cannot withhold (or threaten to withhold) that which it does not deliver, PMC has not alleged a reciprocity agreement. *See id.*

Moreover, Google does not itself deliver "referral traffic." Referral traffic flows to publishers based on *users* of Google Search choosing to click on links to publishers' sites in search results. *See* AC ¶233. Google cannot force users to click on links and thus cannot possibly promise or agree to provide any referral traffic to publishers—rendering PMC's entire theory of agreement implausible. *See Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563-64 (E.D. Pa. 2002) (not crediting allegations of agreement that "makes no economic sense").

Instead, what PMC really alleges is that Google has refused to provide it with access to its search engine on PMC's desired terms. That theory no longer works after *Trinko*. The notion that Google "must provide [PMC] access" on PMC's chosen terms "is squarely a refusal-to-deal theory," which PMC "cannot 'avoid …' by attempting to 'recast' [Google's] conduct" as reciprocal dealing or anything else "when the substance of that conduct is a refusal to deal." *AliveCor, Inc. v. Apple Inc.*, 2026 WL 61304, at *8 (9th Cir. Jan. 8, 2026). Indeed, PMC concedes that its claims stem from "Google's refusal to permit publishers to opt out of Google using their content for AI purposes." AC ¶127. Its fundamental complaint is that Google has "alter[ed] the terms in the" purported "Input Market" for search engines by using the search engine "inputs" provided by PMC "not only to populate search results, but also as an input" for Google's generative AI offerings. *Id.* ¶89. PMC would prefer that Google freeze the way it presents its search results forever. But Google has no obligation to index PMC's content or show links to its pages on the SERP in the way that PMC desires. Having chosen to incorporate PMC's freely offered content into its search index, it is black-letter law that Google is "free to choose … the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448. "[L]ike any other firm," Google has the right

"to make decisions about … on what terms [it] will deal" with publishers who want their content indexed. *New York v. Facebook, Inc*., 549 F. Supp. 3d 6, 24 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023). It need not "offer [its indexing] service at the … prices" or terms that PMC "would have preferred." *linkLine*, 555 U.S. at 451.

Even if search indexing could be appropriately considered a "transaction" between Google and PMC (and it cannot), PMC merely alleges that Google has altered the terms on which it is willing to engage in that transaction. Under the contrived framework PMC alleges, Google is now asking PMC to "pay" for "Search Referral Traffic" by providing Search Index Data that can be used both to populate search results and for use in Google's GAI offerings. *See* AC ¶214. The antitrust laws do not police such garden-variety price-setting decisions. At most, "this case involves a refusal to deal at Plaintiff's desired … price." *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *7 (N.D. Ill. Sept. 28, 2015). Such a claim "is ill-suited to judicial resolution" and foreclosed by firms' right to choose the terms on which they will deal with others. *Id.* at *8; *see also linkLine*, 555 U.S. at 454 ("An upstream monopolist with no duty to deal is free to charge whatever … price it would like[.]"); *Trinko*, 540 U.S. at 407 ("charging of monopoly prices[] is … not unlawful"); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 927 (1st Cir. 1984) ("A legitimate buyer is entitled to use its market power to keep prices [it pays] down.").

The one "'narrow-eyed needle' of an exception" to "the general no-duty-to-deal rule," *New York*, 549 F. Supp. 3d at 25, is not alleged or applicable here. It applies only when an alleged refusal to deal (1) involves "a preexisting voluntary and presumably profitable course of dealing" that is later terminated; (2) "products that the defendant already sells in the existing market to other similarly situated customers"; and (3) "a willingness to forsake short-term profits to achieve an anti-competitive end." *Id.* at 27; *see also Trinko*, 540 U.S. at 409; *Google Search*, 747 F. Supp. 3d

11

at 181-84 (applying *Trinko* standard to a refusal to deal involving Google's search business).

Nothing in the Amended Complaint suggests this narrow exception would apply here. Most fundamentally, PMC does not—and could not—allege that Google terminated any preexisting course of dealing with PMC. As explained, there is no agreement whereby Google provides "Search Referral Traffic" to PMC. But even if there were, the Amended Complaint admits that PMC has allowed—and continued to allow—"Google to access its content and include it in Google's search index" and that, as a result, users of Google's search engine "generate traffic to PMC's websites via search results." AC ¶68. Thus, PMC pleads that the alleged course of dealing continues uninterrupted. Nor has the supposed "bargain" between Google and publishers changed: Google continues to provide links to publisher pages on the SERP, including in its AI Overviews. *Id.* ¶¶164-165; *Google Search Remedies*, 2025 WL 2523010, at *10. PMC instead complains that Google has placed a so-called "condition" on the receipt of "Search Referral Traffic"—the use of content to train Google's AI models. AC ¶214. But there are no allegations that Google treats PMC differently from other publishers or that Google's conduct is "irrational but for its tendency to harm competition." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 24 (D.D.C. 2021). PMC's Amended Complaint alleges, however, that Google uses content voluntarily offered by publishers generally, and that Google's opt-out policies apply to all publishers, not just PMC. *See, e.g.*, AC ¶¶5, 62, 105. It is also perfectly rational for Google to improve its products using readily available indexed search data, so the challenged conduct is not "irrational but for its tendency to [supposedly] harm competition." *Facebook*, 560 F. Supp. 3d at 24.

None of these defects is curable by further amendment. If they were, PMC surely would have cured them after Google made these very points in its original motion to dismiss—not to mention the two motions to dismiss the *Chegg* complaints. Instead, PMC's own allegations make

clear that there can be no reciprocal dealing claim (if such a claim were even possible under the law) because there is no agreement between Google and PMC for Google to do anything, let alone on terms of PMC's choosing. And PMC has come nowhere close to plausibly alleging a claim under the narrow refusal to deal exception because its own allegations are *inconsistent with* such a claim. *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 171 (D.D.C. 2013) ("A plaintiff … may not plead facts in their amended complaint that contradict those in their original complaint.").

### B.    PMC Fails To Allege A Viable Reciprocal Dealing Claim

Counts I and II continue to fare no better even if assessed under the reciprocal dealing framework. Courts analyze claims for reciprocal dealing under the same standard as claims for tying—"where a seller conditions the sale of one good (the tying product) on the buyer also purchasing another, separate good (the tied product)." *Brokerage Concepts*, 140 F.3d at 510, 512. And "like tying, not all reciprocal dealing arrangements are anticompetitive." *Id.* at 511.

Count I of PMC's Amended Complaint challenges the alleged reciprocal dealing under Section 1 of the Sherman Act. As with tying, Section 1 reciprocal dealing claims can be evaluated using either "the *per se* and rule of reason tests," as the facts of the case warrant. *Brokerage Concepts*, 140 F.3d at 512; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 84 (D.C. Cir. 2001) (*en banc*). Count II of the Amended Complaint challenges the same alleged reciprocal dealing conduct under Section 2. All Section 2 cases require application of the rule of reason; there is no such thing as a *per se* violation of Section 2. *See Microsoft*, 253 F.3d at 58-59. PMC does not allege otherwise. AC ¶¶268-278.

Courts borrow the elements of a reciprocal dealing claim from tying cases. "There are four elements to a *per se* tying violation: (1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a

substantial volume of commerce." *Microsoft*, 253 F.3d at 85. A rule of reason reciprocal dealing claim, like a rule of reason tying claim, requires a further showing that the challenged conduct "unreasonably restrained competition … in the tied market." *Brokerage Concepts*, 140 F.3d at 519 (cleaned up) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984)).

For the reasons explained below, PMC has failed to allege a valid reciprocal dealing claim under either the rule of reason or the *per se* test. The same flaws from PMC's initial Complaint (and the *Chegg* complaints) persist and have not been cured. The alleged tied markets—for "Republishing Content," "GAI Training Content," and "RAG Content"—are implausible. And even if they were valid markets, PMC has not alleged—as it must—that the challenged conduct harmed competition in those markets. Instead, its Amended Complaint affirmatively alleges facts demonstrating that competition in these markets continues unimpaired, foreclosing any rule of reason violation. PMC's Section 2 reciprocal dealing claim in Count II fails accordingly, as does its Section 1 reciprocal dealing claim in Count I if the Court applies the rule of reason.

