**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PENSKE MEDIA CORPORATION, et al., | Civil Action No. 1:25-cv-03192-APM |
| *Plaintiffs*, | |
| **v.** | |
| GOOGLE LLC and ALPHABET INC., | |
| *Defendants*. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

SUMMARY OF FACTUAL ALLEGATIONS ........................................................ 4

    I.    PMC AND ITS DIVERSE BODY OF HIGH-QUALITY CONTENT ................................................................................................... 4

    II.    THE "FUNDAMENTAL FAIR EXCHANGE" BETWEEN GOOGLE AND THE WEB .............................................................................. 5

    III.    GOOGLE COERCES PUBLISHERS TO PROVIDE FREE CONTENT BY EXPLOITING ITS UNLAWFUL MONOPOLY OVER SEARCH .......................................................................................... 5

    IV.    GOOGLE'S EXPLOITATION OF ITS MONOPOLY POWER IN SEARCH HARMS PMC ...................................................................... 6

LEGAL STANDARD ............................................................................................. 7

ARGUMENT ......................................................................................................... 8

    I.    PMC ADEQUATELY PLEADS COERCIVE RECIPROCAL DEALING ........................................................................................ 8

        A.    PMC Plausibly Alleges Coercive Reciprocal Dealing ...................... 8

            1.    PMC Plausibly Alleges a Coercive Agreement Exchanging Publisher Data for Search Referral Traffic ......................................................................... 8

            2.    PMC's Claims Qualify for Per Se Treatment ...................... 12

            3.    PMC's Allegations Also Satisfy the Rule-of-Reason Standard ................................................................. 14

        B.    PMC Plausibly Alleges the Relevant Markets .................................. 15

            1.    The "Tying" Market for Search Referral Traffic .................. 16

            2.    The Corresponding Input Market .......................................... 19

            3.    The "Tied" Markets for AI Content ...................................... 21

            4.    The Online Publishing Market ............................................... 23

        C.    PMC Has Antitrust Standing for Its Coercive Reciprocal Dealing Claims .............................................................................. 24

       1.     PMC Suffers Underpayment as a Result of Google's Coercive Reciprocal Dealing ................................ 25

       2.     PMC Is Harmed by Reduced Search Traffic and Resulting Lost Revenue ......................................... 26

    D.    The Refusal-To-Deal Doctrine Does Not Apply ............................. 26

II.    PMC ADEQUATELY PLEADS UNLAWFUL MONOPOLY MAINTENANCE ....................................................................... 28

    A.    PMC Plausibly Alleges Monopoly Maintenance.............................. 28

    B.    PMC Has Antitrust Standing to Sue for Unlawful Monopoly Maintenance .................................................... 31

       1.     PMC Adequately Alleges Antitrust Injury as a Supplier of Content for Search and as a Purchaser of Search Referral Traffic ....................................... 31

       2.     Alternatively, PMC Has Antitrust Standing Under *McCready*................................................................. 32

       3.     The *Associated General Contractors* Factors Support Antitrust Standing .................................. 33

III.    PMC ADEQUATELY PLEADS UNLAWFUL TYING ............................. 35

    A.    PMC Plausibly Alleges Separate Products ......................................... 35

    B.    PMC Plausibly Alleges Coercion ..................................................... 37

    C.    PMC Plausibly Alleges Substantial Foreclosure ............................... 38

    D.    PMC Has Antitrust Standing for its Unlawful Tying Claim ............ 39

IV.    PMC ADEQUATELY PLEADS MONOPOLY LEVERAGING ............... 40

V.    PMC ADEQUATELY PLEADS ATTEMPTED MONOPOLIZATION ................................................................. 41

VI.    PMC PLEADS A VIABLE UNJUST ENRICHMENT CLAIM ................. 43

VII.    DISMISSAL WITH PREJUDICE WOULD BE IMPROPER..................... 44

CONCLUSION.................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
   342 F. Supp. 3d 126 (D.D.C. 2018) ................................................................29, 40

*A.O. Smith Corp. v. Lewis, Overbeck & Furman*,
   979 F.2d 546 (7th Cir. 1992) ................................................................12

*AliveCor, Inc. v. Apple Inc.*,
   163 F.4th 1259 (9th Cir. 2026) ................................................................27

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) ................................................................29

*\*Am. President Lines, LLC v. Matson, Inc.*,
   633 F. Supp. 3d 209 (D.D.C. 2022) ................................................16, 24, 41

*\*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
   256 F.3d 799 (D.C. Cir. 2001) ................................................26, 33, 34

*Apple Inc. v. Pepper*,
   587 U.S. 273 (2019) ................................................................34

*Apple iPod iTunes Antitrust Litig.*,
   2009 WL 10678940 (N.D. Cal. Oct. 30, 2009) ................................................37

*Arcell v. Google LLC*,
   744 F. Supp. 3d 924 (N.D. Cal. 2024) ................................................................18

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ................................................................28, 41

*Associated General Contractors v. Carpenters*,
   459 U.S. 519 (1983) ................................................................33

*Athos Overseas, Ltd. v. Youtube, Inc.*,
   2022 WL 910272 (S.D. Fla. Mar. 29, 2022) ................................................11

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ................................................................12

*Betaseed, Inc. v. U & I Inc.*,
   681 F.2d 1203 (9th Cir. 1982) ................................................................12, 13

*Blue Shield v. McCready,*
  457 U.S. 465 (1982).................................................................32, 33

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,*
  140 F.3d 494, 511 .........................................................................12

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962).................................................................18, 21

*Bruton v. Gerber Prods. Co.,*
  703 F. App'x 468 (9th Cir. 2017) ...............................................44

*Cal. Crane Sch., Inc. v. Google LLC,*
  2023 WL 2769096 (N.D. Cal. Mar. 31, 2023)...........................32

*Cavalleri v. Hermes Int'l,*
  2025 WL 2662897 (N.D. Cal. Sept. 17, 2025) ..........................23

*Chase Mfg., Inc. v. Johns Manville Corp.,*
  84 F.4th 1157 (10th Cir. 2023) ...................................15, 26, 27

*Cherkin v. PowerSchool Holdings, Inc.,*
  2025 WL 844378 (N.D. Cal. Mar. 17, 2025)..............................44

*Choh v. Brown Univ.,*
  753 F. Supp. 3d 117 (D. Conn. 2024).........................................23

*City of Moundridge, KS v. Exxon Mobil Corp.,*
  471 F. Supp. 2d 20 (D.D.C. 2007)........................................34, 41

*Concord Assocs., L.P. v. Ent. Props. Tr.,*
  817 F.3d 46 (2d Cir. 2016)..........................................................7

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.,*
  141 F.4th 1075 (9th Cir. 2025) ..................................................43

*Covad Commc'ns Co. v. Bell Atl. Corp.,*
  398 F.3d 666 (D.C. Cir. 2005) ....................................................36

*Dream Big Media Inc. v. Alphabet Inc.,*
  2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ...........................11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992)................................................................28, 35

*EEOC v. St. Francis Xavier Parochial Sch.,*
  117 F.3d 621 (D.C. Cir. 1997) ....................................................37

*Epic Games, Inc. v. Apple, Inc.,
   67 F.4th 946 (9th Cir. 2023) ...............................................................11, 18, 37

ESG Cap. Partners, LP v. Stratos,
   828 F.3d 1023 (9th Cir. 2016) ......................................................................44

F.T.C. v. Ind. Fed'n of Dentists,
   476 U.S. 447 (1986)......................................................................................14

F.T.C. v. Staples, Inc.,
   970 F. Supp. 1066 (D.D.C. 1997)..............................................................21, 22

Flegel v. Christian Hosp., Ne.-Nw.,
   4 F.3d 682 (8th Cir. 1993) ............................................................................18

Fortner Enters., Inc. v. U.S. Steel Corp.,
   394 U.S. 495 (1969).......................................................................................13

*Fotobom Media, Inc. v. Google LLC,
   719 F. Supp. 3d 33 (D.D.C. 2024) ......................................................... passim

Fresh Made, Inc. v. Lifeway Foods, Inc.,
   2002 WL 31246922 (E.D. Pa. Aug. 9, 2002) ................................................23

FTC v. Consol. Foods Corp.,
   380 U.S. 592 (1965)........................................................................................8

FTC v. Facebook, Inc.,
   560 F. Supp. 3d 1 (D.D.C. 2021) .................................................................24

*FTC v. Meta Platforms, Inc.,
   775 F. Supp. 3d 16 (D.D.C. 2024) .....................................................25, 28, 30

FTC v. Qualcomm Inc.,
   969 F.3d 974 (9th Cir. 2020) ...................................................................26, 40

*FTC v. Sysco Corp.,
   113 F. Supp. 3d 1 (D.D.C. 2015) .......................................................16, 17, 23

Great Escape, Inc. v. Union City Body Co.,
   791 F.2d 532 (7th Cir. 1986) ........................................................................10

In re DDAVP Direct Purchaser Antitrust Litig.,
   585 F.3d 677 (2d Cir. 2009)..........................................................................33

In re Dealer Mgmt. Sys. Antitrust Litig.,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) ...........................................................27

*In re Google Digital Advert. Antitrust Litig.*,
2024 WL 988966 (S.D.N.Y. Mar. 7, 2024) ..............................................25, 30

*In re Google Digital Advert. Antitrust Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022)...................................................................10

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...............................................................14

*In re Mosaic LLM Litig.*,
2025 WL 2294910 (N.D. Cal. Aug. 8, 2025) .......................................................22

*Intergraph Corp. v. Intel Corp.*,
195 F.3d 1346 (Fed. Cir. 1999)...............................................................................8

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ................................................................................38

*Jamsports & Ent., LLC. v. Paradama Prods., Inc.*,
2003 WL 1873563 (N.D. Ill. Apr. 15, 2003) .......................................................16

*\*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)....................................................................................8, 9, 10, 12

*Kaufman v. Time Warner*,
836 F.3d 137 (2d Cir. 2016)..................................................................................35

*Key Enters. of Del., Inc. v. Venice Hosp.*,
919 F.2d 1550 (11th Cir. 1990) .........................................................................8, 9

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ................................................................................25

*Kurdistan Victims Fund v. Kurdistan Reg'l Gov't*,
2025 WL 1360432 (D.D.C. May 9, 2025) ............................................................44

*Lambrix v. Tesla, Inc.*,
737 F. Supp. 3d 822 (N.D. Cal. 2024) ..................................................................35

*Le v. Zuffa, LLC*,
2023 WL 5085064 (D. Nev. Aug. 9, 2023) .....................................................19, 21

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*,
795 F. Supp. 639 (S.D.N.Y. 1992) .......................................................................40

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
924 F.2d 1484 (9th Cir. 1991) ..............................................................................18

*Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*,
    772 F. Supp. 614 (D.D.C. 1991) ...........................................................15

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021) ...............................................................................15

*New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*,
    994 F.3d 1166 (10th Cir. 2021) ............................................................40

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) ..........................................................27

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ........................................................27, 28

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ..............................................................16

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) .............................................................................31

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015) ...........................................................31

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem. Hosp.*,
    604 F.3d 1291 (11th Cir. 2010) ............................................................34

*PhantomALERT v. Apple, Inc.*,
    762 F. Supp. 3d 8, 18 (D.D.C. 2025) ..............................................23, 32

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018) ......................................................30, 42, 43

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
    96 F.4th 327 (2d Cir. 2024) ............................................................16, 17

*Robinson v. HP, Inc.*,
    2025 WL 2802077 (N.D. Ill. Sept. 30, 2025) .......................................38

*Rock v. Nat'l Collegiate Athletic Ass'n*,
    928 F. Supp. 2d 1010 (S.D. Ind. 2013) .................................................23

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*,
    1995 WL 150089 (N.D. Cal. Mar. 28, 1995) ........................................18

*SigmaPharm, Inc. v. Mut. Pharm. Co.*,
    772 F. Supp. 2d 660 (E.D. Pa.), *aff'd*, 454 F. App'x 64 (3d Cir. 2011) .................................32

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
   947 F. Supp. 2d 88 (D.D.C. 2013) ...................................................................16, 24

*Spartan Grain & Mill Co. v. Ayers*,
   581 F.2d 419 (5th Cir. 1978) ...................................................................................13