As a result, PMC's Section 1 reciprocal dealing claim can proceed only if the Court concludes that application of the *per se* test is appropriate. It is not. PMC alleges an unusual form of reciprocal dealing that courts have no experience evaluating, much less uniformly condemning as unlawful. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-887 (2007). Procompetitive benefits from the challenged arrangement are readily apparent on the face of PMC's Amended Complaint. *See Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-23 (1979). And the alleged reciprocal dealing involves precisely the type of novel technological arrangement that the D.C. Circuit instructed in *Microsoft* cannot be subject to *per se* treatment. 253 F.3d at 89-91. The Court thus should not apply the *per se* test to PMC's Section 1 reciprocal dealing claim, which, given PMC's failure to allege a rule of reason reciprocal dealing

14

claim, mandates dismissal of Count I.

Further, both PMC's Section 1 and Section 2 reciprocal dealing claims fail, irrespective of the mode of analysis applied, for two additional, independently dispositive reasons: PMC fails to plausibly allege a tying product market in which Google has market power, and PMC fails to allege that Google affords PMC no choice but to provide it with its content.

### 1.    PMC Fails To Plausibly Allege A Reciprocal Dealing Claim Under The Rule Of Reason

Under the rule of reason, PMC must plausibly allege that the challenged reciprocal dealing "has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("*Amex*"). The relevant markets for purposes of this inquiry are the allegedly tied product markets. That is because, definitionally, coercive reciprocal dealing—like tying—imposes a restraint only in the market for the tied product. *See Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34 (2006) ("[T]he justification for the challenge [against ties] rest[s] on either an assumption or a showing that the defendant's position of power in the market for the tying product [is] being used to restrain competition *in the market for the tied product*." (emphasis added)). Thus, a reciprocal dealing claim under the rule of reason requires anticompetitive harm in the form of reduced competition in the market for the tied product. *Brokerage Concepts*, 140 F.3d at 519; *Microsoft*, 253 F.3d at 95. Reciprocal dealing that does not foreclose rivals in the tied market will not harm competition and is thus lawful. *See Microsoft*, 253 F.3d at 95; *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009).

### a.    The allegedly tied markets are implausible

Even after amendment, PMC's rule of reason reciprocal dealing claims fail out the gate because the allegedly tied product markets are implausible. Sufficiently alleging a relevant market is a threshold step in any rule of reason case because "[w]ithout a definition of the market there is

no way to measure the defendant's ability to lessen or destroy competition" or the competitive effects of the challenged conduct. *Amex*, 585 U.S. at 543 (cleaned up). Accordingly, failure to adequately allege the tied markets is fatal. *See Brokerage Concepts*, 140 F.3d at 519; *Cavalleri v. Hermes Int'l*, 2025 WL 2662897, at *3 (N.D. Cal. Sept. 17, 2025) (dismissing complaint because plaintiffs failed to adequately define the tied market and thus "did not come close to plausibly alleging harm to competition in a market for a tied product, which is another essential element of a tying claim"); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1178 (N.D. Cal. 2013) (holding that a complaint did "not plead facts showing any negative impact on competition in the tied markets" because "Plaintiffs have not defined the relevant markets sufficiently to make such a showing").

At the pleading stage, the "alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes … , and it must be plausible." *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013). Relevant markets are defined "by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). A complaint that "fails to draw the market's boundaries to encompass the product at issue as well as all economic substitutes for the product ... cannot state a claim for relief." *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 22 (D.D.C. 2025); *see Sky Angel*, 947 F. Supp. 2d at 103 ("failure to define the market by reference to the reasonable interchangeability—or lack thereof—of services is valid ground for dismissal at the Rule 12(b)(6) stage"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand … [it] is legally insufficient and a motion to dismiss may be granted.").

The purported tied markets are "Republishing Content," "GAI Training Content," and

"RAG Content." AC ¶214. PMC defines these markets as the "supply of access to certain content" for "the purpose of republishing," "GAI training," and "RAG," *id.* ¶¶215-217, and then alleges that each of these purposes has "independent value," and that in some instances, "access to the same content can be allowed for all of these purposes," and in other instances, it "may be allowed only on the condition that its use is restricted to a subset of them," *id.* ¶218.

PMC's allegations are nowhere near sufficient to establish any distinct product markets. The Amended Complaint does not contain a single allegation—even a conclusory one—about "the reasonable interchangeability of use or the cross-elasticity of demand" for "Republishing," "GAI Training," or "RAG" content. *Queen City Pizza*, 124 F.3d at 438. Dismissal is appropriate where a plaintiff simply points to a product and claims that it comprises a relevant market, but fails to allege that nothing is reasonably interchangeable with it. *Id.* at 436; *PhantomALERT*, 762 F. Supp. 3d at 22. On its counsel's fourth complaint alleging the same claims, that remains all PMC has done.

PMC also fails to allege facts to support an "understanding of the bounds" of the alleged Republishing Content, GAI Training Content, and RAG Content markets, which is independently fatal. *PhantomALERT*, 762 F. Supp. 3d at 17. PMC alleges that "republishing, training, and retrieval-augmented generation are separate use cases with independent value," but alleges no facts distinguishing content suitable for each use case or reasonable substitutes for each form of content. AC ¶220. The bare possibility that some aspect of a product is "unique" is legally insufficient to define a market. *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001).

If anything, the Amended Complaint makes clear that Republishing Content, GAI Training Content, and RAG Content are *not* unique. According to PMC, "[i]n some instances, access to the same content can be allowed for" republishing, GAI training, and RAG. AC ¶218. And as to

Google, the publisher content allegedly used for each purpose is the same Search Index Data that PMC chooses to make generally available on the Web. *See id.* ¶230 ("Google uses the same index data for Republishing Content, GAI Training Content, and RAG Content."). PMC does not explain how there could be no reasonable substitutes for republishing, GAI training, and RAG content when its own allegations make clear that each form of content is reasonably interchangeable for each other, as well as for indexing by a search engine. Moreover, one of PMC's primary businesses consists of selling this same content to its customers via subscriptions. *Id.* ¶4. PMC's allegations thus confirm that "there are numerous sources of interchangeable demand" for this content, and that it has improperly "circumscribe[d] the market to a few buyers" to invent distinct markets where none exist. *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008). The three alleged markets thus "do[] not encompass any interchangeable substitute products," which, coupled with PMC's failure to "allege that there are no substitute products," requires dismissal. *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, 2003 WL 22797730, at *5 (E.D. Pa. Nov. 18, 2003); *PhantomALERT*, 762 F. Supp. 3d at 21.

### b.    PMC does not allege any competitive harm in the tied markets

Even assuming the tied markets were plausible, PMC has not alleged that the challenged conduct harmed competition in those markets. PMC alleges that the purported reciprocal dealing "harmed competition in General Search Services," AC ¶260, "reduce[s] the volume of publishing content in the Input Market for General Search Services," *id.*, "restricted output and reduced quality in online publishing markets," *id.* ¶261, and "decreas[ed] the quality of Google's search product," *id.* ¶262. These allegations of harm in markets *other* than the tied markets cannot support a reciprocal dealing claim. *Brokerage Concepts*, 140 F.3d at 511; *Microsoft*, 253 F.3d at 95.

The only consequence in the tied markets that PMC attempts to connect to the challenged conduct is it being "paid less (i.e., nothing)" by Google "for the sale of Republishing Content, GAI

Training Content, and RAG Content." AC ¶¶265, 276. But that does not reflect an anticompetitive effect or "harm [to] the competitive *process*," and PMC does not even claim that it does. *Microsoft*, 253 F.3d at 58. The potential competitive danger of reciprocity is that it may foreclose competitors in the tied market and prevent them from competing effectively. AREEDA ¶1776b; *see Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201 (9th Cir. 2012) ("the types of injuries … that are typically alleged to flow from tying" include "exclud[ing] other sellers," "rais[ing] barriers to entry" in the tied market, or "caus[ing] consumers to forego the purchase of substitutes for the tied product"). But PMC has not alleged that Google's alleged reciprocal dealing somehow prevented other buyers from competing to license PMC's content for republishing, GAI training, and RAG. Nor would such an allegation make sense. Publisher content used for GenAI products is non-rivalrous. PMC can "sell" its content to an unlimited number of buyers for an unlimited number of purposes because the content is incapable of being exhausted—anyone can "buy" the use of the same content without depleting its availability for other buyers. Nor does PMC allege that Google imposed exclusivity provisions or otherwise restricted it or any other publishers from providing the same content to anyone else. Thus, PMC's provision of content to Google for republishing, GAI training, or RAG—whether "forced" or not—"can [have] no adverse impact on competition because no portion of the market which would otherwise have been available to other [buyers] has been foreclosed" as a result. *Jefferson Parish*, 466 U.S. at 16.