*Spectrum Sports, Inc. v. McQuillian*,
   506 U.S. 447 (1993).............................................................................................40, 42

*Stallard v. Goldman Sachs Group*,
   2024 WL 4903783 (D.D.C. Nov. 27, 2024) ...........................................................34

*Tawfilis v. Allergan, Inc.*,
   157 F. Supp. 3d 853 (C.D. Cal. 2015) ....................................................................30

*Teradata Corp. v. SAP SE*,
   124 F.4th 555 (9th Cir. 2024) ...................................................................12, 13, 14

*Times-Picayune Pub. Co. v. United States*,
   345 U.S. 594 (1953).................................................................................................24

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001).............................................................................20, 21

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998).......................................................................................20

*Tremblay v. OpenAI, Inc.*,
   716 F. Supp. 3d 772 (N.D. Cal. 2024) .....................................................................44

*United States v. Aetna Inc.*,
   240 F. Supp. 3d 1 (D.D.C. 2017) .............................................................................17

*United States v. AirCo, Inc.*,
   386 F. Supp. 915 (S.D.N.Y. 1974) ..........................................................................10

*United States v. Apple, Inc.*,
   2025 WL 1829127 (D.N.J. June 30, 2025).............................................................42

*\*United States v. Bertelsmann SE & Co. KGaA*,
   646 F. Supp. 3d 1 (D.D.C. 2022).................................................................20, 23, 29

*United States v. eBay, Inc.*,
   968 F. Supp. 2d 1030 (N.D. Cal. 2013) ...................................................................14

*United States v. Empire Gas Corp.*,
   393 F. Supp. 903 (W.D. Mo. 1975), .......................................................................10

*United States v. Gen. Dynamics Corp.*,
258 F. Supp. 36 (S.D.N.Y. 1966) ..............................................................................8

*\*United States v. Google LLC*,
2025 WL 3496448 (D.D.C. Dec. 5, 2025)..............................................................36

*\*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) ..................................................................... *passim*

*\*United States v. Google LLC*,
778 F. Supp. 3d 797 (E.D. Va. 2025) ...................................................16, 27, 29

*\*United States v. Google LLC*,
803 F. Supp. 3d 18 (D.D.C. 2025)...........................................................12, 36

*United States v. Live Nation Ent., Inc.*,
2025 WL 835961 (S.D.N.Y. Mar. 14, 2025) ......................................................32, 33

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ............................................................................ *passim*

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)..............................................................................3, 27, 28

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ................................................................................11

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
257 F.3d 256 (2d Cir. 2001)...............................................................................40

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)...............................................................................32

*Weyerhaeuser Co. v. Ross- Simmons Hardwood Lumber Co.*,
549 U.S. 312 (2007)............................................................................................29

*\*Yelp Inc. v. Google LLC*,
2025 WL 2978394 (N.D. Cal. Oct. 22, 2025)...................................................35, 38

**Statutes**

Sherman Act 15 U.S.C. § 1 ...............................................................................4, 12

Sherman Act 15 U.S.C. § 2 ...................................................................4, 28, 29, 35, 41

**Rules**

Fed. R. Civ. P. 12(b)(6)...................................................................................15, 16, 17

Fed. R. Civ. P. 15(a)(2)...................................................................................................44

**Other Authorities**

Areeda et al., Antitrust Law ¶ 338a2 (5th ed. 2022)....................................................24

## INTRODUCTION

Google has shattered the longstanding bargain that allows the open internet to exist. The consequences for online publishers—to say nothing of the public at large—are profound. By this litigation, Plaintiffs Penske Media Corporation and its subsidiary publishers (collectively, "PMC") seek to hold Google accountable for its antitrust violations.[1]

Before AI Overviews, Google and publishers had a simple deal: publishers allowed Google to crawl their content to build Google's search index ("Search Index Data"), and Google referred user traffic to publishers. Google advertised to users on its search engine results page ("SERP"); publishers received traffic (and revenue) when users clicked through to their sites. But that deal no longer holds. Now, Google threatens to withhold that traffic unless publishers acquiesce to the use of their content for Google's generative AI ("GAI") products, which compete directly with publishers for user attention. Google's search monopoly leaves publishers with no choice: acquiesce—even as Google cannibalizes the traffic publishers rely on—or perish.

Everybody knows this is happening. As People Inc.'s CEO explained, Google "is using their market power to make sure we can't take back leverage . . . . Google uses one crawler . . . for search and AI, so it makes it unblockable for us. . . . [I]f we block them, we then block search also. And even in a depleted state, search is still obviously material to us."[2] ECF No. 17 ("Compl."), ¶ 122. Even other search engines call it what it is. Microsoft recently explained: "The open web was built on an implicit value exchange where publishers made content accessible, and distribution

---

[1] Google chooses to open its motion by criticizing two different plaintiffs for amending pleadings as of right, falsely claiming those amendments do not address Google's prior criticisms. In truth, it is Google who has consistently refused to acknowledge how its use of its search monopoly to preference AI Overviews in search is an existential threat to publishers across various industries.

[2] The publishing industry is unanimous: Google's conduct is coercive. *See* Compl. ¶¶ 122-23 (collecting publisher statements, including that "[Google is] holding us hostage").

channels—like search—helped people find it. That model does not translate cleanly to an AI-first world, where answers are increasingly delivered in a conversation."[3]  By accessing publisher content for unauthorized uses in its GAI products, which it preferences at the top of the SERP, Google reduces click-throughs to publisher sites, increases zero-click behavior, and diverts traffic that publishers need to support their advertising, affiliate, and subscription revenue. *Id.* ¶¶ 163-64 (visuals of AI Overviews at top of SERP); *id.* ¶ 196. As USA Today's CEO put it, "Google's insinuation . . . that AI Overview is not getting in the way of the ten blue links and the traffic going back to creators and publishers is just 100% false . . . . [Users] are reading the overview and stopping there . . . . We see it." *Id.* ¶ 200. In other words, Google leverages its monopoly in search to hold publishers ransom.

Google's conduct gives it an unfair advantage over its AI competitors, entrenching its leverage over publishers and search. While rivals must win on innovation and improved productivity, Google starts miles ahead by exploiting its search monopoly to extract zero-cost inputs for its GAI products. This rent-seeking reduces productivity, harms competition, and chills innovation. Google reaps the benefits; publishers, consumers, and competitors bear the costs. This Court has already found that "Google is a monopolist, and it has acted as one to maintain its monopoly" in General Search Services in violation of the antitrust laws. *See United States v. Google LLC* ("*Google Search*"), 747 F. Supp. 3d 1, 32 (D.D.C. 2024). With "no true competitor" in the search market, *id.* at 144, Google has enormous power to coerce publishers.

Google's naked exercise of monopoly power threatens to destroy and usurp the online publishing market. Why would any online publisher invest in developing new content only to face

---

[3] Tim Frank, *Blog Post: Building Toward a Sustainable Content Economy for the Agentic Web*, Microsoft Advertising (Feb. 3, 2026) https://about.ads.microsoft.com/en/blog/post/february-2026/building-toward-a-sustainable-content-economy-for-the-agentic-web.

a Hobson's Choice: permit Google to "gobble [] up and regurgitate" that content for *free* and for *all* purposes—including to compete with the publisher—or disappear from Google's search results? Compl. ¶ 191. Indeed, this "could put the future of the open Internet in danger." *Id.*

Google's response is to ignore PMC's well-pleaded allegations describing markets for content licensing for republishing, GAI training, and retrieval-augmented generation ("RAG"). In these markets, law-abiding companies compete to pay for licensing rights to publishers' content. Google, by contrast, relies on its unlawful monopoly to coerce publishers into providing the same content for free. This is a coercive abuse of monopoly power, not competition on the merits.

PMC is a direct victim of Google's anticompetitive conduct. In a competitive search engine market, PMC could choose not to deal with Google and instead rely on referral traffic from other search engines. But because Google has excluded its rivals, PMC has no meaningful alternative. *See Google Search*, 747 F. Supp. 3d at 145. PMC suffers underpayment because it is forced to forgo the compensation it would otherwise receive for licensing its content for GAI purposes. Worse yet, Google uses the unlawfully extracted content to power the GAI products that compete with PMC by answering queries on the SERP, resulting in substantial lost revenue for PMC.

Google tries to sidestep its unlawful conduct by miscasting it as a lawful "refusal to deal" under *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), or as innocent "product improvement." ECF No. 25-1 ("Mot."), at 8-11, 31. But these mischaracterizations are willfully blind to PMC's allegations. PMC's claims are based on the conditions placed by Google on the parties' dealings, not on a refusal to deal. Nor is PMC arguing that Google cannot develop GAI products. Rather, Google has no right to leverage its unlawful monopoly in search to extract PMC's content for Google's GAI products without compensation— a drastic departure from past dealings, enabled only by its unlawful market power.

Google urges this Court not to "turn a blind eye to 'common sense.'" Mot. 32 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). On this point, PMC agrees. Common sense, combined with this Court's familiarity with Google's search engine and GAI products from the *Google Search* case, will demonstrate that Google cannot escape liability as a matter of law. Google's motion ignores controlling pleading standards, improperly disputes—and often ignores—PMC's factual allegations, and depends on incorrect legal assertions. When PMC's factual allegations are properly considered under the applicable standards, PMC's Amended Complaint ("Complaint") states plausible claims for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and unjust enrichment. Google's motion should be denied.

## SUMMARY OF FACTUAL ALLEGATIONS

### I.    PMC AND ITS DIVERSE BODY OF HIGH-QUALITY CONTENT

PMC is a leading global media organization and owns over 25 print and digital properties, including iconic brands Billboard, Rolling Stone, and Variety, as well as industry publications The Hollywood Reporter, Indiewire, and Deadline. Compl. ¶¶ 2, 19-29; *id.* ¶¶ 35-44.

PMC is built on producing quality content developed under journalistic standards. PMC's content attracts a monthly audience of more than 120 million visitors in the United States alone and nearly double that globally. *Id.* ¶¶ 2, 32-33. Above all, PMC's growth reflects sustained investment in high-quality content. In PMC's own words, "We are a CONTENT company; content is our lifeblood." *Id.* ¶ 2. To produce its award-winning content, PMC invests enormous resources in human talent, technology, and infrastructure. *Id.* ¶ 3. PMC has nearly 800 employees focused on publishing, including writers, reporters, and editors, who contribute their creativity, time, and labor to deliver reliable journalism, strong perspectives, and compelling storytelling. *Id.* ¶¶ 32-34.

## II.  THE "FUNDAMENTAL FAIR EXCHANGE" BETWEEN GOOGLE AND THE WEB

Google recognizes a "fundamental fair exchange" in which publishers allow website crawling so Google can build its index, and, in return, Google displays links on the SERP that send users to publishers' sites. *Id.* ¶ 69. For years, Google touted its critical role in "support[ing] a healthy, open web" and claimed to "care passionately—perhaps more than any other company—about the health of the web ecosystem." *Id.*

Website traffic is vital to PMC—just as it is for many online publishers—with "almost all" of PMC's search referral traffic generated through Google's SERP. *Id.* ¶ 184. Referrals from Google's monopoly search engine generate a large portion of revenue (whether from digital advertising, affiliate links, or subscriptions to PMC's publications) that PMC, in turn, devotes to producing content. *Id.* ¶¶ 2-4, 70-71.

Google pays nothing for publishers' Search Index Data, while benefiting tremendously from advertising revenue generated from searches built on that data. *Id.* ¶ 132. In 2021, for example, Google booked $146 billion in advertising revenue. *Google Search*, 747 F. Supp. 3d at 32. Under this "fundamental fair exchange," PMC allowed Google to access its content without requiring payment because it received something of value in return: monetizable search referral traffic. *Id.* ¶¶ 66-69. PMC's business depends on this traffic. *Id.* ¶¶ 46, 70-72.