Indeed, PMC's Amended Complaint essentially admits that competition continues unimpeded in the allegedly tied markets. The Amended Complaint overflows with allegations detailing arrangements under which "[o]ther GAI companies have announced licensing deals in which they pay" publishers for content, with estimates of "the value of the overarching AI content market … grow[ing] close to $30 billion by 2034." *See* AC ¶¶119, 129-130, 219. Given the

absence of any anticompetitive effects in the tied markets from the alleged reciprocal dealing, PMC's rule of reason claims fail. And having alleged that competition in the supposed AI content markets is robust, PMC cannot change course on amendment and contradict its original allegations. Like Chegg before it, PMC has pled itself out of a rule of reason reciprocal dealing claim.

### c.    The alleged harms in other markets are both irrelevant and implausible

As explained, coercive reciprocal dealing cannot harm competition in markets unrelated to the alleged coercion because the challenged conduct does not restrain those markets. *See supra* p.15. Even taking PMC's allegations of out-of-market harms at face value, they fail to plausibly establish any cognizable anticompetitive effect. PMC alleges that the challenged conduct harms competition in three other markets: the "Input Market" for general search services, the "Online Publishing" market, and the General Search Services market. The Input Market and Online Publishing market are both implausibly alleged, precluding any finding of an anticompetitive effect. *See Amex*, 585 U.S. at 543. And the competitive harm alleged in all three supposed markets depends on a purported output reduction by online publishers that is wholly speculative, implausible, and legally insufficient to show harm to competition.

### i.    The alleged search engine "Input Market" is implausible

PMC alleges that there is a relevant "input market for publisher content used for search results," which it terms the "Input Market." AC ¶78. "In this input market, Google accesses PMC's content through an exchange whereby PMC permits Google to index its content for the purpose of including PMC in links published on Google's SERP, which leads to search referral traffic for PMC." *Id.* ¶235. PMC also alleges that Google is a "monopsonist" in the Input Market by virtue of its alleged monopoly in the General Search Services market. *Id.* ¶78. That does not follow, but in any case the allegation appears to serve no purpose, as none of PMC's claims involve Google

allegedly unlawfully acquiring or maintaining a monopsony, nor using it to coerce PMC given that "Search Referral Traffic," rather than search "inputs," is the alleged tying market.

As with its AI content markets, PMC does not attempt to allege that there are no reasonable substitutes for general search engines from the perspective of publishers seeking to distribute their content. That alone suffices for the Court to dismiss any claim predicated on alleged harm to competition in the alleged Input Market. *PhantomALERT*, 762 F. Supp. 3d at 21.

Moreover, the existence of an Input Market restricted solely to general search engines makes no sense. Google indexes whatever publicly available content publishers allow, AC ¶¶60-61, and makes that indexed content available to users on its SERP. Unlike in traditional input markets like those for labor, *see* U.S. Dept. of Justice & Fed. Trade Comm'n, Merger Guidelines § 4.3 (2023), a publisher's choice to make its content available for indexing by Google does not limit its ability to give the same content to other search engines or distributors. Thus, just like its alleged AI content markets, *see supra* pp.15-18, PMC's search Input Market fails to account for "reasonable interchangeability of use"—that is, the other options available to either PMC or Google in and beyond the alleged market. This is a fatal defect. *Brown Shoe*, 370 U.S. at 325. The Amended Complaint points to numerous other buyers for its and other publishers' content. *See* AC ¶4 (PMC's subscribers), ¶¶129, 212 (other technology companies). Yet PMC offers no explanation for why these are not "reasonably interchangeable buyers" that are outside the relevant market, and the market thus fails. *Campfield*, 532 F.3d at 1119.

### ii.     The alleged "Online Publishing" market is implausible

PMC also alleges an "online publishing market" which "consists of websites and apps on which publishers display textual content." AC ¶80. According to PMC, it includes "news articles, periodicals, reports, and other types of information that is [sic] made available online." *Id.*

As Google explained in its prior motion to dismiss (and which PMC has made no attempt

to cure), this market is entirely implausible. There are no facts alleged suggesting that all "textual content" or "information … made available online" are reasonably interchangeable with one another, and PMC has thus wholly failed to explain "why they are appropriately in the same product market." *Fresh Made, Inc. v. Lifeway Foods, Inc.*, 2002 WL 31246922, at *5 (E.D. Pa. Aug. 9, 2002). "[A] relevant market cannot meaningfully encompass th[e] infinite range" of potential substitutes for products. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 613 n.31 (1953). Instead, "[t]he circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Id.* PMC makes no attempt to do so. Its proposed market "includes an almost unlimited range of" text-based online information "in all its various forms." *Gross v. Wright*, 185 F. Supp. 3d 39, 51 (D.D.C. 2016). "Such indiscriminate monikers are unhelpful in delineating a meaningful product market for federal antitrust purposes." *Id.*; *see also Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) (relevant market of "the pharmaceutical industry" implausible where plaintiff "fail[ed] to state *any* facts indicating that all pharmaceutical products are interchangeable for the same purpose"). PMC's failure to justify "lumping [nearly] all" online content "into the same market regardless of material distinctions" renders it implausible. *Rock v. NCAA*, 928 F. Supp. 2d 1010, 1022 (S.D. Ind. 2013).[1]

   **iii. PMC does not plausibly allege harm to competition in any of the three non-tied markets**

   PMC alleges that Google's conduct has "restricted output and reduced quality" in online

---

[1] Indeed, this contradicts the otherwise materially identical Amended Complaint filed by PMC's counsel in *Chegg*, which alleges that "forms of online informational content such as that conveyed by popular interest, news, or other nonfiction publishers *cannot* substitute for educational publishing content." Am. Compl. ¶54, Dkt. 18, *Chegg, Inc. v. Google, LLC*, No. 1:25-cv-00543-APM (D.D.C. June 9, 2025) (emphasis added). Both cannot be right.

publishing by "diverting traffic" and harming publishers' businesses, thereby harming competition in the Online Publishing market, as well as the search "Input Market" and the GSS market which purportedly rely on publisher outputs. AC ¶¶239, 261, 274. These speculative, "generalized allegations of harm" are "'devoid of further factual enhancement'" and "insufficient to survive a motion to dismiss." *Arcell v. Google LLC*, 744 F. Supp. 3d 924, 931 (N.D. Cal. 2024).

Despite Google's having raised these same deficiencies with respect to both the original Complaint here and in *Chegg*, PMC still does not allege specific facts about the quality and output of content that would exist in a competitive market. "[C]hanges in output are often explained by events completely unrelated to possible predation. For example, changes in technology, consumer taste, or the state of the economy affect overall market demand and thus output." AREEDA ¶730. For that reason, PMC must plausibly allege that this reduction is the result of a less competitive market due to some legally prohibited conduct by Google. *See Amex*, 585 U.S. at 548-49. But PMC makes no nonconclusory allegations that Google's alleged reciprocal dealing excluded competitors from the so-called markets or otherwise created monopoly power. Moreover, the alleged harms— that publishers will stop producing "relevant and reliable" information because of being "[s]tarv[ed]" of search traffic, AC ¶¶262, 275—are entirely speculative.

And those harms are logically limited to publishers like PMC that rely heavily on "Search Referral Traffic." Publishers that rely on other sources of customers, such as "[d]irect navigation" to a publisher's website or "a publisher's website via links on other publishers' pages or social media," *id.* ¶210, will not suffer the same harms. But "[h]arm to one or more competitors will not suffice" to establish an antitrust violation. *Microsoft*, 253 F.3d at 58. As a matter of law, conduct that affects only a subset of competitors cannot cause "anticompetitive effects on the overall market." *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 403-04 (3d Cir. 2016);

*see also Choh v. Brown Univ.*, 753 F. Supp. 3d 117, 133-34 (D. Conn. 2024) ("effects relat[ing] to just some market participants" are "not effects in the market as a whole").