## III.  GOOGLE COERCES PUBLISHERS TO PROVIDE FREE CONTENT BY EXPLOITING ITS UNLAWFUL MONOPOLY OVER SEARCH

In *Google Search*, this Court found that Google has monopoly power in the market for General Search Services (89.2%) and that Google unlawfully maintained that monopoly through anticompetitive conduct. *Id.* ¶¶ 75-76 (quoting *Google Search*, 747 F. Supp. 3d at 119). Google's search monopoly gives it corresponding monopsony power over the input market for search: publisher content. *Id.* ¶ 78. Google can and has set the price for publisher content at zero. *Id.* ¶¶

235-36.

Google exploits its monopoly power by using Search Index Data to compete with the very publishers coerced to provide it with that data for free. *Id.* ¶ 77. Google continues to pay nothing to access PMC's content while appropriating the content to train and ground its AI models, *id.* ¶¶ 193, 235-39. Through RAG, or "grounding," Google uses, repackages, and republishes publisher content for display on Google's SERP, cannibalizing the traffic on which PMC depends. *Id.* ¶¶ 139-40, 158-65. The purpose is not to facilitate click-throughs but to have users consume PMC's content, repackaged by Google, directly on the SERP. *Id.* ¶ 159.

This injures PMC twice over: Google underpays PMC for its content (by providing no compensation to PMC for the use of its content for republishing, training, and grounding) while also reducing the benefits PMC used to receive under the parties' "fundamental fair exchange" by reducing or even eliminating click-throughs to PMC's websites. *Id.* ¶ 116; *see also id.* ¶¶ 184-209.

Online publishers like PMC cannot simply opt out of this unfair exchange; they have no choice but to accede because of Google's dominance in search. As a condition to providing *any* search traffic to publishers, Google requires publishers to acquiesce in Google's use of their content for any and all purposes. *Id.* ¶ 214. Disappearing from Google's search results would be devastating to PMC's business. *Id.* ¶ 193. Google's dominance in search gives it the unique power to extract these concessions. No other search engine or GAI company—including one of Google's largest competitors, Microsoft—has sufficient market power to compel publishers to permit access to their content for these purposes, at a price of zero. *Id.* ¶¶ 193, 224.

## IV.  GOOGLE'S EXPLOITATION OF ITS MONOPOLY POWER IN SEARCH HARMS PMC

Google's misappropriation of PMC's content diminishes traffic to PMC's sites and thus threatens the very core of PMC's business. Google has acknowledged what is obvious to anyone

who uses the Internet: when Google provides "[d]irect answers" on its SERP, that "reduce[s] search referral traffic" and "hurt[s] [content providers'] ability to monetize" their content. *Id.* ¶ 187 (quoting Google engineer). Studies show that AI Overviews have diminished—and will continue to diminish—search referral traffic. *See id.* ¶ 188 (predicting substantial advertising revenue loss and "20% to 60%" search traffic decline); *id.* ¶¶ 189-90 (GAI-assisted search reduces click-throughs); *id.* ¶¶ 202-03 (AI Overviews reduce click-throughs). One study shows AI Overviews reduce click-through rates by as much as 34.5% for the top organic search result. *Id.* ¶ 196.

Google's AI Overviews also increases the prevalence of "zero-click" searches. Bain & Company concluded 60% of Google searches terminate without a click, while Similarweb reports an 83% zero-click rate for searches with AI Overviews. *Id.* Consistent with these studies, PMC has experienced declines in click-through rates as Google has increased its AI Overviews coverage of content on PMC's sites. *Id.* ¶¶ 194-95. Users who can obtain PMC's content through Google's AI Overviews have no incentive to navigate to PMC's websites, giving PMC fewer opportunities for advertising and other revenue. *Id.* ¶ 191.

## **LEGAL STANDARD**

On a motion to dismiss, "[t]he court must accept well-pleaded allegations as true, . . . view the allegations in the light most favorable to Plaintiff[,] and draw all reasonable inferences in its favor." *Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 41, 52 (D.D.C. 2024). "[T]here is no heightened pleading standard in antitrust cases, and the facts alleged are subject to [Rule] 8(a)'s general requirement of a short plain statement of facts supporting a plausible claim." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (cleaned up).

## ARGUMENT

### I.    PMC ADEQUATELY PLEADS COERCIVE RECIPROCAL DEALING

#### A.    PMC Plausibly Alleges Coercive Reciprocal Dealing

PMC's coercive reciprocal dealing claims are a straightforward application of the doctrinal framework underpinning tying, exclusive dealing, and monopolization cases. While antitrust law allows firms to obtain monopolies as a reward for innovation, firms may not use a monopoly in one market to suppress competition in a second market. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14-15 (1984) (use of market power "to impair competition on the merits in another market" may "harm existing competitors or create barriers to entry" and "increase the social costs of market power"); *see also FTC v. Consol. Foods Corp.*, 380 U.S. 592, 594 (1965) ("reciprocity" is "one of the congeries of anticompetitive practices at which the antitrust laws are aimed"); *United States v. Gen. Dynamics Corp.*, 258 F. Supp. 36, 59 (S.D.N.Y. 1966) ("[C]oercive reciprocity . . . is inimical to a competitive economic society.").

Unlawful coercive dealing occurs where "one party has sufficient market power to unduly influence a second party to treat the first more favorably than the free market would otherwise dictate, and the second party acts in conformity with the reciprocal arrangement[.]" *Key Enters. of Del., Inc. v. Venice Hosp.*, 919 F.2d 1550, 1562 (11th Cir. 1990), *reh'g granted, vacated on other grounds*, 979 F.2d 806 (11th Cir. 1992) (mem.); *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361 (Fed. Cir. 1999). That is precisely what PMC alleges here.

##### 1.    PMC Plausibly Alleges a Coercive Agreement Exchanging Publisher Data for Search Referral Traffic

By coercing PMC to supply content for non-search uses as a condition of being included in its search index, Google is engaged in unlawful reciprocal dealing. PMC's Complaint describes in detail the relevant product markets and the facts establishing Google's coercive conduct. *See*

Compl. ¶¶ 210-34. In summary, Google threatens to withhold Search Referral Traffic (the "tying" product) from PMC, unless PMC provides Google with Republishing Content, GAI Training Content, and RAG Content (the "tied" products) at depressed, sub-competitive prices. *Id.* ¶ 214. PMC cannot "opt out" of providing the tied products to Google because that would mean complete elimination from the SERP—a devastating result for PMC, which generates significant revenues from search referral traffic. *Id.* ¶ 193.

This coercive "deal"—the opposite of "choice and control,"—is made possible only by Google's overwhelming, and unlawful, monopoly power in General Search Services, as recognized by this Court in *Google Search*. *Id.* ¶ 116 (quoting Google); *id.* ¶ 121. Google's search monopoly allows it to "unduly influence" PMC to treat Google "more favorably than the free market would otherwise dictate[.]" *Key Enters.*, 919 F.2d at 1562.

In a competitive input market for search, no single search engine would have sufficient market power to demand that publishers providing content for indexing also provide content for Republishing, GAI Training, and RAG at no cost. In those circumstances, publishers like PMC would have leverage to seek fair prices for their content. They could forgo indexing by any search engine demanding sub-competitive prices for content licensing, because referral traffic would remain available from other search engines. But these competitive pressures disappear where, as here, Google has used its unlawful monopoly power to "thwart[] true competition by foreclosing its rivals from the most effective channels of search distribution." *Google Search*, 747 F. Supp. 3d at 145. Google's coercion is further evidenced by the fact that publishers obtain substantial compensation for Republishing Content, GAI Training Content, and RAG Content from companies without a monopoly over search. Companies seeking to compete in search-adjacent GAI-based markets have paid upwards of "tens of millions" to license publisher content that

Google extracts for *free*. Compl. ¶ 250; *id.* ¶¶ 119, 128-30, 224.

Google's response to PMC's allegations of coercion, at most, raises factual disputes inappropriate for resolution on a motion to dismiss. *See In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 369 (S.D.N.Y. 2022) (at pleading stage, rejecting Google's argument that alleged coercion was instead "technological innovation"). Google first argues that no reciprocity agreement exists because it has not "promised to deliver" any search referral traffic. Mot. 8-10. But this simply disputes PMC's well-pleaded factual allegations of a longstanding agreement in which publishers permit Google to index their content in exchange for Search Referral Traffic. *See* Compl. ¶ 63 ("Google claims that publishers who contribute high-quality content to its Search Index are rewarded with search traffic."); *id.* ¶¶ 56-65.

Google's attempt to recast PMC's allegations as "[m]ere unilateral conduct" should also be rejected. Mot. 9-10. Crucially, Google's cited cases were decided on full records, not at the pleading stage, where allegations must be construed in PMC's favor. On those records, the courts found that *only one* party decided to purchase from another—a unilateral decision—to "maintain good relations," *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 538 (7th Cir. 1986), or to "curry favor," *United States v. AirCo, Inc.*, 386 F. Supp. 915, 918 (S.D.N.Y. 1974). Here, PMC pleads a reciprocal exchange, Compl. ¶¶ 5, 56-65, 68-69, which constitutes "[a] bilateral understanding," *United States v. Empire Gas Corp.*, 393 F. Supp. 903, 915 (W.D. Mo. 1975), *aff'd*, 537 F.2d 296 (8th Cir. 1976) (cited Mot. 9), not mere unilateral conduct that happens to "involve some degree of reciprocity," *Great Escape*, 791 F.2d at 537. That Google "cannot force users to click on links" (Mot. 10) is irrelevant, because Google's obligation under the agreement is to provide search distribution that in fact induces user clicks, not to force users to do so.

Google's insistence that it does not coerce publishers because Search Referral Traffic is a

"free service" (Mot. 28) again disputes PMC's well-pleaded allegations. Search Referral Traffic is not "free" to PMC, because PMC must provide its valuable content to Google. Compl. ¶¶ 68-69. Antitrust law recognizes that a product or service may not be "free" even if no money is exchanged. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 (9th Cir. 2023) ("[T]here may be markets where companies offer a product to one side of the market for free but profit in other ways, such as by collecting consumer data or generating ad revenue." (citing *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 44–45, 55 (D.D.C. 2022)); *Google Search*, 747 F. Supp. 3d at 109 (citing *Epic Games*, 67 F.4th at 978). Google's cited cases are inapposite; each was dismissed for failure to allege coercion, not because the product at issue cost zero dollars. *Athos Overseas, Ltd. v. Youtube, Inc.*, 2022 WL 910272, at *3 (S.D. Fla. Mar. 29, 2022) ("Plaintiff was not 'forced' to buy [the alleged tied product]."); *Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, at *4 (N.D. Cal. Nov. 1, 2022) ("Plaintiffs do not allege what Google products they were forced to purchase . . . .").

Finally, Google asserts that if PMC "feels[] pressured to allow Google to index [its] content, that is a function of competitive pressure from other publishers competing for search engine users' attention, not Google." Mot. 28-29. This again improperly disputes PMC's allegations that publishers across the online publishing industry submit to Google's exploitative terms because of Google's unlawful market power, not because of fair competition. Compl. ¶¶ 121-27, 193. Google's own documents, made public in the *Google Search* case, admit that publishers face a "forced choice" and cannot afford to opt out of search. *Id.* ¶ 116. That publishers, including PMC, must deal with Google or face financial harm is evidence of coercion. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 473 (7th Cir. 2020) (plaintiffs' "ultimate decisions, after much financial pain," to deal with monopolist "d[id] not disprove an illegal tie"). Indeed, the fact that Google has forced publishers across the industry to agree to these terms forms the

"combination . . . in restraint of trade"—the basis of PMC's Section 1 claim. 15 U.S.C. § 1.[4]

This Court recognized this "increasingly existential problem faced by publishers and digital creators," explaining in its *Google Search* remedies decision last year:

> With Google specifically, publishers are caught between a rock and a hard place. Because publishers rely heavily on Google to drive traffic to their sites, they have little choice but to allow Google to crawl their content for [indexing]. Publishers [ ] might want to deny Google permission to use its content to train and appear in its GenAI offerings, like AI Overviews, unless compensated. . . . Publishers cannot [ ] opt out of Google's use of their content to fine-tune Google's Search models or for display in AI Overviews. So, say, a publisher did not want Google to display its content in AI Overviews. It could accomplish that . . . only by opting out of being crawled altogether. But that is not a tenable choice, as it may mean the publisher's absence from Google's search index and its non-appearance on the SERP, which is critical to directing user traffic to their site.