### 2.    *Per Se* Treatment Is Inappropriate

Courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). *Per se* treatment "is appropriate only after courts have had considerable experience with the type of restraint at issue, … and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886-87. "[W]here the economic impact of certain practices is not immediately obvious," courts decline to adopt a *per se* rule. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). The "group of restraints" appropriately subject to *per se* treatment is "small." *Amex*, 585 U.S. at 540. PMC's allegations fail to meet this high bar for at least three reasons.

*First*, "reciprocal dealing has not been the subject of extensive case law development." *Brokerage Concepts*, 140 F.3d at 511-12; *see also* AREEDA ¶1775c ("Because of the small number of decisions, the law concerning reciprocity agreements is quite undeveloped."). The few reciprocal dealing cases that exist involve reciprocal *buying*, where a buyer conditions its purchase of a product on the seller agreeing to buy a separate product from it—again, "I'll buy from you if you buy from me." *Brokerage Concepts*, 140 F.3d at 511. PMC's theory, by contrast, is based on reciprocal *selling*, in which "a firm with [supposed] market power" (Google) "*refuses to sell* product X to a customer" (PMC) "unless that customer agrees to *sell (or give)* product Y to it." AC ¶210 (emphasis added). Put differently, PMC alleges a form of reciprocal dealing in which Google says, "I *won't sell* to you unless you *sell* to me." This variation is plainly not one that "courts have had considerable"—or really any—"experience with." *Leegin*, 551 U.S. at 886. In fact, the only court to address a similarly structured reciprocal selling claim determined that the

arrangement was *not* unlawful. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361-62 (Fed. Cir. 1999) (holding that a seller's conditioning "a continued supply … of CPUs and technical information" on the buyer's "relinquishment of … technology patents without costs" to the seller did not constitute coercive reciprocal dealing).

*Second*, rule of reason analysis is required because the challenged conduct has facially apparent procompetitive benefits. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986). The supposed reciprocal dealing is undertaken in connection with Google's provision of AI Overviews, which PMC's own allegations confirm improves Google's search product, making it easier for users to find helpful information responsive to their queries. *See* AC ¶¶7-8, 99-100, 161; *see also Google Search Remedies*, 2025 WL 2523010, at *10 (AI Overviews have led to "an increase in both consumer satisfaction and volume of queries"). And the challenged arrangement allegedly "effectively lowers Google's costs" to provide this feature. AC ¶260. Thus, even crediting PMC's allegations that the conduct at issue could harm competition in some ways and in certain alleged markets, it nevertheless clearly "increase[s] economic efficiency" for users of Google's search engine, precluding *per se* treatment. *Broadcast Music*, 441 U.S. at 20-23.

*Third*, "novel business practices—*especially* in technology markets—should not be 'conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990-91 (9th Cir. 2020) (quoting *Microsoft*, 253 F.3d at 91). That prudential concern is implicated here, where the challenged conduct involves using content indexed by a search engine in cutting-edge GenAI products. In *Microsoft*, the D.C. Circuit held that *per se* treatment was inappropriate where "the tied good [was] physically and technologically integrated with the tying good." 253 F.3d at 90; *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 997 (9th Cir. 2023)

(similar). The issue here is nearly identical, as the alleged "tying" good—Search Referral Traffic—is allegedly generated using the exact same Search Index Data that also constitutes the supposedly tied "Republishing Content," "GAI Training Content," and "RAG Content." AC ¶103. "Given the costs of improperly condemning a practice across the board, extending a *per se* rule requires caution and judicial humility." *Epic Games*, 67 F.4th at 997. Courts have no experience evaluating the competitive effects of arrangements involving providers of data for one purpose supposedly being coerced into acceding to the use of that same data to provide "multiple functionalities," so it is not appropriate to "universally condemn" such an arrangement. *Id.*; *see also Microsoft*, 253 F.3d at 93 ("[B]ecause of the pervasively innovative character of platform software markets, tying in such markets may produce efficiencies that courts have not previously encountered and thus the Supreme Court had not factored into the per se rule as originally conceived.").

### 3.    PMC Fails To Plausibly Allege The Tying Market

PMC continues to allege that the tying product market is "Search Referral Traffic." AC ¶¶257, 270.  But its allegations supporting that market remain woefully deficient. PMC asserts only that "[t]here is a distinct relevant antitrust market for Search Referral Traffic." *Id.* ¶¶78, 212. That conclusory allegation cannot be credited. And PMC never even tries to meet the bedrock requirement of defining this market "by reference to the reasonable interchangeability—or lack thereof—of services" it includes. *Sky Angel*, 947 F. Supp. 2d at 103.

The absence of factual allegations supporting this supposed market is unsurprising because a "market" for "Search Referral Traffic" makes no sense. "[A] market is 'any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level.'" *PhantomALERT*, 762 F. Supp. 2d at 17. Here, PMC alleges that a "market" exists in which Google "sells" "Search Referral Traffic" to publishers, who "'pay' for search distribution by contributing their websites' contents and associated metadata to

the search engines." AC ¶58. But as discussed, Google does not sell "Search Referral Traffic" to publishers (or anyone), obtains no revenue for delivering that traffic, and PMC does not buy the traffic from Google. "Search Referral Traffic" is not a product in any meaningful sense—no more than receiving phone calls from just the yellow pages would be. Courts have repeatedly rejected proposed markets for "referrals" where, as here, "nothing in the record suggests that the referrals … are ever sold." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1487, 1489 (9th Cir. 1991); *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 690 (8th Cir. 1993) (similar). Instead, the "product at issue" in these markets are the services to which consumers are actually referred. *See Morgan, Strand, Wheeler & Biggs*, 924 F.3d at 1489 ("the product at issue here is radiologist's services"). The same is true here. "The product delivered to consumers on a GSE" includes "a search engine results page." *Google Search*, 747 F. Supp. 3d at 110. Google "refer[s]" users to links in its search results, who then choose to click on those links and generate this so-called "Search Referral Traffic." AC ¶¶58-62. Search Referral Traffic is a consequence of *users'* choice of whether to click on links, not anything done by Google. It is not a good or service offered by Google to publishers in any kind of economic transaction. And it bears no resemblance to the "grouping of sales" typically regarded as a market. *PhantomALERT*, 762 F. Supp. 3d at 17.

Moreover, the alleged Search Referral Traffic market does not include "all economic substitutes for the product." *PhantomALERT*, 762 F. Supp. 3d at 22. PMC acknowledges that web publishers have other ways of obtaining traffic, such as "[d]irect navigation" to a publisher's website or "a publisher's website via links on other publishers' pages or social media" or, indeed, purchasing ads, AC ¶212. PMC alleges that these alternatives are "not viable substitutes for Search Referral Traffic" because users "go to search engines when they are specifically looking for information." AC ¶212. That allegation is both conclusory and irrelevant. The relevant question is

whether PMC can plausibly allege that this "intentional search traffic"—from users who are supposedly "specifically looking for information"—is not reasonably interchangeable with other forms of traffic. PMC cannot make this showing. To the contrary, PMC alleges it monetizes all forms of traffic in the same ways—through "advertising, commissions when a user purchases a product through an affiliate link on its sites, and subscription fees"—without regard to how or with what level of intentionality the user arrived at the page, *id.* ¶55. PMC's acknowledgement that it can obtain traffic from other sources, and can earn revenues from it through the same means, is a concession that these other forms of traffic are "'reasonably interchangeable … for the same purposes'" with "Search Referral Traffic" and that the alleged market is thus implausible. *Queen City Pizza*, 124 F.3d at 438.