*United States v. Google LLC*, 803 F. Supp. 3d 18, 150-51 (D.D.C. 2025) ("*Google Search Remedies I*") (record citations omitted).

### 2.  PMC's Claims Qualify for Per Se Treatment

Coercive reciprocal dealing claims are analytically similar to tying claims, which have often received per se treatment. *Betaseed, Inc. v. U & I Inc.*, 681 F.2d 1203, 1216-17 (9th Cir. 1982); *see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (applying tying concepts to coercive reciprocal dealing claim); *A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546, 550 n.3 (7th Cir. 1992) ("Tying arrangements are traditionally held to be *per se* violations of the antitrust laws."). In a tying claim, a party exploits its market power over a "tying" product to require purchasers to also purchase a "tied" product. *Jefferson Par.*, 466 U.S. at 12; *see also Teradata Corp. v. SAP SE*, 124 F.4th 555, 564-65 (9th Cir. 2024), *cert. denied*, 146 S. Ct. 118 (2025) (tying arrangements allow sellers "to leverage" power in one market "and thereby

---

[4] Google's citation to *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 336 (1990) (cited Mot. 29), is irrelevant, as that case stands for the ordinary proposition that antitrust injury must be attributable to the defendant's anticompetitive conduct.

extend its market power to the tied product market") (cleaned up). Both types of anticompetitive conduct involve a party's leveraging of its market power to force another party to purchase from or sell to it, thus gaining competitive advantage from market power rather than competitive merit. *See Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 424 (5th Cir. 1978); *Betaseed*, 681 F.2d at 1220.

Tying arrangements are per se unlawful if "(1) the defendant has market power in the tying product market, and (2) the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Teradata*, 124 F.4th at 572 (cleaned up); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001). Both elements are satisfied here. *First*, Google has market power in the tying product market. *See* Compl. ¶ 211. *Second*, Google's coercive reciprocal dealing arrangement affects a not insubstantial amount of commerce. PMC expends "hundreds of millions of dollars" to creating high-quality content that Google takes for free. *See*, *e.g.*, *id.* ¶ 254; *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ($200,000 was substantial commerce). The total amount of affected commerce is even greater when accounting for the value of content that Google has misappropriated from other publishers. Compl. ¶¶ 119, 128-31; *id.* ¶ 250 (OpenAI content agreements ballparked at "tens of millions" of dollars).

Google suggests that per se treatment should be denied because courts lack experience with coercive reciprocal dealing claims. Mot. 24. But courts have ample experience with tying claims, which Google concedes are analyzed "under the same standard." *Id.* at 13. Moreover, Google's insistence that AI Overviews has "facially apparent" pro-competitive effects (*id.* at 25) ignores its use of illegal monopoly power to extract Republishing Content, GAI Training Content, and RAG

Content from PMC for zero compensation.[5] This lawsuit does not allege that the existence of AI Overviews is a standalone antitrust violation; it challenges Google's use of unlawfully extracted content to produce them—a coercive reciprocal dealing arrangement with no "procompetitive virtue." *See F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986); c*f. Teradata*, 124 F.4th at 573 ("'[C]ertain tying arrangements'—those in which a seller uses its tying-market power to capture a non-de minimis volume of commerce—'are unreasonable per se.'" (quoting *Jefferson Par.*, 466 U.S. at 9)).

Finally, Google's contention that the per se rule cannot apply because the challenged conduct is a "novel business practice[]" in a "technology market[]" (Mot. 25-26) is premature. "[W]ithout the benefit of discovery, and thus without sufficient factual evidence . . . , the court simply cannot determine with certainty the nature of the restraint, and by extension, the level of analysis to apply." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039-40 (N.D. Cal. 2013); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) ("whether per se or rule of reason analysis applies . . . is more appropriate on a motion for summary judgment"). Every case Google cites for the proposition that its conduct cannot be "conclusively presumed to be unreasonable and therefore illegal" (Mot. 25) was decided with the benefit of a fully developed record.[6] PMC's claims warrant the same treatment.

### 3.  PMC's Allegations Also Satisfy the Rule-of-Reason Standard

The Court need not decide between per se or rule-of-reason analysis now, because PMC also adequately alleges that Google's conduct is unlawful under the rule of reason. *Fotobom*, 719

---

[5] That consumers might share in the value that Google unlawfully extracts from publishers is not pro-competitive.

[6] *See* Mot. 25 (citing *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020); *Microsoft Corp.*, 253 F.3d 34; and *Epic Games*, 67 F.4th 946).

F. Supp. 3d at 51. Google's arguments otherwise should be rejected.

Under the rule of reason, conduct is unlawful "if it has the 'net effect' of substantially impeding competition." *Id.* at 50 (citation omitted). This "fact-specific assessment," *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81 (2021) (citation omitted), is "often beyond the scope of a Rule 12(b)(6) inquiry," *Fotobom*, 719 F. Supp. 3d at 50 (citation omitted). At this stage, a plaintiff need only "sketch the outline of the injury to competition with allegations of supporting factual detail" and "plead an injury to competition beyond the impact on the plaintiffs themselves." *Id.* The Complaint meets this standard.

Google's conduct has substantial anticompetitive effects, including imposition of sub-competitive prices in the input market for search and the markets for Republishing Content, GAI Training Content, and RAG Content, Compl. ¶¶ 77-79, 116, 214, 260; restricted competition in the Online Publishing market, *id.* ¶¶ 77-79, 231-33, 261; reduced quality and quantity of output in the Online Publishing market, *id.* ¶¶ 184-85, 233-34, 262; and the elimination of choice among market participants, *id.* ¶¶ 207-09, 245-46, 262.

Google's arguments that the Complaint fails to plead reciprocal dealing under the rule of reason are wrong. Google erroneously contends that rule of reason is restricted to anticompetitive effects in the tied markets. Mot. 15, 20. Courts have made clear that this analysis "encompasses all of the circumstances of the case," *Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*, 772 F. Supp. 614, 625 (D.D.C. 1991) (citation omitted), and "requires consideration of . . . the effects of that arrangement in both the tying and tied markets," *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1178 (10th Cir. 2023) (citation omitted).

### B. PMC Plausibly Alleges the Relevant Markets

Google overstates the requirements for plausibly pleading an antitrust market and

mischaracterizes PMC's Complaint. Mot. 15-20. A plaintiff need not plead a market "with specificity," and a proposed market definition will "survive[] a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

Market definition is a "pragmatic, factual analysis," grounded in "commercial realities," not a "formal, legalistic one." *United States v. Google LLC* ("*Google Ad Tech*"), 778 F. Supp. 3d 797, 833 (E.D. Va. 2025) (cleaned up); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27 (D.D.C. 2015) ("[T]he boundaries of a product market may be determined by examining such practical indicia as industry or public recognition, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (cleaned up)). No "economically technical recitation of the market boundaries" is required. *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013). Market definition is generally a fact-driven empirical question not amenable to resolution on a motion to dismiss. *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 222 (D.D.C. 2022); *see also Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024). As demonstrated below, the Complaint satisfies the pleading standard.

### 1.   The "Tying" Market for Search Referral Traffic

Google's dispute over PMC's tying market definition of Search Referral Traffic (Mot. 26-28) raises premature factual disputes about reasonable interchangeability. At this stage, PMC need only explain why obvious substitutes are unreasonable; it "is not required to anticipate and refute in its complaint all possible market substitutes." *Jamsports & Ent., LLC v. Paradama Prods., Inc.*, 2003 WL 1873563, at *6 (N.D. Ill. Apr. 15, 2003). The Complaint meets this requirement.

Google insists that other forms of referral traffic or online distribution, like social media

and direct navigation, must substitute for Search Referral Traffic because those sources can be monetized. Mot. 28. But reasonable interchangeability depends on how purchasers—here, online publishers—view Search Referral Traffic. *Sysco*, 113 F. Supp. 3d at 25 (interchangeability looks to "whether buyers view similar products as substitutes."). As alleged, Search Referral Traffic is uniquely valued by publishers because it captures users searching for specific content, and this "intentional" traffic cannot be delivered by sources like social media and publisher pages. Compl. ¶¶ 67, 212. As this Court has already explained, "unlike [social media]," general search engines like Google "are a gateway to the World Wide Web," and searches are "not constrained by subject matter, inventory, or query type." *Google Search*, 747 F. Supp. 3d at 110 (finding that social media sites "are not adequate substitutes" for general search services). In contrast, social media sites are "walled gardens," and "only yield [search] results from profiles on the platform and do not display web links to external sites." *Id.* at 111. Nor can direct navigation to websites viably substitute for Search Referral Traffic, because "[d]irect navigation requires the user to know both a publisher's specific URL and that the publisher offers relevant content." Compl. ¶ 212. At best, Google has set up a factual dispute inappropriate for resolution at the Rule 12(b)(6) stage.

But even if these sources of traffic are weak economic substitutes, that does not mean they compete in the same market *as a matter of law. See Sysco*, 113 F. Supp. 3d at 30-31; *Google Search*, 747 F. Supp. 3d at 116 (that users perform searches on social media "tells the court little about actual substitution"). That products are "functionally similar" does not mean they are "*economic* substitutes," *Regeneron Pharms.*, 96 F.4th at 340, the "key question" is whether substitution constrains "any anticompetitive pricing," *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017) (cleaned up). Social media cannot compensate for the drastic traffic reduction if a publisher opted to engage only with social media or GAI platforms to the exclusion of Google.

*See* Compl. ¶ 106 ("[v]irtually no digital publishers can afford" to opt out of Google's search index); *id.* ¶¶ 119-20.

Google also argues that a market for Search Referral Traffic "makes no sense" because "Google does not sell 'Search Referral Traffic' to publishers." Mot. 26-27. But there is no "categorical rule that an antitrust market can *never* relate to a product that is not licensed or sold." *Epic Games*, 67 F.4th at 978; *see also Arcell v. Google LLC*, 744 F. Supp. 3d 924, 931-32 (N.D. Cal. 2024) (rejecting "Google's sweeping claim" that plaintiffs "can never suffer antitrust injury from the use of products . . . that do not charge a fee"). Numerous courts, including this one, have found markets for nominally "free" products. *Google Search*, 747 F. Supp. 3d at 109-10.

Google claims that Search Referral Traffic is not a market because it "is a consequence of *users'* choice of whether to click on links[.]" Mot. 27. No caselaw supports this proposition. On the contrary, courts accept defined "referral" markets. *See, e.g.*, *Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, 1995 WL 150089, at *3 (N.D. Cal. Mar. 28, 1995) ("physician referrals" market). Because Google's two cited cases (Mot. 27) were decided on full records at summary judgment—where plaintiffs produced no evidence supporting their proposed markets— they have no bearing here. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1486, 1489 (9th Cir. 1991) (finding "nothing in the record" that referrals are sold); *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688, 691 (8th Cir. 1993)) (similar). Here, PMC need only plead its market and has done so.

The market for Search Referral Traffic is also supported by *Brown Shoe* "practical indicia."

***Peculiar characteristics and uses***. Search Referral Traffic serves a particular function: it connects a user who submits a search query to a web publisher with information that can answer that query. Compl. ¶ 56. That is why Google has long emphasized, "[O]ur goal is to have people

leave our website as quickly as possible." *Id.* During the *Google Search* remedies phase, OpenAI's Head of Product for ChatGPT confirmed Google's "leverage" over the web ecosystem stems from the "traffic" it sends to publishers—underscoring Search Referral Traffic's distinct role. *Id.* ¶ 120.

**Industry and public recognition.** The Complaint details numerous examples of industry recognition of Search Referral Traffic as a distinct product. *See id.* ¶¶ 185-90 (describing analyses and studies on search traffic); *id.* ¶¶ 196-97, 202-03 (discussing analyses and studies on click-through rates). Publishing industry leaders discuss Search Referral Traffic's importance. *See id.* ¶¶ 200-01. Google itself recognizes Search Referral Traffic as a distinct product, as it has commented on the impact of its products on Search Referral Traffic, *id.* ¶¶ 198-99, and one scientist has noted that "[d]irect answers" to queries "reduce search referral traffic," which "hurts [content providers'] ability to monetize" from search, *id.* ¶ 187; *see also id.* ¶¶ 160-61.