### 4. PMC Fails To Allege Coercion

PMC also fails to adequately allege that publishers have no choice but to "sell" the tied products to Google. Instead, the Amended Complaint, like its forebears, makes clear that Google does not require publishers to "give" Google anything. Google indexes publicly available content, and PMC admits that publishers may block Google from indexing their content if they wish. AC ¶¶60-62. Google does not charge publishers to index their websites, nor does it pay publishers for indexing access. There can be no coercion for passive "acceptance of a free service" like the one at issue here. *See Athos Overseas, Ltd. v. YouTube, Inc.*, 2022 WL 910272, at *3 (S.D. Fla. Mar. 29, 2022) ("[A]cceptance of a free service does not constitute an impermissible tie-in."); *Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, at *4 (N.D. Cal. Nov. 1, 2022) ("Because they fail to allege they purchased any Google ... services, [Plaintiffs] fail to allege coercion.").

PMC suggests that Google "coerc[es] publishers to supply content to be used for other purposes as a condition of being included in its search index *at all*." AC ¶210 (emphasis added). But to the extent publishers feel pressured to allow Google to index their content, that is a function

of competitive pressure from other publishers competing for search engine users' attention, not Google. Any associated injuries are "losses stemming from continued competition" and are not cognizable harms under the antitrust laws. *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 334 (1990). And it is insufficient to establish the requisite coercion for a reciprocal dealing claim because PMC can concededly still choose not to provide this content.

### C.    PMC Lacks Antitrust Standing On Its Reciprocal Dealing Claims

To allege antitrust standing, PMC must plausibly plead "that the defendant's illegal conduct caused its injury" and that the "injury ... reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806, 812 (D.C. Cir. 2001). For its reciprocal dealing claim, PMC identifies two supposed injuries: (1) it "was paid less (i.e., nothing) for the sale of Republishing Content, GAI Training Content, and RAG Content than it would have but for Google's conduct;" and (2) it "lost revenues as a result of Google diverting traffic from [its] website in the form of lost advertising, affiliate, and subscription revenue from users' visits to its sites." AC ¶¶265, 276. Neither injury is sufficient to confer antitrust standing, because PMC fails to plausibly allege that either flows from the alleged anticompetitive consequences of the challenged "reciprocal dealing." *See Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 43 (D.D.C. 2024).

PMC's first claimed injury is insufficient because PMC has not alleged that the supposed reduction in payments for PMC's republishing, GAI training, and RAG content was caused by the so-called reciprocal dealing. As explained, *see supra* pp.18-20, PMC has not alleged that Google's alleged reciprocal dealing excluded potential buyers for content or that it prevented publishers from licensing elsewhere as would be necessary for a viable claim. The Amended Complaint contains no allegations regarding how Google's conduct has prevented other buyers from paying PMC more for republishing, GAI training, or RAG content from PMC, or how market prices for

that content would have been higher but for Google's conduct. AC ¶¶265, 276. These allegations "are entirely too conclusory and speculative" to plead a plausible basis for antitrust standing. *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015). PMC's own allegations make clear that robust competition exists for AI content. *See e.g.*, AC ¶¶129-131 (Perplexity, Amazon, Potato, and "other … technology companies"), *id*. ¶250 (OpenAI).

PMC's second alleged injury—lost advertising, affiliate, and subscription revenues, AC ¶¶265, 276—also cannot confer antitrust standing. PMC claims it lost advertising, affiliate, and subscription revenue because of a purported reduction in "Search Referral Traffic" to its websites—an alleged injury that occurs in the purported market for "Search Referral Traffic" (where PMC does not even allege competition was harmed), not the allegedly tied markets of Republishing, GAI Training, and RAG Content. A party whose injuries "are experienced in another market do[es] not suffer antitrust injury" even if the injury "flow[s] from that which makes the defendant's conduct unlawful." *Qualcomm*, 969 F.3d at 992; *Fotobom*, 719 F. Supp. 3d at 44 (plaintiff must "'suffer[] its injury in the market where competition is being restrained'").

## II.    PMC FAILS TO PLEAD UNLAWFUL MONOPOLY MAINTENANCE (COUNT IV)

PMC's claim for unlawful monopoly maintenance in the GSS market fails for two reasons. *First*, PMC does not plausibly allege that Google engaged in any exclusionary or anticompetitive conduct in the GSS market. *Second*, even if PMC had sufficiently alleged anticompetitive conduct, PMC does not plausibly allege that it has antitrust standing; it is not a participant in the GSS market and has not suffered an antitrust injury in that market.

### A.    PMC Has Not Alleged Exclusionary Conduct In The GSS Market

PMC has failed to plausibly allege "exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 58 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)).

PMC provides no plausible allegations that Google's conduct was exclusionary as a matter of law. For starters, PMC's allegations amount to an argument that Google Search has become too efficient, thereby leading to fewer visits to PMC's websites. But "product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999-1000 (9th Cir. 2010) ("There is no room ... for balancing the benefits or worth of a product improvement against its anticompetitive effects."); *see also Microsoft*, 253 F.3d at 68 ("[A] monopolist does not violate the Sherman Act simply by developing an attractive product."); *AliveCor*, 2026 WL 61304, at *5-6 (Section 2 claim can be based only on some act "separate from … product improvement"). This Court has recognized that AI Overviews "ha[ve] had a generally positive effect on Search—Google has seen an increase in both consumer satisfaction and volume of queries." *Google Search Remedies*, 2025 WL 2523010, at *10. PMC itself alleges that these features improve users' ability to find helpful information responsive to their queries. *See, e.g.*, AC ¶¶7-8, 99-100, 161.

PMC also alleges that Google uses its monopoly power in the GSS market to obtain "GAI Training Content[] and RAG Content for free," which "effectively lowers Google's costs," AC ¶¶259-260, but this likewise fails to plausibly allege anticompetitive conduct in the GSS market. A firm's efforts to lower its costs is "to be encouraged" and does not violate the antitrust laws. *See, e.g.*, *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 340 (3d Cir. 2018); *Kartell*, 749 F.2d at 929. Regardless, PMC's factual allegations do not support an inference that Google's actions prevent any GSS rivals from obtaining this content for free. At most, PMC alleges that "some" "competitor search platforms" "must pay a significantly higher price for the same content," which allegedly helps Google "entrench its general search monopoly." AC ¶239. But PMC's use of the word "some" makes clear that not all such rivals must pay more. *Id*. Thus, this allegation

contradicts PMC's theory that Google can obtain such content for free only because of its monopoly in the GSS market. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 109 (D.D.C. 2010) ("[W]here some allegations in the complaint contradict other allegations, the conflicting allegations become 'naked assertions devoid of further factual enhancement ... [, which therefore] cannot be presumed true.'"). Even accepting PMC's framing, its allegations support at best an inference that Google, by virtue of its size, can obtain better pricing, which PMC analogizes to "charging supracompetitive prices." AC ¶241. But supracompetitive pricing is not itself anticompetitive. *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022) ("[Monopoly pricing] is a feature, not a bug, of the free market system.").

Finally, PMC claims that Google's conduct "harms consumers by decreasing the quality of Google's search product" by "[s]tarving PMC and other publishers of search traffic," which "will ultimately leave search users without relevant and reliable information to answer their queries." AC ¶289. Yet PMC offers nothing other than speculation to support this sky-is-falling hyperbole, despite Google having repeatedly raised this defect both with Chegg's allegations and with PMC's initial Complaint. Regardless, the quality of Google Search does not depend solely on the amount of referral traffic it sends websites. Instead, as is obvious, Google Search's quality depends on its ability to provide information responsive to user queries. Even at the pleading stage, the Court need not turn a blind eye to "common sense," dooming PMC's theory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Moreover, even if this diminished quality theory were plausible, an alleged monopolist's unilateral reduction in the quality of its own product is not an exclusionary or anticompetitive practice. *See* AREEDA ¶651 (explaining this principle through an example of Microsoft developing a version of Windows that is "particularly buggy and prone to crashes"). Doing so does not impair the ability of any other firm to compete, and indeed would enhance the

competitiveness of rivals' comparatively higher quality offerings. *See Microsoft*, 253 F.3d at 58 (exclusionary conduct "must harm the competitive *process*").