**Distinct customers.** Search Referral Traffic has distinct customers: web publishers. "Users seeking answers to their search queries click on search results to visit a web publisher's site." *Id.* ¶ 58. Search Referral Traffic allows publishers to reach users interested in their content. *Id.*

**Unique production facilities.** As this Court explained in *Google Search*, "if Google's search quality substantially degraded," social media and direct navigation could not simply "shift resources to put out a product that resembles" search referral traffic. 747 F. Supp. 3d at 113. The Complaint details how, in order to provide Search Referral Traffic, search engines must crawl publisher sites to index the site's information. Compl. ¶¶ 61-65. Google's crawler has far broader access to the web than other web crawlers. *Id.* ¶¶ 122-23, 145.

### 2.  The Corresponding Input Market

Google is a monopsonist in the corresponding input market for Search Referral Traffic. Compl. ¶ 78. "At a very basic level, the input market is the supply side of the equation." *Le v. Zuffa, LLC*, 2023 WL 5085064, at *16 (D. Nev. Aug. 9, 2023). In the input market for Search

Referral Traffic, publishers contribute their website content, or Search Index Data, to Google's search index so that Google can use that content to generate search results. Compl. ¶¶ 58-61, 68. Google's sole rebuttal that it "does not follow" that Google is a monopsonist in the input market for Search Referral Traffic (Mot. 20) is conclusory in the face of PMC's well-pleaded allegations of monopsony power, *e.g.*, Compl. ¶¶ 78, 102, 116, 119, 122-27, 230.

PMC adequately alleges Google's monopsony power in the input market. Google has "the power to control prices" for Search Index Data, as evidenced by the very fact that it obtains PMC and other online publishers' content for a zero access fee. *Microsoft*, 253 F.3d at 51; *see also Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (market power "may be proven directly by evidence of the control of prices"). Moreover, PMC alleges that Google continues to pay the same zero access fee but now provides less to publishers and reaps more itself. Compl. ¶¶ 102, 116, 132, 211, 214, 233. Google provides fewer click-throughs and less search referral traffic to publishers but receives free content not only for search indexing but also for AI purposes—and increased advertising revenue as more users remain on Google's own site. *E.g.*, *id.* ¶¶ 57, 132, 233. Google has in effect further depressed prices in the input market—strong evidence of its monopsony power. *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 11 (D.D.C. 2022) (monopsony buyer "can lower prices or otherwise harm sellers").

Google incorrectly claims that PMC fails to plead a lack of reasonable substitutes for general search engines. Mot. 20-21. PMC in fact alleges that there are no buyers of publisher Search Index Data who are reasonably interchangeable with Google. Compl. ¶¶ 78, 214. The "other search engines or distributors" Google identifies (Mot. 21) cannot provide the referral traffic that Google has provided, so they are not "seen by sellers"—publishers like PMC—"as being reasonably good substitutes." *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (citation

omitted). Nor can they exert competitive pressures on depressed prices from Google's monopsony over Search Index Data. In short, there is no "sufficiently viable . . . alternative[]" "to defeat [Google's] exercise of monopsony power." *Zuffa*, 2023 WL 5085064, at *16 n.25.

Google also challenges the input-market definition because PMC is not prevented from licensing its content for other purposes. Mot. 21. But products are reasonably interchangeable only if they "can be used for the *same* purpose." *F.T.C. v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997) (emphasis added) (citation omitted). Content licensed for search indexing serves a different purpose than content licensed for GAI training—these are not interchangeable products. *See Todd*, 275 F.3d at 203-06 (possibility professionals could obtain employment in other industries did not disprove industry-specific market at pleading stage). Accordingly, the price that other companies pay for GAI Training Content does not constrain the price Google pays for Search Index Data.

### 3.  The "Tied" Markets for AI Content

PMC's Complaint properly defines markets for the tied products, Republishing Content, GAI Training Content, and RAG Content. Compl. ¶¶ 214-26. The allegations supporting these markets are straightforward because the markets' boundaries are easily discernable using the *Brown Shoe* indicia, as described below.

***Peculiar characteristics and uses; pricing.*** Republishing, GAI Training, and RAG each refer to specific uses of content by large language models ("LLMs"), each with independent value and pricing. *Id.* ¶¶ 218-25. Republishing refers to the copying and publishing of existing content. *Id.* ¶ 215. GAI training content teaches an LLM to take a seed input (e.g., a question or prompt) and iteratively predict the most likely next word based on learned patterns. *Id.* ¶¶ 134-38, 216. RAG Content "grounds" an LLM with external sources of information to improve its output quality. *Id.* ¶¶ 139-40, 217.

***Industry and public recognition.*** Public reporting has recognized the existence of these AI

content markets, while noting they are "opaque" because participating companies generally do not disclose details of their content licensing agreements. *Id.* ¶¶ 219, 220-24. Courts too have recognized AI content-licensing markets. *See, e.g.*, *In re Mosaic LLM Litig.*, 2025 WL 2294910, at *4 (N.D. Cal. Aug. 8, 2025) (discussing discovery related to "market for licensing for AI-training purposes").

*Distinct customers.* The customers for Republishing Content, Training Content, and RAG Content are technology companies that deploy LLMs. *See id.* ¶ 221 (describing Perplexity's licensing program); *id.* ¶ 224 (describing OpenAI's partnership with the Washington Post).

These allegations bear directly on cross-elasticity of demand and reasonable interchangeability. Notably, Google claims that PMC's allegations regarding these three markets are insufficient, but it nowhere suggests that PMC has defined these markets too broadly or narrowly. Mot. 17-18. Instead, Google erroneously argues that the fact that the same content can in some instances be licensed for multiple uses somehow defeats the existence of distinct product markets. *Id.* But as explained above, products are not interchangeable unless they can be "used for the same purpose." *Staples*, 970 F. Supp. at 1074 (citation omitted). Content can be licensed for republishing, training, grounding, a combination of those uses, or none of those uses. Compl. ¶¶ 214-18. Permission to use content for one purpose does not confer the right to use it for other purposes, so these products are not interchangeable.

In any event, the competitive harm underlying a coercive reciprocal dealing claims centers on the seller's ability to leverage its economic power in the tying market to exercise buying power in a second, tied market rather than compete on the merits in the second market. Whether the markets for Republishing, GAI Training, and RAG Content are defined as a single GAI content licensing market or as three separate markets, PMC plausibly alleges that Google is using its

monopoly power in search to invade a second market and avoid competing on the merits there. That is sufficient to define a market for coercive reciprocal dealing at the pleading stage.

### 4.  The Online Publishing Market

PMC plausibly alleges a market for Online Publishing comprised of "news articles, periodicals, reports, and other types of information that is made available online." Compl. ¶ 80. PMC further pleads that production of online content requires specific skills related to the production and dissemination of digital content over the internet, such as experience with website creation, search engine optimization, and content management systems. *Id.* ¶ 82.

Google's sole argument is that PMC's proposed market for Online Publishing is too broad. Mot. 22*; see also id.* 38-39, 41. But PMC alleges that the market excludes print media and identifies the unique knowledge and skills necessary to produce online content. Compl. ¶¶ 82-83; *see Sysco*, 113 F. Supp. 3d at 26 ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 572 (1966)); *Bertelsmann*, 646 F. Supp. 3d at 33 (cleaned up) ("[F]uzziness is inherent in bounding any market," because "[m]arket definition is more art than science."). Unlike the markets in Google's cited cases (Mot. 22, 39), the Online Publishing market is not a narrow submarket that fails to explain exclusion of obvious substitutes, *Fresh Made, Inc. v. Lifeway Foods, Inc.*, 2002 WL 31246922, at *5 (E.D. Pa. Aug. 9, 2002) (rejecting market for "specialty Russian dairy foods"), nor does it encompass a "kaleidoscope" of clearly "non-substitutable" products, *Cavalleri v. Hermes Int'l*, 2025 WL 2662897, at *3 (N.D. Cal. Sept. 17, 2025).[7]

---

[7] Google's other cited cases are inapposite for the same reason, *e.g., Choh v. Brown Univ.*, 753 F. Supp. 3d 117, 133 (D. Conn. 2024); *Rock v. Nat'l Collegiate Athletic Ass'n*, 928 F. Supp. 2d 1010, 1022 (S.D. Ind. 2013); *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 18 (D.D.C.

PMC's allegations are "sufficient to plead the boundaries of relevant competition, particularly when reviewed under the lenient standard for market definition at this stage." *Matson, Inc.*, 633 F. Supp. 3d at 223. In sum, this is "not one of the relatively rare cases of a glaring deficiency in the market-definition pleadings that renders dismissal at the 12(b)(6) stage appropriate." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 16-17 (D.D.C. 2021) (cleaned up).

### C. <u>PMC Has Antitrust Standing for Its Coercive Reciprocal Dealing Claims</u>

PMC alleges that Google's coercive reciprocal dealing results in underpayment to PMC for access to its content and reduced referral traffic, resulting in lost revenue. These injuries are sufficient to confer antitrust standing.

Plaintiffs who are "participant[s] in the relevant market and suffered [] injury in the market where competition is being restrained" are "proper part[ies] to bring a private antitrust action" and therefore have antitrust standing. *Fotobom*, 719 F. Supp. 3d at 43-44 (cleaned up). To "allege antitrust injury at the pleading stage," it is enough to plead that the injury "flows from that which makes defendants' acts unlawful." *Sky Angel U.S.,* 947 F. Supp. 2d at 105, 107 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)); *accord* Areeda et al., Antitrust Law ¶ 338a2 (5th ed. 2022) (violation can be "'substantial' cause" "even if other factors" "aggregate to a more substantial cause"). The Complaint meets that standard.

Google does not identify any plaintiff better situated to challenge its unlawful conduct, nor does it dispute that PMC suffered underpayment and reduced search traffic. Mot. 29. Google only argues that neither injury "flows from the alleged anticompetitive consequences of the challenged 'reciprocal dealing'" and so cannot confer antitrust standing. *Id.* (citation omitted). This is, at best,

---

2025), or because they were not pleading stage cases, *e.g. Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612, (1953).

a premature factual dispute about the effects of Google's conduct.

### 1. PMC Suffers Underpayment as a Result of Google's Coercive Reciprocal Dealing

The Complaint adequately alleges how Google's exploitation of its unlawful market power as the monopolist provider of Search Referral Traffic causes anticompetitive effects in the tied markets of Republishing Content, GAI Training Content, and RAG Content. Compl. ¶¶ 132, 214-34, 260. Google contends these allegations are insufficient because PMC has not alleged that Google excluded other buyers or prevented PMC from entering nonexclusive licensing agreements. Mot. 18-20, 29. But neither is necessary to plead anticompetitive effects. It is sufficient to allege that Google has leveraged its monopoly in General Search Services and monopsony in the corresponding input market to degrade the terms on which *Google* obtains the tied products from PMC. *See FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 55 (D.D.C. 2024) ("An anticompetitive effect is anything that has a substantial effect in protecting a firm's market power, and does so through a means other than competition on the merits" (cleaned up)).

These anticompetitive effects cause PMC to suffer underpayment in those same tied markets. Google continues to pay a zero access price but receives not only Search Index Data, but also Republishing Content, GAI Training Content, and RAG Content from PMC. The fact that Google's competitors are paying publishers like PMC to license this same content only strengthens PMC's allegations of injury. PMC's depressed compensation in these tied markets is an antitrust injury, because it flows directly from the anticompetitive effects of Google's coercive conduct. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988-89 (9th Cir. 2000) (where suppliers are paid less than prices that would prevail in a competitive market, they suffer antitrust injury).

Google suggests that PMC cannot tie its underpayment injury to Google's conduct but has

not, and cannot, cite any authority requiring a heightened causation showing at the pleading stage. To the contrary, Google's own cited case clarifies that "a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 805 (D.C. Cir. 2001) (cited Mot. 29).