**B.    PMC Lacks Antitrust Standing To Bring An Unlawful Monopoly Maintenance Claim**

PMC does not (and could not) allege that it participates in the GSS market or that it suffered any injury in that market. *See Fotobom*, 719 F. Supp. 3d at 44 (agreeing that "the antitrust standing inquiry turns on whether the plaintiff is a participant in the relevant market and 'suffered its injury in the market where competition is being restrained'"). The Amended Complaint confirms this: PMC alleges that it supplies "content that is indexed by Google for search," and that it is therefore a "supplier" in an "input" market upstream of GSS. AC ¶235. But as a matter of law "supplier[s]" do not suffer an "antitrust injury when competition is reduced in the downstream market in which it sells goods or services." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010); *see SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660, 674 (E.D. Pa. 2011) ("Such injury to an input market would remain too remote from the harms that antitrust law seeks to prevent"), *aff'd*, 454 F. App'x 64 (3d Cir. 2011).

Further, PMC cannot "clear[] th[e] high bar" to plausibly allege standing on the basis of its alleged injury being "inextricably intertwined" with the alleged competitive harm in GSS. *Fotobom*, 719 F. Supp. 3d at 47. "[H]arm that is secondary to the anticompetitive conduct cannot support antitrust injury." *Id.* Instead, the party must be "'used as a conduit to harm the defendants' actual competitors' such that the plaintiff's harm is 'an indispensable aspect of the scheme.'" *Id.* (cleaned up). Nothing in the Amended Complaint supports that notion. PMC does not need to engage with Google at all, nor does PMC allege that Google imposes any constraint on PMC's ability to separately deal with Google's GSS competitors and avoid its alleged injuries entirely. *See SigmaPharm*, 772 F. Supp. 2d at 675 ("[Plaintiff] is not a manufacturer of the restrained

product … [a]nd the alleged restraint does not prevent [plaintiff] from offering [its] services to others").

And finally, PMC lacks the necessary "direct and non-speculative damages." *Stallard v. Goldman Sachs Grp., Inc.*, 2024 WL 4903783, at *9 (D.D.C. Nov. 27, 2024). PMC's theory depends on the idea that Google's monopolist status in GSS enables it to obtain content for its generative AI programs for free. But as explained, the Amended Complaint does not plausibly allege that GSS providers would need to pay to license content indexed for search in a more competitive GSS market. *See supra* pp.31-32. Thus, Google's ability to obtain content for free cannot plausibly be the result of Google's alleged monopolization of the GSS market. *See Iqbal*, 556 U.S. at 681 (allegations with "more likely explanations" are implausible).

## III.    PMC FAILS TO PLEAD A VALID CLAIM FOR UNLAWFUL TYING (COUNT V)

PMC newly alleges that Google has unlawfully tied "the sale of the AI Overviews"—the allegedly tied product—"to the sale of its general search product"—the alleged "tying" product— "by designing its SERP so that users are served its AI Overviews above organic search results," in violation of Section 2 of the Sherman Act. AC ¶¶295-296, 298. This claim, which PMC's counsel had conspicuously avoided advancing in favor of their obscure reciprocal dealing charge until their fourth complaint against Google challenging the same conduct, fails on every level.

### A.    PMC Does Not Plausibly Allege The Existence Of A Tie

PMC's tying claim fails because it has not alleged a tie exists. That requires pleading both (1) that "the tying and tied goods are two separate products" and (2) that Google "affords consumers no choice but to purchase the tied product from it"—so-called coercion, *Microsoft*, 253 F.3d at 85; *Epic Games*, 67 F.4th at 995. PMC does not plausibly allege either.

#### 1.    AI Overviews And Google Search Are Not Separate Products

Where the allegedly tied good is not "actually [a] separate product[]," that "preclude[s] any argument that there was an illegal tying arrangement." *Brantley*, 675 F.3d at 1201 n.8. Google's

AI Overviews are not separate from its general search engine, for at least two reasons.

*First*, AI Overviews—like the other informational content presented on Google's SERP—are a *feature* of Google's general search engine, not a separate product, because AI Overviews are simply a summary of information responsive to users' queries.

This Court found in the government search litigation that a key distinguishing feature of general search engines relative to products like Specialized Vertical Providers and social media sites is that "the product delivered to consumers on a GSE … is a search engine results page" that can contain both "organic links that enable the user to navigate to other websites" *and* "vertical offerings"—that is, "categor[ies] of specialized information that is accessible to users without leaving the SERP." *Google Search*, 747 F. Supp. 3d at 42, 110-11. The ability to both visit a link and view information provided directly on the SERP was integral to the Court's finding that there is distinct demand for general search engines such that they constitute a relevant product market. *See id.* at 112. The informational content provided alongside links on the SERP is thus, according to this Court's findings on which PMC relies, "an essential ingredient" to a GSE's "formula for success," such that the "aggregation" of links and information on the SERP "is but a single product." *Rick-Mik Ents., Inc. v. Equilon Ents. LLC*, 532 F.3d 963, 974 (9th Cir. 2008).

An AI Overview is an AI-generated summary of information responsive to a user's query. *See Google Search Remedies*, 2025 WL 2523010, at *10 ("When a user enters a query in Google Search, AI Overviews … 'take the search results that come back and use an LLM to produce a summary of those results.'"). Thus, like the other informational offerings Google presents in response to queries on the SERP, an AI Overview is part of the "'bundle' of search offerings" this Court found comprise a general search engine. *Google Search*, 747 F. Supp. 3d at 115. For good reason then, this Court has described "AI Overviews" as "a GenAI search *feature*," not as a

separate product. *Google Search Remedies*, 2025 WL 2523010, at *18 (emphasis added).

Moreover, "the behavior of firms without market power in the tying good market" provides "[i]ndirect evidence" of the presence or absence of consumer demand for the two products given "that (competitive) supply follows demand." *Microsoft*, 253 F.3d at 86. "If competitive firms always bundle the tying and tied goods, then they are a single product." *Id.* "Microsoft has integrated Copilot into … Bing … through Copilot Answers, which is Microsoft's AI-powered search feature analogous to Google's AI Overviews" *Google Search Remedies*, 2025 WL 2523010, at *19. DuckDuckGo offers a similar, integrated AI feature.[2] That "competitive" firms in GSS offering features akin to AI Overviews have also "bundle[d]" them into their search engines confirms that they are not separate products, and there is thus no tie between AI Overviews and Google's search engine. *Microsoft*, 253 F.3d at 86.

*Second*, and unsurprisingly given the foregoing, PMC alleges *no facts* to satisfy the consumer-demand test, which courts use to determine the existence of separate products. That test "examines direct and indirect evidence of consumer demand for the tied product separate from the tying product." *Microsoft*, 253 F.3d at 86. Direct evidence focuses on whether consumers, when given the choice, would choose to purchase the allegedly tied products separately, and indirect evidence focuses on whether firms offer them separately. *Id.* The Amended Complaint does not contain a single allegation going to any of these factors. It does not allege that any user has requested AI Overviews separately from a search engine or that any firm provides such an offering. Instead, the totality of its allegations on this front is a single conclusory assertion that "Google's general search product and its AI Overviews are distinct and separate products," AC ¶297, which

---

[2] *United States v. Google LLC*, No. 20-cv-3010 (D.D.C.), Rem. Hr'g Tr. 898:8-11 (Weinberg), Dkt. 1398 ("we have what we call Assist, which is equivalent to the AI Overviews … on Google where we are showing answers based on our … web indexing and summarization").

cannot be credited, *Iqbal*, 556 U.S. at 681. Because PMC "sets forth no allegations about the … market's demand for" AI Overviews in relation to search engines, its theory that the two are separate products is implausible and its tying claim fails. *Rick-Mik*, 532 F.3d at 975.