### 2.  PMC Is Harmed by Reduced Search Traffic and Resulting Lost Revenue

PMC also adequately alleges that Google's coercive reciprocal dealing causes harm in the form of lost advertising, affiliate, and subscription revenues from anticompetitive effects in the tying market. Compl. ¶¶ 192-95. Google's coercive reciprocal dealing diverts users away from publishers like PMC and toward Google's own products by preferencing AI Overviews above organic links to publisher content. Reduced click-throughs and increased zero-click searches artificially restrict the availability of Search Referral Traffic for publishers like PMC. While underpayment for the tied goods is sufficient to confer antitrust standing, PMC's revenue loss from reduced Search Referral Traffic provide an independent basis for antitrust standing.

Google is wrong that PMC's injuries in the Search Referral Traffic market are irrelevant to its reciprocal dealing claim. Mot. 30. Under the rule of reason, courts consider anticompetitive harms in both the tied and tying markets. *See Chase Mfg.*, 84 F.4th at 1178. PMC suffers cognizable harm in both. Again, in the tied markets, PMC is underpaid because Google extracts the tied products for free. *See supra* at 25-25. In the tying market, PMC suffers lost revenue from diminished Search Referral Traffic—a direct result of Google's anticompetitive preferencing of its own products over links to publisher content. Unlike in *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (cited Mot. 30), these harms are not "outside the relevant markets."

### D.  The Refusal-To-Deal Doctrine Does Not Apply

Google distorts PMC's allegations to recast its conduct as a "lawful refusal to deal." Mot. 8-13 (citing *Trinko*, 540 U.S. 398). But courts limit *Trinko*'s refusal-to-deal framework to true

refusals to deal with rivals, not more direct interference with competition, such as tying or monopoly abuse. *See Chase Mfg.*, 84 F.4th at 1173 (district court erred by applying refusal-to-deal framework rather than looking to market reality and "practical effect of [monopolist's] conduct"). *Trinko* did not affect antitrust liability in other contexts, such as reciprocal dealing and tying. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 956 (N.D. Ill. 2018) ("*Trinko* . . . did not involve . . . tying claims, nor did [it] abrogate long-standing jurisprudence in th[at] area[]."). As Judge Brinkema explained in *Google Ad Tech* (rejecting near-identical argument by Google), even if certain anticompetitive conduct "can be conceptualized as a conditional refusal to deal, that does not mean it should be assessed as a simple refusal to deal with rivals" under *Trinko*. 778 F. Supp. 3d at 867 (cleaned up). "That is why a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." *Id.*

Moreover, none of the concerns underlying *Trinko*'s refusal-to-deal doctrine are implicated here. PMC is an input provider to Google's search, not a horizontal rival. PMC is not seeking to force Google to "share the source of [its] advantage" or its "economically beneficial facilities." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 25 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023). PMC seeks only to prevent Google from leveraging its unlawful monopoly power over search to coerce PMC into providing its content for free for uses to which it would not otherwise agree without compensation. This is coercive reciprocal dealing, not a lawful refusal to deal. The "free-riding concerns" described in Google's cited cases are not present here. *See AliveCor, Inc. v. Apple Inc.*, 163 F.4th 1259, 1269 (9th Cir. 2026) (cited Mot. 10). If anything, Google is free-riding on PMC by exploiting its content without compensation, then using that content to create products that harm PMC.

Even if Google's conditioning of Search Referral Traffic on PMC providing content for AI

purposes could somehow be characterized as a refusal to deal, Google would still be liable. An "exception" to *Trinko* exists where a plaintiff alleges that "before the defendant refused its competitors access the defendant voluntarily engaged in a course of dealing with its rivals." *New York v. Meta*, 66 F.4th at 305 (discussing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). PMC alleges an extended course of dealing in which Google solicited online publishers to provide content for search indexing before unilaterally revising the terms to Google's benefit and publishers' detriment. *See* Compl. ¶¶ 69, 116 (Google's description of this deal); *id.* ¶ 120 (describing Google's "leverage" "over the ecosystem" because it provides "traffic" to publishers); *id.* ¶ 127 (discussing the effects of GAI on "web and search ecosystems").[8] Google's unilateral degradation of the parties' deal is anticompetitive because it forces PMC to choose between acquiescence and exclusion. Google cannot hide behind *Trinko* to escape liability.

## II.  PMC ADEQUATELY PLEADS UNLAWFUL MONOPOLY MAINTENANCE

### A.  PMC Plausibly Alleges Monopoly Maintenance

"The offense of monopoly under § 2 . . . has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). The second element, anticompetitive conduct, "is the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* at 482-83 (citation omitted). "*Microsoft* holds that anticompetitive conduct by a monopolist is simply conduct that

---

[8] Google's response misconstrues PMC's well-pleaded allegations. Google incorrectly asserts that "PMC does not . . . allege that Google terminated any preexisting course of dealing." Mot. 12. It also mischaracterizes PMC's allegations of coercion—publishers must provide Search Index Data for free or suffer existential harm—as a voluntary choice to "opt out." *Id.*

maintains or expands its monopoly other than through competition on the merits." *FTC v. Meta*, 775 F. Supp. 3d at 54-55. PMC adequately alleges both elements. *See* Compl. ¶¶ 235-42.

As to market power, PMC alleges Google's monopoly in General Search Services and corresponding monopsony in the input market for search.[9] *E.g., id.* ¶¶ 73-79. As to anticompetitive conduct, PMC alleges that Google has ratcheted up the abuse of its market power by unilaterally using PMC's content to generate AI Overviews, including through republishing, training, and RAG. *Id.* ¶¶ 235-42. This type of coercion is anticompetitive conduct. *See, e.g.*, *Google Ad Tech*, 778 F. Supp. 3d at 865 (finding Google's policy anticompetitive because it used coercive monopoly power to deprive publishers of competitive choice).

Any contention that Google's conduct is not exclusionary because it is procompetitive product improvement (Mot. 31) ignores the core of PMC's allegations. PMC alleges that Google's use of its unlawful monopoly power to coerce PMC into supplying content for its GAI products is an abuse of that power. *See 2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 138 (D.D.C. 2018). "[C]hanges in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010); *see Microsoft*, 253 F.3d at 67 (Microsoft's product design choices "constitute[d] exclusionary conduct").

---

[9] "Monopsony power is market power on the buy side of the market." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007). "Although most antitrust law has developed under sell-side theories of harm, i.e., monopoly, monopsony analysis relies on similar principles." *Bertelsmann*, 646 F. Supp. 3d at 22 n.13. For example, in *Bertelsmann*, Judge Pan enjoined a proposed merger between two publishing houses after finding that the merged firm would be able and incentivized to pay smaller advances to authors. The Court treated the authors as sellers to an input market; its monopsony analysis considered whether reduced competition from a merger would harm the authors as sellers, rather than the consumers as buyers. *See id.* at 10-12.

At most, Google's product-improvement argument raises a fact dispute for discovery. *See In re Google Digital Advert. Antitrust Litig.*, 2024 WL 988966, at \*5-6 (S.D.N.Y. Mar. 7, 2024) (rejecting Google's argument that its "transition from Flash to HTML5" "was merely a product redesign that should not give rise to antitrust liability" as "beyond the four corners of the Complaint"); *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 864 (C.D. Cal. 2015) ("procompetitive" argument at most "raised factual issues . . . inappropriate" for pleading stage).

Google next argues that its ability to leverage its monopoly power in search services to obtain GAI Training Content and RAG Content for free is merely cost lowering "encouraged" under the antitrust laws. Mot. 31. But, as Google's cited case clarifies, that is true only when lowered costs "translate[] to enhanced competition among market players, better products, and lower prices for consumers." *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 340 (3d Cir. 2018). Here, any lowered cost has the opposite effect. It suppresses competition in the market, degrades product quality, and ultimately harms consumers. *Supra* at 15.

Google's contention that it has not prevented "any GSS rivals from obtaining this content for free" (Mot. 31) is wrong and irrelevant. This argument ignores PMC's allegations describing valuable content licensing deals between publishers and others for use in GAI products. Compl. ¶¶ 119, 219-24. Google also misconstrues PMC's allegation that "some" of Google's competitors "must pay a significantly higher price for the same content," *id.* ¶ 239, to mean that others of Google's competitors get that content for free, Mot. 31. That is not a reasonable reading of PMC's allegation, let alone one that draws inferences in PMC's favor. In any event, PMC need not show complete exclusion of rivals to demonstrate anticompetitive effects. "As *Microsoft* teaches, an anticompetitive effect is anything that 'has a substantial effect in protecting a firm's market power, and does so through a means other than competition on the merits.'" *FTC v. Meta*, 775 F. Supp.

3d at 54 (quoting *Microsoft*, 253 F.3d at 62) (alteration omitted). This includes "reduced output" or "decreased quality in the relevant market," *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018), both of which PMC alleges result from Google's monopoly. *Supra* at 15.

Finally, Google characterizes PMC's allegations regarding degraded search output quality as "sky-is-falling hyperbole." Mot. 32. But the logical result of Google using publishers' own content to compete against them in Online Publishing is that publishers will be unable to invest in quality content. *E.g.*, Compl. ¶¶ 13, 208. As Google acknowledges, "Google Search's quality depends on its ability to answer user queries" (Mot. 32), which turns on the quality of Search Index Data and data powering AI Overviews, *see* Compl. ¶¶ 103, 143, 172. In short, PMC's allegations are "based on standard principles of supply and demand," which "are routinely credited by courts . . . ." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1065 (D.C. Cir. 2015) (quotation omitted).

### B.  PMC Has Antitrust Standing to Sue for Unlawful Monopoly Maintenance

PMC participates in the General Search Services market as a supplier of content and as a purchaser of Search Referral Traffic. PMC's Complaint straightforwardly alleges that it suffers antitrust injury in both roles. Google's arguments to the contrary rely on misreadings of PMC's Complaint and a misunderstanding of antitrust standing law.

#### 1.  PMC Adequately Alleges Antitrust Injury as a Supplier of Content for Search and as a Purchaser of Search Referral Traffic

Google counterintuitively argues that PMC's underpayment injury cannot confer antitrust standing for PMC's monopoly maintenance claim because injury in the input market for search does not count as an antitrust injury. Mot. 33. This argument misunderstands PMC's allegations about the economic and practical realities resulting from Google's anticompetitive conduct.

Here, the anticompetitive conduct and PMC's injuries occurred <u>in the same</u> markets. The Complaint describes how Google's General Search Services monopoly affords it a corresponding

monopsony in the input market for search. Compl. ¶¶ 237-39. Publishers like PMC participate in the General Search Services market as input providers of Search Index Data; in exchange, Google provides Search Referral Traffic. *Id.* ¶¶ 235-37. The input and output sides are two sides of the same market. Google's coercive conduct has anticompetitive effects and causes PMC injury in both the input market (underpayment) and output market (reduced Search Referral Traffic) for General Search Services. *Cf. United States v. Live Nation Ent., Inc.*, 2025 WL 835961, at *5 (S.D.N.Y. Mar. 14, 2025) ("putting antitrust legalese to the side," plaintiffs had antitrust standing based on "overcharge[]" due to defendants' anticompetitive conduct).

By contrast, Google's cited cases involved injuries in markets <u>separate from and unrelated to</u> the anticompetitive effects. Mot. 33; *see W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (mismatch between injury in market for hospital services to insurers and anticompetitive conduct in separate, downstream insurance market); *PhantomALERT,* 762 F. Supp. 3d at 18 (mismatch between anticompetitive conduct in smartphone market and injury in smartphone app market); *Fotobom*, 719 F. Supp. 3d at 46 (mismatch between anticompetitive conduct in search market and injury in unspecified separate market); *SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660, 673 (E.D. Pa.), *aff'd*, 454 F. App'x 64 (3d Cir. 2011) (no injury based on "ancillary or tangential" harm); *Cal. Crane Sch., Inc. v. Google LLC*, 2023 WL 2769096, at *3 (N.D. Cal. Mar. 31, 2023) (failure to define relevant markets).