### 2.    There Is No Coercion Alleged

PMC's theory of coercion rests on a single allegation that Google has "design[ed] its SERP so that users … are served AI Overviews directly on the SERP." AC ¶243. But "merely offering two products in a single package, allowing each to enhance the appeal of the other, is not itself coercive." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016). "[T]ying" does not "occur[] any time a seller who has market power over product A offers it for sale together with product B." *Id.* Instead, a coercive tie exists only if a seller makes product A available in such a way that the buyer has *no option* other than to also purchase product B or in a manner that could "reasonably perceived as conditioned on refraining from" using an alternative to product B. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016).  Here, however, all that PMC alleges is that Google has presented AI Overviews alongside other search results. There are no allegations—nor could there be—that Search users are required to use AI Overviews to access the rest of the SERP, or to use other Google services. *See Robinson v. HP, Inc.*, 2025 WL 2802077, at *8 (N.D. Ill. Sept. 30, 2025) (rejecting tying claim where "plaintiffs were not required as a condition of purchasing" the tying product to "agree to purchase" the tied product). Nor is there any allegation that Google's display of AI Overviews somehow requires users to refrain from viewing any other source of information. Rather, PMC alleges that some Search users *choose* to view the AI Overviews presented to them on the SERP. AC ¶246. But user choice is not coercion. Nor can any acceptance of the freely offered AI Overviews by users show coercion. *See supra* p.28. Simply presenting Search users with the option to view AI Overviews cannot, as a matter of law, constitute tying. *See Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp.

455, 471-72 (S.D.N.Y. 1996) (selling products "as part of a package" is not tying).

### B.    The Tying Claim Is Subject To The Rule Of Reason, Which It Fails

PMC's claim is brought under Section 2 and thus subject to the rule of reason. *See Microsoft*, 253 F.3d at 58-59. Moreover, the D.C. Circuit has foreclosed *per se* condemnation when, as here, the supposedly "tied good [is] physically and technologically integrated with the tying good." *Microsoft*, 253 F.3d at 90; *see supra* pp.25-26. PMC's own allegations also make clear that Google's display of AI Overviews on the SERP results in facially apparent procompetitive benefits for users, precluding *per se* treatment of the alleged tie. *See supra* p.25.

Under the rule of reason, the tying claim fails. To state such a claim, PMC must plausibly allege that the challenged conduct harmed "competition in the tied good market." *Microsoft*, 253 F.3d at 95. PMC has not and cannot do so, for at least three reasons.

*First*, PMC does not attempt to identify—much less plausibly allege—a relevant market centered on the supposedly tied product, AI Overviews. The Amended Complaint does not contain a single allegation even purporting to articulate the range of reasonable economic substitutes for AI Overviews. *See PhantomALERT*, 762 F. Supp. 3d at 22. PMC thus "do[es] not actually propose the contours of a relevant [tied product] market." *Choh*, 753 F. Supp. 3d at 133 (dismissing claim based on alleged market with participants that were "not identified").

Read liberally, PMC may argue that its allegations that AI Overviews compete in some fashion with a wide array of disparate and unrelated services, ranging from "generative AI" to "news articles [and] periodicals," to other "search results" shown in Google's SERP suffice to allege a tied market. *See, e.g.*, AC ¶¶80, 85, 127, 246. But PMC alleges no "facts that might support lumping such a hugely diverse array of non-substitutable products" into a single tied product market. *Cavalleri*, 2025 WL 2662897, at *3. And of course, crediting the allegation that AI Overviews compete with other content on the SERP, *see* AC ¶246, would establish only that AI

Overviews are in the same market as Google's search engine and confirm there is no tie, *see Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016) ("The 'separate product' element requires that the alleged tying product and tied product … exist in separate and distinct product markets."); *supra* pp.34-35. PMC's failure to propose a relevant market for AI Overviews is fatal, as without one it cannot establish that the supposed tie, "as it actually operates in the market, has unreasonably restrained competition." *Jefferson Parish*, 466 U.S. at 29-30 (rejecting rule-of-reason tying claim where tied product "market … has not been defined"); *see supra* pp.15-16.

*Second*, to the extent PMC claims that "AI Overviews constitute [a] form[] of online publishing" and that thus the alleged Online Publishing market is the tied market, *see* AC ¶115—a theory that the Amended Complaint fails to expressly allege—that theory fails. As explained, the supposed Online Publishing market is implausibly broad and encompasses nearly all forms of text-based content on the internet. *See supra* pp.21-22. That facially unsustainable market cannot support a rule-of-reason tying claim any more than it can support a reciprocal dealing claim. *Cavalleri*, 2025 WL 2662897, at *3; *Sidibe*, 4 F. Supp. 3d at 1178.

*Third*, PMC also does not plausibly allege that the alleged tying excluded competition in any market. This includes the Online Publishing market—and, although irrelevant to the viability of its tying claim—the supposed tying market of GSS or any of PMC's other purported markets unrelated to the alleged tie. *See supra* pp.20-24. The alleged (and implausible) competitive harms PMC identifies as flowing from the alleged tying are the same as the harms underlying its other claims, *see* AC ¶¶300-301, so its tying claim rises and, in this case, falls with those claims.

## C.    PMC Lacks Antitrust Standing To Bring A Tying Claim

Finally, PMC lacks antitrust standing on this claim. The supposed coercion underlying the alleged tie was directed at users of Google's search engine, not PMC. Moreover, PMC's purported injuries from the tying allegedly occur in unrelated markets and cannot support standing. *Fotobom*,

719 F. Supp. 3d at 44. PMC claims without explanation that the supposed tying resulted in it being "paid less" for "Republishing," "GAI Training," and "RAG Content." AC ¶304. Setting aside PMC's total failure to explain any causal connection between that purported injury and the alleged tie, that injury occurs in the supposed markets for AI content, in which PMC does not and could not allege the tying harmed competition. PMC also alleges it was injured because the display of AI Overviews supposedly causes "zero-click searches"—that is, users not clicking on links to PMC's pages on Google's SERP. AC ¶¶246-248, 298, 304. That injury occurs in the so-called "Search Referral Traffic" market in which Google purportedly "sells" publishers link clicks and distribution. AC ¶58; *see supra* pp.26-28. PMC does not allege that the tying harmed competition in this (implausible) market either. The harm PMC claims to have suffered thus "is secondary to the anticompetitive conduct" and "cannot support antitrust injury." *Fotobom*, 719 F. Supp. 3d at 47. Because PMC experienced all of its alleged injuries in markets unrelated to alleged tying, it lacks antitrust standing to bring a tying claim. *Id.* at 44; *Qualcomm*, 969 F.3d at 992.

## IV.    PMC FAILS TO PLAUSIBLY PLEAD MONOPOLY LEVERAGING (COUNT III) AND ATTEMPTED MONOPOLIZATION OF THE ONLINE PUBLISHING MARKET (COUNT VI)

### A.    There Is No Claim For Monopoly Leveraging Under The Sherman Act

In Count III, PMC alleges that Google "unlawfully leveraged its monopoly power in General Search Services into other markets, including the online publishing market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2." AC ¶280. The Supreme Court has foreclosed this type of standalone leveraging claim. "[T]he conduct of a single firm, governed by § 2, 'is unlawful only when it threatens actual monopolization.'" *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The Court has thus rejected the existence of a leveraging claim without any alleged "'dangerous probability of success' in monopolizing a second market." *Trinko*, 540 U.S. at 415 n.4. Any so-called "leveraging" theory may be brought only as an attempted monopolization claim.

B.      **PMC Fails To Plausibly Plead Attempted Monopolization**

PMC's attempted monopolization claim—Count VI, which alleges that Google has used a monopoly in GSS to "creat[e] monopolies in the online publishing market," AC ¶309—is implausible. This claim fails out of the gate because attempted monopolization requires a plausibly defined relevant market. *Spectrum Sports*, 506 U.S. at 459. As explained above, the alleged Online Publishing market is manifestly implausible. *See supra* pp.21-22.

But even setting that aside, while PMC styles Google's alleged conduct as one sounding in tying or leveraging, at bottom, PMC's claim amounts to the assertion that Google has developed features that make Google Search more effective and efficient all to position itself as a monopolist in the Online Publishing market. This is because the supposed "leveraging" consists of Google making its SERP more attractive to users. That theory does not pass the straight face test, let alone the pleading standard for an attempted monopolization claim. Attempted monopolization requires that a plaintiff prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports*, 506 U.S. at 456. PMC does not pled any of these elements.