## 2. <u>Alternatively, PMC Has Antitrust Standing Under *McCready*</u>

In the alternative, PMC has antitrust standing because its injuries are "inextricably intertwined" with the injury that Google seeks to inflict on its competitors in the General Search Services market. *See Blue Shield v. McCready*, 457 U.S. 465, 484 (1982). *McCready* held that health insurance subscribers had standing to sue their insurer for colluding with physicians and

32

psychiatrists to deny them reimbursement for payments made to psychologists. *Id.* The Court acknowledged that while the psychologists (not the patients) were the conspiracy targets, antitrust standing "cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market." *Id.* at 479. Since *McCready*, "several circuits have construed *McCready* as recognizing antitrust injury where the plaintiff was used as a conduit to harm the defendants' actual competitors, such that the plaintiff's harm is an indispensable aspect of the scheme." *Fotobom*, 719 F. Supp. 3d at 47 (cleaned up).

Like the *McCready* subscribers denied reimbursement, PMC has been denied compensation for its content. This harm to PMC is an essential means by which Google's illegal conduct ultimately injures competition in General Search Services. By obtaining PMC's content for republishing, training, and grounding at zero cost, Google effectively increases the relative costs to its competitors of obtaining content for these purposes. This solidifies barriers to entry for Google's would-be competitors. *See* Compl. ¶ 79. Even if Google's coercive abuse of its monopoly power "targeted [its] competitors," PMC's underpayment injury is "inextricably intertwined" with the "anti-competitive effects" of Google's conduct "and thus flowed from that which makes [Google's] acts unlawful." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (cleaned up). "Rejecting a claim of antitrust injury under these circumstances—on the pleadings no less—would 'engraft artificial limitations on the § 4 remedy,' precisely what the Supreme Court has forbidden." *Live Nation*, 2025 WL 835961, at *5 (quoting *McCready*, 457 U.S. at 472.).

### 3.  The *Associated General Contractors* Factors Support Antitrust Standing

The Supreme Court in *Associated General Contractors v. Carpenters*, 459 U.S. 519 (1983), identified certain "additional factors to be considered in determining whether the plaintiff has 'antitrust standing,'" *Andrx*, 256 F.3d at 806. These include "the directness of the injury, whether

the claim for damages is 'speculative,' the existence of more direct victims, the potential for duplicative recovery and the complexity of apportioning damages." *Id.* (quoting *Assoc. Gen. Contractors*, 459 U.S. at 542-45). Every factor weighs in favor of PMC having antitrust standing.

Google does not argue that duplicative recovery or apportionment of damages poses a problem. *See* Mot. 33-34. Nor could it: no other plaintiff is better situated to sue, and PMC's damages from Google's anticompetitive conduct cannot be claimed by Google's competitors.[10]

Contrary to Google's arguments, PMC's injuries are "direct and non-speculative." Mot. 34. PMC alleges underpayment for its content and reduced Search Referral Traffic harming advertising and other revenue. *See supra* at 24-26. There are no intermediate steps between Google's coercion and its failure to pay PMC for PMC's content. PMC has alleged a direct causal chain: Google's use of PMC's content for GAI products deprecates PMC in SERP engagement through AI Overviews, resulting in reduced advertising revenue due to lack of search referrals. *See* Compl. ¶¶ 187, 232. Courts have found far longer causal chains sufficiently direct for antitrust standing. *See, e.g.*, *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem. Hosp.*, 604 F.3d 1291, 1304, 1306-07 (11th Cir. 2010) (injury sufficiently direct even though "several steps must occur" first). Further, "there is nothing speculative about" PMC's alleged "damages for the alleged loss of revenue and profits." *City of Moundridge, KS v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 32 (D.D.C. 2007). Google's sole authority, *Stallard v. Goldman Sachs Group*, 2024 WL 4903783, at *9 (D.D.C. Nov. 27, 2024) (cited Mot. 34), is inapposite—the plaintiff there failed to allege any anticompetitive conduct, unlike PMC.

---

[10] In any event, the existence of another potential plaintiff is not dispositive of the antitrust standing inquiry. *Apple Inc. v. Pepper*, 587 U.S. 273, 287 (2019).

### III. **PMC ADEQUATELY PLEADS UNLAWFUL TYING**

PMC also sufficiently alleges that Google's conduct constitutes unlawful tying in violation of § 2 of the Sherman Act. PMC's Complaint plausibly alleges the four elements of a per se tying claim: "(1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce." *Fotobom*, 719 F. Supp. 3d at 50 (quoting *Microsoft*, 253 F.3d at 85); *Yelp Inc. v. Google LLC*, 2025 WL 2978394, at *2-4 (N.D. Cal. Oct. 22, 2025).[11] Another federal court recently denied a motion to dismiss a similar § 2 tying claim brought by Yelp against Google, which alleged that Google abused its monopoly in general search services by designing its SERP to compel users to use Google's own local search product. *Yelp*, 2025 WL 2978394, at *1.

### A. **PMC Plausibly Alleges Separate Products**

Products are "distinct" when there is "sufficient consumer demand so that it is efficient for a firm to provide [them] separately." *Eastman Kodak Co*, 504 U.S. 462. This can be inferred from facts including "consumer requests to offer the products separately, disentangling of the products by competitors, analogous practices in related markets, and the defendant's historical practice." *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 848 (N.D. Cal. 2024); *see also Microsoft*, 253 F.3d at 86. Whether products are separate for purposes of a tying claim is a question of fact. *See Eastman Kodak*, 504 U.S. at 463; *Kaufman v. Time Warner*, 836 F.3d 137, 144 (2d Cir. 2016).

PMC adequately pleads that Google's general search product (the tying good) and AI

---

[11] Google does not challenge PMC's allegation that Google has market power in the tying market. Mot. 34-40. The Court need not decide now whether PMC's tying claim is subject to per se liability or rule-of-reason analysis because PMC has also pled unlawful tying under a rule of reason theory. *See supra* at 14 (citing *Fotobom*, 719 F. Supp. 3d at 51).

Overviews (the tied good) are separate products. PMC's allegations concerning the contrasting purposes of Google's general search product and AI Overviews plausibly allege that consumers seek these products separately. As alleged, search engines "take in a user's search query and return search results that require users to travel to other webpages to explore information responsive to that query." *Id.* ¶ 56; *see also id.* ¶ 55. By contrast, AI Overviews provide an AI-generated "overview on a topic" on an interface "designed to keep users within [Google's] [Search Generative Experience], as opposed to exploring the web." *Id.* ¶ 150; *id.* ¶¶ 160-62.

Moreover, Google and its competitors provide these products separately. Google for years provided a standalone general search product in which Google's "10 blue links" "sen[t] visitors to websites small and large." *Id.* ¶ 69. And Google's AI Mode provides AI Overviews separate from the SERP. *See id.* ¶ 156. Most companies that compete with Google in the generative AI space—such as OpenAI—do not provide a general search product. *See id.* ¶¶ 112-13, 223.

Google's argument that AI Overviews are a "feature" of Google's general search engine (Mot. 35-36) at most raises factual disputes that cannot be resolved at this stage. *See Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005). Google attempts to support this contention with the *Google Search* decisions, but none of those establish as a factual matter that general search and AI Overviews are the same product. The *Google Search* liability opinion said nothing about AI Overviews, which were not rolled out broadly until after the liability trial. *See* Compl. ¶¶ 152-53.

This Court has repeatedly described Google's GAI products and General Search Services as separate products in separate markets: "GenAI products have emerged as a competitive threat to the traditional GSE," *Google Search Remedies I*, 803 F. Supp. 3d at 95, and "search and GenAI are not completely interchangeable," *United States v. Google LLC*, 2025 WL 3496448, at *4

(D.D.C. Dec. 5, 2025). In any event, "the mere fact that two items are complements . . . does not make them a single product for purposes of tying law." *Microsoft*, 253 F.3d at 86 (citation omitted). This is true even where products are technologically integrated. *See Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678940, at *5 (N.D. Cal. Oct. 30, 2009) ("by virtue of technological integration, purchasers are coerced into purchasing two allegedly separate products"); *Epic Games*, 67 F.4th at 996.

Google's argument that other search firms "bundle" their search engines with AI-assisted search products (Mot. 36) improperly asks the Court to consider facts outside PMC's Complaint. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).[12] And those facts are disputed. Numerous general search engines either do not offer AI-assisted search or allow users to opt out.[13] PMC has alleged ample facts showing that the tying and tied products are separate, and Google's attempt to create a factual dispute at this stage should be rejected.

### B.  PMC Plausibly Alleges Coercion

Google does not offer users its search engine separately from its AI Overviews product. *See* Compl. ¶¶ 153-55. And Google does not dispute, nor could it, that Google's terms of service prohibit users from modifying any part of Google's services or software when they use Google's general search services. *Id.* ¶ 244. As the court explained in denying Google's motion to dismiss Yelp's tying claim, "[a] reasonable inference therefrom—drawn in [PMC]'s favor at the pleading stage—is that this means users are prohibited from, among other things, tampering with the results

---

[12] Google improperly cherry-picks statements from hearing transcripts in *Google Search.* Mot. 36 n.2.

[13] *E.g.*, *Opting Out of DuckDuckGo AI Features*, DuckDuckGo, https://duckduckgo.com/duckduckgo-help-pages/ai-features/opting-out-of-ai ("At DuckDuckGo, we recognize not everyone wants AI in their browser or search results."); *see also* Frank *supra* note 3; Compl. ¶ 224.

displayed to remove . . . AI Overviews[] that [PMC] alleges are part of Google's SERP." *Yelp*, 2025 WL 2978394, at *4. Moreover, the fact that a higher percentage of Google searches are zero-click when AI Overviews appear, Compl. ¶¶ 100, 203, 246, demonstrates that "some appreciable number of such users do not engage further with the contents of the SERP" because "they have already consumed Google's [AI Overviews] content *by design.*" *Yelp*, 2025 WL 2978394, at *4. This is sufficient to plead that Google users are "coerced into consuming" AI Overviews. *Id.*

Google's coercion arguments are unavailing and, at best, raise improper factual disputes. Mot. 37-38. None of Google's cited cases involve an analogous tying arrangement that failed to give users the option of purchasing the tying product without a second tied product. In *Robinson v. HP, Inc.*, buyers "were not required to purchase HP-branded ink cartridges as a condition of purchasing their printers." 2025 WL 2802077, at *5 (N.D. Ill. Sept. 30, 2025). Likewise, in *It's My Party, Inc. v. Live Nation, Inc.*, numerous customers purchased the alleged tying good without having to purchase the alleged tied good. 811 F.3d 676, 685 (4th Cir. 2016). Both cases involved consumers who could freely purchase the tying good and decline the tied good. Users of Google's General Search Services cannot do the same.

### C.  **PMC Plausibly Alleges Substantial Foreclosure**

"Under a *per se* tying theory, [PMC] need only plead that the tying arrangement forecloses a substantial volume of commerce, and under the rule of reason, a net effect of substantially impeding competition." *Fotobom*, 719 F. Supp. 3d at 52. Under either standard, PMC alleges sufficient anticompetitive harm in the tied market for Online Publishing. The tie encourages zero-click searches resulting in significant losses in revenue from search referrals. *See* Compl. ¶¶ 100, 196. The effect is to prioritize Google's own AI Overview content over the content of publishers like PMC. *Id.* ¶¶ 246-49. Online publishers are collectively projected to lose up to $2 billion in

advertising revenue as a result of AI Overviews, easily clearing the "substantial volume" threshold. *Id.* ¶¶ 66, 185-88 & n.112. These revenue losses have already led to declines in the quantity of quality content. *See id.* ¶¶ 207, 248, 261-62. Such content serves as the input to General Search Services, which further harms users. *See id.* ¶¶ 240, 260.

Google's argument that PMC's alleged Online Publishing market is overbroad (Mot. 38-39) fails for the same reasons discussed. *Supra* at 23. Moreover, as Google concedes, PMC alleges that AI Overviews compete (unfairly) in the Online Publishing market. Mot. 38 (citing Compl. ¶¶ 80, 85, 127, 246). Contrary to Google's contention, nothing in the Complaint suggests that AI Overviews are in the same market as Google's General Search Services. As explained, *supra* at 35-37, AI Overviews is a separate product, and the mere fact that AI Overviews appear on the SERP and compete with other outputs generated from a user's search query does not mean that it competes directly with General Search Services.