1.      **PMC Fails To Allege Anticompetitive Conduct In The Relevant Market**

The challenged conduct for PMC's attempted monopolization claim is the same as that underlying its other claims. *See* AC ¶¶308-310. It cannot support an attempted monopolization claim for the same reasons: because it consists of non-actionable product improvements and a refusal to deal. *See supra* pp.8-13, 31. PMC also does not plausibly allege, as it must, that the challenged conduct harmed competition in the Online Publishing market. *See supra* pp.22-24. Moreover, the lost clicks that publishers allegedly experience due to the challenged conduct, AC ¶310, occur in the so-called "Search Referral Traffic" market (which pertains to the "distribution" of content, *id.* ¶212), not the Online Publishing market (which is defined to include content, *see*

AC ¶80), and are thus not "anticompetitive effects 'in the market where competition is [allegedly] being restrained'" that could support a claim for attempted monopolization, *Qualcomm*, 969 F.3d at 992 (anticompetitive effect cannot be based on "impact … beyond the[] [relevant] markets").

### 2. PMC Fails To Allege Google's Specific Intent To Monopolize Online Publishing

PMC does not, as is "required," provide any "factual assertion" showing a "[s]pecific intent to engage in predatory or anticompetitive conduct." *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 42 (D.D.C. 2007). Far from it: PMC's allegations show Google's intent to provide more useful responses to users' search queries. *See, e.g.*, AC ¶¶161-164 (Google statement that AI Overviews "deliver a fast and easy way to access relevant information").

### 3. PMC Fails To Allege Google Has A Dangerous Probability Of Achieving Monopoly Power In Online Publishing

Finally, PMC has failed to plausibly allege a dangerous probability of Google achieving monopoly power in the alleged online publishing market.

*First*, establishing a "dangerous probability of success" requires a plaintiff to show, as a threshold matter, that the relevant market "can be monopolized." *Microsoft*, 253 F.3d at 81. This requires plausibly defining the relevant market, which PMC has failed to do, *see supra* pp.21-22, and showing that "substantial barriers to entry protect that market," *Microsoft*, 253 F.3d at 81.

PMC has alleged nothing of the sort here. The word "barrier" appears in the Amended Complaint only with reference to the "search market." AC ¶79. PMC offers no allegations whatsoever of entry barriers in Online Publishing and, given the overbreadth of the alleged market, it is implausible that there are any. As common knowledge indicates, essentially anyone can start a website and display textual content. *See Phila. Taxi Ass'n*, 886 F.3d at 342 (dismissing complaint and noting that "[e]asy entry—particularly historical evidence of entry—is even more significant in the attempt case than in monopolization cases generally"); *TKO Energy Servs., LLC v. M-I*

*L.L.C.*, 539 F. App'x 866, 872 (10th Cir. 2013) (affirming dismissal where plaintiff did "not plead … what substantial entry barriers exist"). It is difficult to imagine a category with fewer barriers to entry than online textual content, and this basic inference warrants dismissal.

*Second*, PMC has also failed to allege any facts to show that Google has a dangerous probability of monopolizing the alleged market, such as the defendant's "actual or probable market power," *Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 635 F. Supp. 534, 538 (D.D.C. 1986), or its "market share, or the ability to affect competition," *Carpenter Tech. Corp. v. Allegheny Techs., Inc.*, 646 F. Supp. 2d 726, 735 (E.D. Pa. 2009). "The D.C. Circuit … has observed that 'a share of 30% or less [of the relevant market] presumptively *disproves* requisite power'" to show a dangerous probability. *Fotobom*, 719 F. Supp. 3d at 52. PMC makes *no* allegations at all about Google's share in Online Publishing. That omission is dispositive. *See Therapearl, LLC v. Rapid Aid Ltd.*, 2014 WL 4794905, at *8 n.10 (D. Md. Sept. 25, 2014) (dismissing attempted monopolization claim for failure to allege market share).

## V.    PMC FAILS TO PLEAD A VIABLE UNJUST ENRICHMENT CLAIM (COUNT VII)

### A.    California Law Applies To PMC's Unjust Enrichment Claim

Under the District of Columbia's choice-of-law rules, this Court must first determine if there is a conflict between the laws of the relevant jurisdictions, and, if there is, determine which jurisdiction "has the 'more substantial interest' in having its law applied." *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992). There is a "clear conflict" between the three jurisdictions that may have an interest in applying their substantive law here: California, the District of Columbia, and New York. The District of Columbia and New York recognize a standalone cause of action for unjust enrichment. *See News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222-23 (D.C. 2005); *City of Almaty v. Sater*, 503 F. Supp. 3d 51, 59 (S.D.N.Y. 2020). California does not. *Abuelhawa v. Santa Clara Univ.*, 529 F. Supp. 3d 1059, 1070 (N.D. Cal. 2021) ("California law is

clear: 'Unjust enrichment is not a cause of action.'" California instead treats unjust enrichment as a narrower "quasi-contract claim seeking restitution," for which a plaintiff must show "defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). D.C. and New York law have no such requirement. *See, e.g.*, *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 814 (D.C. 2009); *Philips Int'l Invs., LLC v. Pektor*, 117 A.D.3d 1 (N.Y. App. Div. 2014).

Next, California has the most substantial interest in applying its laws. Four factors determine which jurisdiction controls: (1) "the place where the injury occurred," (2) "the place where the conduct causing the injury occurred," (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties," and (4) "the place where the relationship is centered." *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006).

All four factors establish that California has the most significant interest. First, "[p]ecuniary harm to a plaintiff 'will normally be felt most severely at the plaintiff's headquarters or principal place of business.'" *Iron Vine Sec., LLC v. Cygnacom Sols.*, 274 A.3d 328, 349 (D.C. 2022). Here, that is California because Penske Media Corporation, the parent company of the other plaintiffs, and half of the subsidiary corporation plaintiffs are headquartered there. AC ¶¶19-34. Second, Google is also headquartered in and has its principal place of business in California, *id.* ¶35, so California is the place "where the conduct causing the [alleged] injury occurred," *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014). Third, California is the relevant place of business of the parties because the defendants and a majority of the plaintiffs are headquartered there. *See Margolis v. U-Haul Int'l, Inc.*, 818 F. Supp. 2d 91, 105-06 (D.D.C. 2011). Fourth, California is the "center[]" of the "relationship" between the parties because it is where "defendants have their primary place of business and where they make the[] policies and practices" challenged by PMC.

*Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 31 (D.D.C. 2019).

### B.    PMC Fails To Allege Facts That Would Support A Quasi-Contractual Claim For Restitution

PMC has not plausibly alleged that Google was "unjustly conferred a benefit 'through mistake, fraud, coercion, or request,'" as it must under California law. *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. 2023). To start, PMC does not allege any mistake or fraud. In fact, PMC alleges that Google's Terms of Service and Privacy Policy clearly indicated that "[Google] was using content it crawls from the web to train the models that it uses to generate AI Overviews" and that this included plaintiffs' works. AC ¶178. And PMC concedes that they had the option of whether to permit indexing. *Id.* ¶235. It therefore fails to allege the kind of "direct request" that might support an unjust enrichment claim. *See Russell*, 680 F. Supp. 3d at 1133-34.

Nor does simply calling Google's conduct "coercion" make it so. To state a viable claim for "restitution for economic duress" under California law, PMC must plausibly allege that "'a reasonably prudent person subject to such an act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin.'" *Uniwill L.P. v. City of Los Angeles*, 124 Cal. App. 4th 537, 545 (2004). PMC does not come close to clearing that high bar. Nowhere does PMC plausibly allege that it had no feasible economic alternative other than acquiescing to the purported misappropriation of its content. Because PMC does not allege the requisite "qualifying conduct" on Google's part, its unjust enrichment claim fails as a matter of law. *See Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772, 782-83 (N.D. Cal. 2024) (dismissing unjust enrichment claim for "OpenAI's use of [plaintiff's] copyrighted books to train ChatGPT" for want of allegations of "fraud, mistake, coercion, or request").

### CONCLUSION

PMC's Amended Complaint should be dismissed with prejudice.

Dated: January 12, 2026

Respectfully submitted,

By: */s/ Sonal N. Mehta*
Sonal N. Mehta*
Chris Johnstone*
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
sonal.mehta@wilmerhale.com
chris.johnstone@wilmerhale.com
*Admitted Pro Hac Vice*

David Gringer (Bar No. 1001200)
Paul Vanderslice (Bar No. 888314605)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
david.gringer@wilmerhale.com
paul.vanderslice@wilmerhale.com

*Counsel for Defendants Google LLC &
Alphabet Inc.*