### D. PMC Has Antitrust Standing for its Unlawful Tying Claim

PMC alleges that Google's tying of AI Overviews to search has caused PMC antitrust injury in the form of lost revenue from reduced traffic. Compl. ¶¶ 192-95. PMC's injuries are not, as Google claims, in "unrelated markets." Mot. 39-40. Rather, PMC's injuries result directly from Google's anticompetitive conduct in the tied market of Online Publishing. Compl. ¶¶ 54, 79, 207.

PMC also alleges that Google's illegal tie has anticompetitive effects in the tying market of General Search Services. *Id.* ¶¶ 248-49. By denying revenue to online publishers, Google restricts output and degrades Online Publishing, which in turn degrades the quality of Google's General Search Services and AI Overviews, as both depend on Online Publishing content. *Id.* ¶¶ 60, 134, 177, 253. Google identifies no procompetitive justification for forcing its search engine users to use AI Overviews.

PMC thus pleads injuries suffered directly in the tying and tied markets, not "outside of the relevant markets," *Qualcomm Inc.*, 969 F.3d at 992, or in markets "secondary to the anticompetitive conduct," *Fotobom*, 719 F. Supp. 3d at 47. These allegations are enough to plead that PMC suffered "injuries, if proved," that "flow from the very monopolistic conduct that is unlawful under the antitrust laws." *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 648 (S.D.N.Y. 1992).

## IV.  **PMC ADEQUATELY PLEADS MONOPOLY LEVERAGING**

Google's assertion that the Supreme Court "has foreclosed" monopoly leveraging as a viable standalone antitrust claim (Mot. 40) is unsupported. While some courts have questioned the continued viability of monopoly leveraging claims separate from attempted monopolization claims after *Spectrum Sports, Inc. v. McQuillian*, 506 U.S. 447 (1993), other courts, including in this district, continue to recognize their validity. *See 2301 M Cinema*, 342 F. Supp. 3d at 133 (recognizing illegality of "unlawful monopoly leveraging" (quotation omitted)). [14]

The elements of monopoly leveraging are: the defendant "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage over [the plaintiff] in another distinct market; and (3) caused injury by such anticompetitive conduct." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001). PMC adequately pleads each element, with detailed allegations that Google's use of its adjudicated monopoly power in search threatens the market for online publishing "with the higher prices or reduced output or quality associated with the kind of monopoly that is ordinarily accompanied by a large market share." *Id.*; *see* Compl. ¶¶ 73-79; *see also supra* 38-39.

---

[14] *See, e.g.*, *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1173 (10th Cir. 2021).

Strong justifications support PMC's monopoly leveraging claim proceeding under these circumstances. Google cites no cases rejecting a monopoly leveraging claim where the defendant was previously adjudicated to have unlawfully maintained its monopoly in the leveraged market.

## V.    PMC ADEQUATELY PLEADS ATTEMPTED MONOPOLIZATION

"To establish a § 2 violation for attempted monopolization, a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Fotobom*, 719 F. Supp. 3d at 52 (quoting *Microsoft*, 253 F.3d at 80)). Courts "'must examine the facts of each case'—ultimately, what constitutes an offense is 'a question of proximity and degree.'" *Matson, Inc.*, 633 F. Supp. 3d at 232 (quoting *Spectrum Sports*, 506 U.S. at 454-55). PMC alleges Google's attempted monopolization of the Online Publishing market, as explained below. Google's scattershot arguments mischaracterize the relevant legal standards and ignore PMC's allegations.

*Anticompetitive conduct.* The same facts supporting Google's coercive reciprocal dealing establish anticompetitive conduct for attempted monopolization. *See supra* at 8-15. Google suggests that diminished click-throughs affect only the market for Search Referral Traffic, not the Online Publishing market (Mot. 41), but click-throughs are the pivotal means by which publishers generate revenue. Less revenue forces publishers to "lay off staff" or go "out of business," decreasing the quantity and quality of the Online Publishing content and harming consumers. Compl. ¶ 261. Google cannot disregard this harm by arbitrarily cutting off the causal chain.

*Specific intent to monopolize.* Specific intent to monopolize can be inferred from "conduct that has no legitimate business justification but to destroy or damage competition." *City of Moundridge*, 471 F. Supp. 2d at 42-43 (citation omitted); *Aspen Skiing*, 472 U.S. at 608 n.39. Google's specific intent is shown by its refusal to permit publishers to opt out of their content being used for GAI products, despite its recognition that publishers faced a "forced choice" given

41

Google's dominance. Compl. ¶ 116. Moreover, Google sought to avoid drawing attention to its decision not to offer a publisher opt out, *id.* ¶ 182, suggesting that Google understood its conduct was suspect. PMC further alleges that Google is willing to destroy the Online Publishing market so long as it can make its GAI product the most powerful one. *Id.* ¶ 187 (senior Google engineer's admission that "[d]irect answers reduce search referral traffic" and hurt publishers' ability to monetize). These facts, coupled with Google's anticompetitive conduct, adequately allege specific intent. *See United States v. Apple, Inc.*, 2025 WL 1829127, at *15 (D.N.J. June 30, 2025) ("statements allegedly made by Apple executives regarding the barriers set in place to maintain its monopoly" adequately pleaded specific intent).

Google's contrary argument that "PMC's allegations show Google's intent to provide more useful responses" (Mot. 42) fails at this stage for the same reasons as Google's other fact-bound product improvement arguments. *See supra* at 29-30.

***Dangerous probability of monopolization.*** To determine whether a defendant has the ability to lessen or destroy competition in that market, *Spectrum Sports*, 506 U.S. at 456, courts "may consider factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand," *Phila. Taxi*, 886 F.3d at 342 (cited Mot. 42). PMC alleges that Google is destroying competition in Online Publishing by eliminating incentives for content creation. As Google provides "derivative, regurgitated content on its SERP," users stop clicking through to original content. Compl. ¶ 233; *see id.* ¶ 78. "That means less revenue for original publishers, which in turn undermines their ability to invest in new content," and a "reduc[tion] of output of original content across the entire market." *Id.* ¶ 233. These allegations regarding Google's impact on the industry's "probable development" support a dangerous probability of

monopolization. *Phila. Taxi*, 886 F.3d at 342.

Google's market share in Online Publishing is significant. Searches on Google that result in AI Overviews are over 80% zero-click. Compl. ¶ 246. Nearly 90% of queries that trigger AI Overviews are informational. *Id.* ¶ 171. Competition in Online Publishing is rapidly weakening due to Google's misappropriation of publisher content. As fewer users click through to publishers' websites, the economic incentives necessary for the creation and publication of high-quality original content will evaporate. *Id.* ¶¶ 107, 187.

Google argues that PMC fails to sufficiently allege barriers to entry in the Online Publishing market (Mot. 42-43), but the dangerous-probability element is satisfied by allegations that a would-be monopolist "would likely erect significant barriers to entry upon acquisition of a dominant market share," even if such barriers do not exist now. *Microsoft*, 253 F.3d at 84. As the Complaint explains, online publishers cannot generate revenue unless users can find publishers' content. Compl. ¶¶ 45-47. But with Google republishing content directly to Google's SERP, those potential customers have no reason to click through to the publishers' websites. *Id.* ¶ 100. The result is a "catch-22" that erects barriers to entry for new competitors. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075, 1089 (9th Cir. 2025). Moreover, as Google eats up market share, potential competitors will need a full GAI infrastructure in order to compete. Developing this infrastructure requires "vast datasets of written material," and the technology to train and ground LLMs. Compl. ¶133; *id.* ¶ 140. These "high capital costs" and "scale" "are significant barriers" that will protect Google's market dominance. *Google Search*, 747 F. Supp. 3d at 119.

Finally, the Complaint properly defines the Online Publishing market. *See supra* at 23. Google's contrary arguments (Mot. 41, citing Mot. 21-22) exaggerate the pleading standard.

## VI.  PMC PLEADS A VIABLE UNJUST ENRICHMENT CLAIM

Google's argument for dismissal of PMC's unjust enrichment claim, Mot. 43-45, relies on

outdated caselaw and ignores PMC's allegations. Recent decisions have allowed "independent claim[s] for unjust enrichment [under California law] to proceed," *Bruton v. Gerber Prods. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (citation omitted). Under that authority, these standalone claims routinely survive motions to dismiss. *E.g.*, *Cherkin v. PowerSchool Holdings, Inc.*, 2025 WL 844378, at *7 (N.D. Cal. Mar. 17, 2025). Google's authorities all pre-date these decisions.

PMC sufficiently pleads unjust enrichment, which requires showing "that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038-39 (9th Cir. 2016) (citation omitted). Google benefited through monetization of AI Overviews and increased stock price by unjustly taking PMC's "meticulously researched, carefully written, thoroughly edited, and highly accurate" content as republishing, training, and grounding material for its AI systems. Compl. ¶ 253. Beyond those allegations, PMC pleads the value of PMC's content, *id.* ¶ 254, that Google has unjustly taken for its benefit, *id.* ¶¶ 8, 132, 169, at great harm to PMC and other digital publishers, *id.* ¶¶ 146, 150-51. As PMC alleges, Google obtained these benefits through coercion by leveraging its monopoly power in the search market to force PMC to supply content for Google's GAI products. Compl. ¶¶ 5, 9-13, 35-37, 42, 51, 146, 168; *see also supra* at 8-14. This distinguishes *Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772 (N.D. Cal. 2024) (cited Mot. 44), where plaintiffs failed to allege that the benefit to OpenAI was obtained through "fraud, mistake, coercion, or request." *Id.* at 783. In the alternative, PMC pleads a quasi-contract claim for restitution, *see ESG*, 828 F.3d at 1038-39, which Google concedes is recognized under California law, Mot. 42. PMC's unjust enrichment claim should proceed.

## VII.  DISMISSAL WITH PREJUDICE WOULD BE IMPROPER

To the extent the Court is inclined to dismiss any of PMC's claims, PMC respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Kurdistan Victims Fund v. Kurdistan Reg'l*

*Gov't*, 2025 WL 1360432, *4-5 (D.D.C. May 9, 2025) (permitting multiple amendments to cure pleading deficiencies). New information regarding the impact of Google's coercive, anticompetitive continues to surface.[15] Content licensing markets continue to mature as GAI companies sign deals with publishers and companies like Microsoft introduce opportunities for publishers to monetize their content for AI-related uses.[16] PMC should be given the opportunity to cure any deficiencies by incorporating newly available information into a second amended complaint. Further, PMC has not yet had an opportunity to amend in light of Google's arguments for dismissal of PMC's tying claims.

## **CONCLUSION**

For the foregoing reasons, PMC respectfully requests that the Court deny Google's motion to dismiss the Complaint.

---

[15] *See* Ryan Law *et al.*, *Update: AI Overviews Reduce Clicks by 58%*, Ahrefs (Feb. 4, 2026), https://ahrefs.com/blog/ai-overviews-reduce-clicks-update/.

[16] *See* Frank, *supra* note 3.

Dated: February 12, 2026

Respectfully submitted,

By: */s/ Ian Crosby*

Ian Crosby (Bar ID: WA0036)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com

Davida Brook (Bar ID: CA00117)
Halley Josephs (Bar ID: CA00217)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com
hjosephs@susmangodfrey.com

Geng Chen (Admitted *pro hac vice*)
Y. Gloria Park (Bar ID: NY0615)
Elizabeth Aronson (Bar ID: NY0645)
Kaholi Kiyonami (Admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
gchen@susmangodfrey.com
gpark@susmangodfrey.com
baronson@susmangodfrey.com
kkiyonami@susmangodfrey.com

*Attorneys for Plaintiffs Penske Media Corporation,*
*Billboard Media, LLC, Deadline Hollywood, LLC,*
*Fairchild Publishing, LLC, Gold Derby Media, LLC,*
*The Hollywood Reporter, LLC, Indiewire Media, LLC,*
*Rolling Stone LLC, SheMedia, LLC, and Variety*
*Media, LLC*

**CERTIFICATE OF SERVICE**

On February 12, 2026, I hereby certify that I caused a true and correct copy of the foregoing

document to be electronically filed with the Clerk of the Court using the CM/ECF system, which

will send notification to the attorneys of record.

/s/ *Ian Crosby*
Ian Crosby