## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PENSKE MEDIA CORPORATION, et al.,

                *Plaintiffs*,

    v.

GOOGLE LLC; ALPHABET INC.,

                *Defendants*.

Case No. 1:25-cv-03192-APM

## <u>REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

I.   PMC Fails To Plead A Valid Claim For Reciprocal Dealing (Counts I-II)..........................2

    A.   Google's Conduct Constitutes A Lawful Refusal To Deal On PMC's Preferred Terms, Not Reciprocal Dealing .................................................................2

    B.   PMC Fails To Allege A Viable Reciprocal Dealing Claim......................................5

        1.   PMC Fails To Plausibly Allege A Reciprocal Dealing Claim Under The Rule Of Reason...................................................................................5

            a.   The allegedly tied markets are implausible .....................................5

            b.   PMC does not allege any competitive harm in the tied markets...........................................................................................7

            c.   The alleged harms in other markets are both irrelevant and implausible........................................................................................8

                i.   The alleged search engine "Input Market" is implausible........................................................................10

                ii.   The alleged "Online Publishing" market is implausible........................................................................11

                iii.   PMC does not plausibly allege harm to competition in any of the three non-tied markets ...............................12

        2.   *Per Se* Treatment Is Inappropriate ............................................................12

        3.   PMC Fails To Plausibly Allege The Tying Market ....................................14

        4.   PMC Fails to Allege Coercion ...................................................................15

    C.   PMC Lacks Antitrust Standing On Its Reciprocal Dealing Claims......................16

II.  PMC Fails To Plead Unlawful Monopoly Maintenance (Count IV)................................17

    A.   PMC Has Not Alleged Any Exclusionary Conduct In The GSS Market .............17

    B.   PMC Lacks Antitrust Standing To Bring An Unlawful Monopoly Maintenance Claim .........................................................................................18

III. PMC Fails To Plead A Valid Claim For Unlawful Tying (Count V)...............................19

    A.   PMC Does Not Plausibly Allege The Existence Of A Tie ...................................19

        1.   AI Overviews And Google Search Are Not Separate Products................20

        2.   There Is No Coercion Alleged ...................................................................21

    B.   The Tying Claim Is Subject To The Rule Of Reason, Which It Fails .................22

    C.   PMC Lacks Antitrust Standing To Bring A Tying Claim ....................................22

IV.     PMC Fails To Plausibly Plead Monopoly Leveraging (Count III) And Attempted
        Monopolization Of The Online Publishing Market (Count VI) .........................................23

        A.      There Is No Claim For Monopoly Leveraging Under The Sherman Act ..............23

        B.      PMC Fails To Plausibly Plead Attempted Monopolization...................................23

V.      PMC Fails To Plead A Viable Unjust Enrichment Claim (Count VII) ............................24

VI.     Amendment Would Be Futile ...........................................................................................25

# TABLE OF AUTHORITIES[*]

Page(s)

**CASES**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
    342 F. Supp. 3d 126 (D.D.C. 2018) ...................................................................23

*Abuelhawa v. Santa Clara Univ.*,
    529 F. Supp. 3d 1059 (N.D. Cal. 2021) ...................................................24, 25

*Aerotec Int'l, Inc. v. Honeywell Int'l*,
    836 F.3d 1171 (9th Cir. 2016) .......................................................................4

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) .......................................................................17

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
    256 F.3d 799 (D.C. Cir. 2001) .......................................................................16

*Baiul-Farina v. Lemire*,
    804 F. App'x 533 (9th Cir. 2020) .......................................................................25

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................3, 21

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982) .......................................................................18

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) .......................................................................10

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
    140 F.3d 494 (3d Cir. 1998) .......................................................................8, 9, 13

*Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*,
    2003 WL 22797730 (E.D. Pa. Nov. 18, 2003) .......................................................................6

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) .......................................................................15

*Bruton v. Gerber Products Co.*,
    703 F. App'x 468 (9th Cir. 2017) .......................................................................24

---

[*] Authorities principally relied upon are marked with an asterisk.

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
    532 F.3d 1111 (10th Cir. 2008) ...............................................................7

*Cavalleri v. Hermes Int'l*,
    2025 WL 2662897 (N.D. Cal. Sept. 17, 2025) ......................................20

*Chase Manufacturing, Inc. v. Johns Manville Corp.*,
    84 F.4th 1157 (10th Cir. 2023) .............................................................8, 9

*Choh v. Brown Univ.*,
    753 F. Supp. 3d 117 (D. Conn. 2024) .....................................................14

*City of Moundridge v. Exxon Mobil Corp.*,
    471 F. Supp. 2d 20 (D.D.C. 2007) .........................................................24

*City of Oakland v. Oakland Raiders*,
    83 Cal. App. 5th 458 (2022) ..................................................................25

*Crowder v. LinkedIn Corp.*,
    2023 WL 2405335 (N.D. Cal. Mar. 8, 2023) .........................................17

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) .................................................................14

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) ................................................................18

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ..................................................................14

*Fotobom Media, Inc. v. Google LLC*,
    719 F. Supp. 3d 33 (D.D.C. 2024) ...................................................19, 22

*FTC v. Meta Platforms, Inc.*,
    775 F. Supp. 3d 16 (D.D.C. 2024) ...............................................8, 12, 17

*FTC v. Qualcomm, Inc.*,
    969 F.3d 974 (9th Cir. 2020) .................................................................16

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) .............................................................15

*Great Escape, Inc. v. Union City Body Co.*,
    791 F.2d 532 (7th Cir. 1986) ...................................................................3

*Gross v. Wright*,
    185 F. Supp. 3d 39 (D.D.C. 2016) ..........................................................14

*Hartford Casualty Insurance Co. v. J.R. Marketing, LLC*,
  61 Cal. 4th 988 (2015) ....................................................................................24

*In re Diamond Shamrock Corp.*,
  113 F.T.C. 316 (1990)........................................................................................2

*In re Theos Dark Chocolate Litig.*,
  750 F. Supp. 3d 1069 (N.D. Cal. 2024) ..........................................................25

*\*Intergraph Corp. v. Intel Corp.*,
  195 F.3d 1346 (Fed. Cir. 1999)........................................................................13

*\*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016) ...........................................................................22

*\*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984).................................................................................................9

*Kartell v. Blue Shield of Mass., Inc.*,
  749 F.2d 922 (1st Cir. 1984) ..............................................................................8

*Kellam Energy, Inc. v. Duncan*,
  668 F. Supp. 861 (D. Del. 1987) .....................................................................15

*Kone v. District of Columbia*,
  808 F. Supp. 2d 80 (D.D.C. 2011) ....................................................................7

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
  588 F.3d 908 (6th Cir. 2009) .......................................................................7, 15

*\*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)..........................................................................................13

*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian
  Healthcare Servs.*,
  994 F.3d 1166 (10th Cir. 2021) .......................................................................23

*National Cable Television Ass'n v. Broadcast Music, Inc.*,
  772 F. Supp. 614 (D.D.C. 1991) ........................................................................8

*\*New York v. Facebook, Inc.*,
  549 F. Supp. 3d 6 (D.D.C. 2021) ...................................................................4, 5

*\*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)..........................................................................................12

*\*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)........................................................................................3, 4

*PhantomALERT v. Apple, Inc.,*
    762 F. Supp. 3d 8 (D.D.C. 2025) ..................................................................14

*Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.,*
    886 F.3d 332 (3d Cir. 2018)........................................................................24

*Power Analytics Corp. v. Operation Tech., Inc.,*
    820 F. App'x 1005 (Fed. Cir. 2020) ...........................................................17

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997)..............................................................6, 11, 14

*Rick-Mik Ents., Inc. v. Equilon Ents. LLC,*
    532 F.3d 963 (9th Cir. 2008) ......................................................................21

*Rollins v. Wackenhut Servs., Inc.,*
    703 F.3d 122 (D.C. Cir. 2012) ....................................................................25

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.,*
    1995 WL 150089 (N.D. Cal. Mar. 28, 1995) ...............................................14

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.,*
    947 F. Supp. 2d 88 (D.D.C. 2013) ................................................................5

*United States v. Aetna Inc.,*
    240 F. Supp. 3d 1 (D.D.C. 2017) .........................................................11, 15

*United States v. Google LLC,*
    747 F. Supp. 3d 1 (D.D.C. 2024) ...........................................................4, 20

*United States v. Google LLC,*
    778 F. Supp. 3d 797 (E.D. Va. 2025) .........................................................3, 4

*United States v. Google LLC,*
    803 F. Supp. 3d 18 (D.D.C. 2025) .........................................................15, 17

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001)...........................................8, 9, 12, 13, 21, 24

*Uniwill v. City of Los Angeles,*
    124 Cal. App. 4th 537 (2004) .....................................................................25

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)........................................................................................4

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC,*
    257 F.3d 256 (2d Cir. 2001)........................................................................23

*Yelp Inc. v. Google LLC*,
    2025 WL 1168900 (N.D. Cal. Apr. 22, 2025) ............................................................21, 22

*Yelp Inc. v. Google LLC*,
    2025 WL 2978394 (N.D. Cal. Oct. 22, 2025)...................................................................19

**OTHER AUTHORITIES**

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW
    (4th & 5th eds. 2024) .................................................................................................12, 13

PMC's opposition confirms that its case is fundamentally flawed. Its primary complaint, like Chegg's before it, is that Google has improved its search engine by incorporating AI Overviews, causing its own traffic from Google Search to diminish. PMC claims these facts have resulted in the breach of some unspoken, unwritten "bargain" that apparently forbids Google from innovating and enhancing the quality of Google Search unless doing so does not lower PMC's traffic. But the antitrust laws do not recognize such a claim, however styled. That is little surprise, because underneath the Amended Complaint's obscure claims and alphabet soup of putative markets, what PMC really complains of is its fear of being left behind in the natural cycle of procompetitive innovation—fostered by rapid advancements in generative AI technologies—that the antitrust laws encourage. PMC's claims are legally defective and it is now clear that PMC has no amendment to offer that can save them. The Amended Complaint should be dismissed with prejudice.

PMC's primary cause of action relies on so-called "reciprocal dealing," an obscure theory it aims to resuscitate from the dustbin of antitrust history. But what PMC labels reciprocal dealing is really an alleged refusal by Google to provide PMC with placement and display within Google Search on PMC's preferred terms. The antitrust laws impose no obligation on Google to do so. In any event, PMC's Amended Complaint makes clear that the alleged "reciprocal dealing" had *no effect* on competition in the bewildering "input" markets for AI content it alleges, dooming its claims.

PMC's theories that Google's launch of the AI Overviews feature on Google Search simultaneously constitutes monopolization of the GSS market, tying, and attempted monopolization of an alleged "Online Publishing" market comprising all text-based content on the Internet fare no better. Based on PMC's own allegations, AI Overviews are an undisputed

improvement to Google's Search product, and thus their introduction cannot be exclusionary as a matter of law. Nor can PMC distort into a coercive tying claim the unsurprising fact that some users *choose* to engage with AI Overviews.

Ultimately, PMC's disappointment that the traffic it enjoyed (for free) from being included in Google Search may have reduced over time as technology advanced and Google continued to innovate in response to an evolving competitive landscape cannot be converted into a cognizable antitrust theory. As PMC correctly acknowledges, "the existence of AI Overviews is [not] a standalone antitrust violation." Opp. 14. And it says that "AI Overviews"—not any alleged anticompetitive conduct by Google—"have diminished ... search referral traffic." *Id.* at 7. Its alleged injuries thus flow from conduct it concedes is lawful, which ends this case.

The time for additional chances on these claims has passed. Across this case and *Chegg*, PMC and its counsel have had *four* opportunities to plead their best case and have come up far short. If there were any additional facts that could save these claims, PMC would already have alleged them. None exist, so dismissal should be with prejudice.

## I. PMC FAILS TO PLEAD A VALID CLAIM FOR RECIPROCAL DEALING (COUNTS I-II)

### A. Google's Conduct Constitutes A Lawful Refusal To Deal On PMC's Preferred Terms, Not Reciprocal Dealing

PMC's opposition confirms that its reciprocal dealing claims fail because it has not, and cannot, allege the basic prerequisite for such a claim: an "actual agreement between" PMC and Google to make "reciprocal purchases." *In re Diamond Shamrock Corp.*, 113 F.T.C. 316 (1990). PMC concedes that it is required to plausibly allege that such an agreement exists to state a claim, Opp. 10-12, but its failure to do so dooms its reciprocal dealing claims, Mot. 8-10.

Despite accusing Google of "disput[ing] PMC's well-pleaded factual allegations" of a reciprocity "agreement," Opp. 10, PMC's opposition identifies no facts showing that Google and

PMC (or any other publisher) *agreed* to exchange content for "search referral traffic." Instead, as Google's motion explained, PMC's allegations establish only that search engines can work in a mutually beneficial way for publishers and search engine operators. Mot. 9; *see* AC ¶¶56-65. PMC does not address the "obvious alternative explanation" that Google and publishers are engaged in "independent action" in each's unilateral interest. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564, 567 (2007). Thus, it has not "raise[d] a suggestion of a preceding agreement." *Id.* at 557. Instead, PMC has alleged (at most) "[m]ere unilateral conduct" by both Google and publishers, which cannot plausibly establish a reciprocal dealing agreement even if there is "some degree of reciprocity." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 537 (7th Cir. 1986).

PMC's articulation of the substance of this purported "longstanding agreement" underscores its real gripe: that Google refuses to do business with PMC on its preferred terms. According to PMC, in exchange for publisher content, Google supposedly assumed an "obligation … to provide search distribution that *in fact induces* user clicks" on links to publishers' pages. Opp. 10 (emphasis added). That is, PMC alleges Google *must* design and operate its search engine how PMC prefers—to "in fact induce[]" clicks to its websites, rather than to provide users with the most helpful information responsive to their queries and allow them to choose where to go. But it is black-letter law that Google may provide its users the best possible search experience it can and—having chosen to include PMC's content and make it available to users on its search engine—Google has "no duty to deal under the terms and conditions preferred by [PMC]." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009); Mot. 10-12.

PMC argues that refusal-to-deal doctrine does not apply here based on Judge Brinkema's liability decision in *United States v. Google LLC* ("*Google Ad Tech*"), 778 F. Supp. 3d 797 (E.D. Va. 2025). *See* Opp. 26-27. But *Google Ad Tech* addressed "restricting AdX's submission of real-

time bids only to DFP, and [] not allowing AdX to provide real-time bids to other publisher ad servers," which is nothing like the challenged conduct here. 778 F. Supp. 3d at 861. Rather, PMC's claim reduces to a routine refusal-to-deal theory that Google should design and operate Search in a way that delivers more traffic to PMC and do so on PMC's preferred terms. *See, e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l*, 836 F.3d 1171 (9th Cir. 2016). Further, in *Google Ad Tech* Judge Brinkema incorrectly held that *Trinko* applies only to "highly regulated industr[ies]," 778 F. Supp. 3d at 867, which conflicts with the law in this Circuit and many others applying *Trinko* outside "highly regulated" contexts, including to Google Search. *United States v. Google LLC* ("*Google Search*"), 747 F. Supp. 3d 1, 181-184 (D.D.C. 2024). Whatever the merits of Judge Brinkema's decision—which Google disagrees with and intends to appeal—it offers PMC no help.

PMC also argues that the refusal-to-deal doctrine should not apply because the PMC is "an input provider …, not a horizontal rival." Opp. 27. There is no basis for this argument in law or logic. PMC cites no case holding that refusal to deal law is inapplicable to transactions involving "input provider[s]." That directly contradicts *Trinko* and *linkLine*, both of which involved the provision at wholesale of telecommunications network elements that firms used ***as inputs*** to offer service. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004); *linkLine*, 555 U.S. at 449. Moreover, PMC alleges it is Google's "horizontal rival" in a purported "Online Publishing" market. AC ¶89. It claims Google has a competitive advantage in Online Publishing because Google can distribute its own content via Search, and seeks to compel Google to make PMC's allegedly competing content available to more Google users on PMC's preferred terms. AC ¶¶78, 140. Thus, PMC wants Google to "share the [alleged] source of [its] advantage." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 25 (D.D.C. 2021). This is a standard refusal-to-deal theory.

4

PMC's argument that the challenged conduct falls within the narrow exception to the refusal-to-deal doctrine likewise fails. PMC misstates the exception's requirements, focusing on just one part of a "three-part test." *New York*, 549 F. Supp. 3d at 27. PMC ignores the fact that an actionable refusal to deal requires "products that the defendant already sells" to "similarly situated customers" and a "willingness to forsake short term profits to achieve an anti-competitive end." *Id.*; Mot. 11-12. That is unsurprising, for Google's indexing policies apply to all publishers, not just PMC. AC ¶180. PMC also fails to allege that Google's refusal to provide PMC with preferred positioning and display on its search engine causes Google to forgo short-term profits, nor would such an allegation make sense. On the contrary, all of the facts alleged by PMC reflect Google making a rational decision to use indexed Search data to improve its Search product for the benefit of its users.

**B.    PMC Fails To Allege A Viable Reciprocal Dealing Claim**

      **1.    PMC Fails To Plausibly Allege A Reciprocal Dealing Claim Under The Rule Of Reason**

            **a.    The allegedly tied markets are implausible**

To begin, PMC's reciprocal dealing claims fail because it has not plausibly alleged the tied product markets for "Republishing Content," "GAI Training Content," and "RAG Content." Mot. 15-18. PMC accuses Google of "overstat[ing] the requirements for plausibly pleading an antitrust market." Opp. 15. But PMC's cited authority for the proposition that no "economically technical recitation of the market boundaries" is required, *id.* at 16 (discussing *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013)), endorses the exact requirements Google identified, Mot. 16. That is, "failure to define the market by reference to the reasonable interchangeability—or lack thereof—of services is valid ground for dismissal at the Rule 12(b)(6) stage." *Sky Angel*, 947 F. Supp. 2d at 103. PMC has not done so, and its claims fail accordingly.

Moreover, PMC's opposition confirms that it is attempting to define three separate markets around the *same content* delineated solely on the purpose for which the content is used. Opp. 21-22. PMC concedes that this content can be used for each of these three purposes or "a combination of those uses." *Id.* at 22. And PMC accepts that the same content can be used as "Search Index Data" and therefore as "inputs" for a general search engine. *Id.* at 19-21. Thus, PMC acknowledges that each supposedly distinct form of content is reasonably interchangeable for multiple purposes. This is a concession that the three alleged markets exclude "interchangeable substitute products" and are thus implausibly narrow. *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, 2003 WL 22797730, at *5 (E.D. Pa. Nov. 18, 2003); Mot. 18.

PMC's only response is to assert that the content at issue in these supposed markets could theoretically be licensed by the publisher for only one specific purpose, and in that scenario the licensee would not have permission to use it for other purposes. Opp. 22. PMC identifies no licensing agreement structured in this manner, and regardless, speculation about hypothetical restrictions cannot plausibly allege a relevant market (or three). The law is clear that "contractual restraints" cannot "render otherwise identical products non-interchangeable for purposes of relevant market definition." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997). "A court making a relevant market determination looks … to the uses to which the product is put by consumers in general," so "the relevant inquiry here is not whether" some set of hypothetical content licensees "may reasonably use" the licensed content for "both approved or non-approved" purposes "interchangeably without triggering liability for breach of contract, but whether" users of the content "in general might use such [content] interchangeably." *Id.* It is clear—and PMC does not dispute—that they can and do, invalidating these proposed markets.

PMC also meekly points to supposed "*Brown Shoe* indicia" of these markets. Opp. 21-22.

But as the Sixth Circuit has explained, "these practical indicia come into play only *after* the 'outer boundaries of a product market are determined' by evaluating 'the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009). *Brown Shoe* indicia are not a substitute for allegations about reasonable interchangeability. *Id.* In any event, crediting PMC's supposed "indicia" only shows that (1) Republishing, GAI Training, and RAG are AI-related functions; (2) content licensing agreements for AI exist; and (3) "technology companies that deploy LLMs" consume such content. Opp. 21-22. PMC never explains how this distinguishes the three markets from each other or any others.

Perhaps recognizing the implausibility of these markets, PMC ultimately contends that it does not matter "[w]hether the markets for Republishing, GAI Training, and RAG Content are defined as a single GAI content licensing market or as three separate markets." Opp. 22. But even this unpled, composite market excludes the interchangeable use of this content as Search Index Data. So, like the others, this market is artificially "circumscribe[d] … to a few buyers" to improperly exclude "numerous sources of interchangeable demand" for the same content, and is thus legally deficient. *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008). One poorly defined market, as opposed to three, cannot salvage PMC's claims.

### b.    PMC does not allege any competitive harm in the tied markets

PMC's opposition all but admits that it has not alleged any competitive harm in the supposed tied markets. Opp. 25. The potential competitive harm from reciprocal dealing is the foreclosure of competitors in the tied market. Mot. 19. PMC has not alleged any such foreclosure—and pled itself out of doing so by repeatedly conceding throughout the Amended Complaint that competition amongst publishers and GenAI firms for content licensing arrangements is robust and growing. Mot. 19-20. PMC does not respond to, and thus concedes, these points. *Kone v. District*

*of Columbia*, 808 F. Supp. 2d 80, 83 (D.D.C. 2011).

Instead, PMC incorrectly argues that it did not need to allege foreclosure or exclusion of competing content buyers because Google "degrad[ing] the terms on which *Google* obtains the tied products from PMC" is an anticompetitive effect. Opp. 25. That too is not the law. The case on which PMC relies for this proposition explains that "[i]n identifying … anticompetitive effects," courts focus on "whether the actions *foreclosed* competition on the merits." *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 54 (D.D.C. 2024) (emphasis added). PMC nowhere explains how Google alone obtaining content on favorable terms could, without any corresponding market foreclosure, "harm the competitive *process*" in the alleged AI content markets. *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). Other firms remain free to negotiate the best deal that they can, and buyers like Google (and others) may lawfully "use [their] market power to keep prices [paid] down." *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 929 (1st Cir. 1984).

### c.     The alleged harms in other markets are both irrelevant and implausible

To state a rule of reason reciprocal dealing claim, PMC had to allege competitive harm in the markets for the tied products. Mot. 15; *Brokerage Concepts*, *Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511, 519 (3d Cir. 1998); *Microsoft*, 253 F.3d at 95. PMC has not and so argues that it need not.

PMC has no valid authority for its assertion that the Court can assess the effects of the challenged conduct in other markets. Opp. 15. The first case PMC cites, *National Cable Television Ass'n v. Broadcast Music, Inc.*, 772 F. Supp. 614 (D.D.C. 1991), is not a reciprocal dealing or a tying case and thus provides no information as to how the rule of reason applies to such claims. The second, *Chase Manufacturing, Inc. v. Johns Manville Corp.*, remarked in dicta that a court applying the rule of reason could consider "the effects of [a tying] arrangement in both the tying

and tied markets." 84 F.4th 1157, 1178 (10th Cir. 2023). The court then concluded that there was no tie and did not reach effects. *Id.* at 1178-1181. Thus, the decision does not hold that a plaintiff can establish tying or reciprocal dealing under the rule of reason based solely on anticompetitive effects in the tying market. Indeed, that would conflict with binding authority from the Supreme Court in *Jefferson Parish* and the D.C. Circuit in *Microsoft*, as well as the principles underlying the core antitrust concern with tying and reciprocal dealing.

In *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, the Supreme Court held that "the burden of proving" that a tying arrangement is illegal under the rule of reason "necessarily involves an inquiry into the actual effect of the [challenged conduct] on competition among anesthesiologists"—the tied market—and rejected the plaintiff's claim for failing to prove the challenged conduct "unreasonably restrained competition" in that market. 466 U.S. 2, 29 (1984). Applying that holding, the en banc D.C. Circuit in *Microsoft* repeatedly emphasized that "show[ing] that [a tie] unreasonably restrained competition" under the rule of reason "'involves an inquiry into the actual effect' of [the tie] on competition in the tied good market." 253 F.3d at 95; *see also id.* at 96 ("plaintiffs must demonstrate that [the tie's] benefits—if any—are outweighed by the harms in the *tied product* market"); *id.* ("plaintiffs must … demonstrat[e] that the anticompetitive effect in the [tied] market is greater than th[e] benefits"). The law in this Circuit is that a plaintiff must establish harm to competition in the tied market to state a rule of reason tying claim. The law on reciprocal dealing claims is in accord. *Brokerage Concepts*, 140 F.3d at 511, 519.

This rule makes sense. As PMC explains, "the competitive harm underlying a coercive reciprocal dealing claims [sic] centers on the seller's ability to leverage its economic power in the tying market to exercise buying power in the second, tied market rather than compete on the merits

in the second market." Opp. 22; *see also id.* at 8 ("firms may not use a monopoly in one market to suppress competition in a second market"). PMC articulates no concerns with competition in the tying market. And if a tie does not "'impose restraints on competition in the market for a tied product,'" there is no "threaten[ed] injury to competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012); *see* Mot. 15.

*Chase Manufacturing*'s dicta offers no assistance to PMC for the additional reason that PMC does not allege that the challenged conduct harmed competition in the tying market for "Search Referral Traffic." PMC only purports to identify competitive harms in its AI content markets, the "Online Publishing" market, and the GSS market—not the SRT market. *See* Opp. 15. Nor would an allegation of competitive harm in SRT make sense. According to PMC, this supposed market consists of search engines competing to "sell" SRT to publishers. AC ¶58. If, as alleged, Google has imposed conditions on its "sale" of SRT, reduced the volume of SRT it sells, or increased the price of SRT, those unilateral actions by a single competitor would have no effect on other search engines' abilities to sell SRT. If anything, the challenged conduct stimulates competition in SRT by incentivizing competing search engines to offer referrals to publishers on more favorable terms than Google. Any reciprocal dealing claim predicated on harm to this market (wrongly assuming its validity, *see* Mot. 26-28; *infra* pp.14-15) would necessarily fail.

Further, no case PMC cites suggests that a properly pled reciprocal dealing theory could be based solely on harm to competition in markets beyond the tied and the tying markets. Regardless, PMC's opposition confirms that the challenged conduct did not cause any competitive harm in these other, implausible markets either. *See* Opp. 15.

### i.    The alleged search engine "Input Market" is implausible

PMC's purported search "input market" fails for the same reasons as its alleged AI content markets. *See supra* pp.5-7. The opposition defends this market by claiming that publishers

supposedly lack content "buyers" reasonably interchangeable with Google and other search engines. Opp. 20-21. This conclusory assertion ignores numerous other buyers identified in the Amended Complaint, including AI companies and other non-search distributors. Mot. 21. PMC says these other buyers are not reasonably interchangeable because they do not provide the same referral traffic as search engines. Opp. 20. But a plaintiff cannot exclude firms from a relevant market based solely on volume distinctions. The relevant question is whether there are other buyers that "constrain *any* anticompetitive … pricing" for content, *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017) (emphasis added), which there are. PMC next repeats that "licensing" its content for use in a search engine makes it non-interchangeable with the same content licensed for GAI training and other purposes. Opp. 21. That is, again, an improper attempt to define a market based on contractual restraints imposed on particular market participants, rather than the actual reasonable interchangeability of use of the product. *Queen City Pizza*, 124 F.3d at 438. Finally, PMC rehashes its specious charge that Google is a "monopsonist" in this "input market." Opp. 19-20. But even if Google is a monopolist in the downstream market for GSS (a proposition it continues to vigorously dispute), it cannot be presumed a monopsonist with respect to its inputs (or anything else). *See* Mot. 20-21. PMC alleges nothing to support that presumption.

> ii.    **The alleged "Online Publishing" market is implausible**

PMC barely defends the indefensible "Online Publishing" market, which PMC does not dispute is defined so broadly as to include all text-based information on the Internet. Opp. 23. And PMC does not dispute that its Amended Complaint contains no facts to support the manifestly implausible inference that all such content is sufficiently interchangeable that it should all be included in a single market. PMC's counsel has already contradicted this supposed market by alleging in *Chegg* that other forms of online content are not substitutes for "online educational publishing" content. Mot. 21-22. Instead, PMC argues only that it has "exclude[d] print media"

and blithely asserts that the remaining content is not "'non-substitutable.'" Opp. 23. In these circumstances—where a plaintiff does not even try to justify the boundaries of its colossally overbroad market—courts routinely dismiss. *See* Mot. 21-22 (collecting cases).

### iii. PMC does not plausibly allege harm to competition in any of the three non-tied markets

PMC fails to sufficiently allege harm to competition in either the search "input" market, "Online Publishing," or the GSS market. Its opposition merely asserts that "Google's conduct has substantial anticompetitive effects" and cites paragraphs in its Amended Complaint purportedly alleging output and quality reductions in these markets. Opp. 15. But PMC never explains why any of these allegations show harm to *competition*—that is, a reduction in output or quality to a level below what would be expected in a competitive market, *Ohio v. Am. Express Co.*, 585 U.S. 529, 548-549 (2018)—or that the reduction was caused by Google's alleged reciprocal dealing. Neither is inherently indicative of a reduction in competition; in fact, output and quality reductions can make it *easier* for rivals to compete with firms with market power. *See* Mot. 23; PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶651b1. The cases PMC cites demonstrate this point. For example, *FTC v. Meta* (cited at Opp. 25) explains that these kinds of alleged harms are "downstream from the anticompetitive effect itself," and that courts examine whether the challenged conduct "foreclosed competition …, not whether they led to price or output changes." 775 F. Supp. 3d at 54. PMC identifies no foreclosure of competition causing these alleged quality and output reductions, and thus has failed to plausibly allege competitive harm.

### 2. *Per Se* Treatment Is Inappropriate

PMC does not dispute that its Section 2 reciprocal dealing claim is ineligible for *per se* treatment as a matter of law. Mot. 13; *Microsoft*, 253 F.3d at 58. For its Section 1 claim, it also does not dispute that *per se* treatment is rare and reserved for the kind of restraint with which courts

have "considerable experience" and would "invalidate[] in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-887 (2007); *see* Mot. 24. PMC has not met that high bar. It argues that "[c]oercive reciprocal dealing claims are analytically similar to tying claims, which have often received per se treatment." Opp. 12. But PMC does not explain how the economic consequences of tying are so sufficiently similar to reciprocal dealing—which "has not been the subject of extensive case law development," *Brokerage Concepts*, 140 F.3d at 511-512—to justify the importing *per se* principles from tying law (where they are already increasingly disfavored, *see, e.g.*, AREEDA ¶1720c) to this species of claim. That is particularly true given PMC's unusual reciprocal *selling* theory, which was rejected on the merits by the only other court to consider a similar claim. *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361-1362 (Fed. Cir. 1999); Mot. 24-25.

In response to Google's showing (Mot. 25) that PMC's own allegations demonstrate Google's introduction of AI Overviews has procompetitive benefits, precluding *per se* condemnation, PMC argues that it is not "alleg[ing] that the existence of AI Overviews is a standalone antitrust violation," but rather that it is challenging "Google's use of unlawfully extracted content to produce them." Opp. 13-14. But PMC alleges that the way Google "produce[s]" AI Overviews generates cost efficiencies. *See* AC ¶260 (alleged reciprocal dealing "lowers Google's costs" to provide AI Overviews); Mot. 25. These dueling considerations call for precisely the kind of balancing the rule of reason facilitates. *See Leegin*, 551 U.S. at 885-886.

Finally, the arrangement at issue falls within the heartland of novel practices in integrated technology markets that *Microsoft* held are ineligible for *per se* condemnation. 253 F.3d at 90-93; Mot. 25-26. PMC's only response is that this issue is "premature." Opp. 14. But all predicates establishing the impropriety of *per se* treatment are facially apparent from the Amended

Complaint. In similar circumstances, courts routinely dismiss *per se* claims on the pleadings. *See,
e.g.*, *Gross v. Wright*, 185 F. Supp. 3d 39, 52 (D.D.C. 2016); *Dickson v. Microsoft Corp.*, 309 F.3d
193, 205 (4th Cir. 2002); *Choh v. Brown Univ.*, 753 F. Supp. 3d 117, 126-127 (D. Conn. 2024).

### 3.    PMC Fails To Plausibly Allege The Tying Market

PMC's attempt to salvage its "tying" market for "Search Referral Traffic" also fails. To
begin, SRT is not a product because it is not exchanged for consideration. Rather, so-called SRT
is a consequence of *user* choices to click on links, not anything done by Google. And while "there
may be markets where companies offer a product to one side of the market for free but profit in
other ways," critically, in those markets a *product* is offered and the other requisites for a market
are satisfied. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 (9th Cir. 2023).

Here, the alleged market is defined around "referrals." Courts have repeatedly rejected
proposed markets for "referrals" because they are generally not bought or sold. Mot. 27. PMC's
supposed case recognizing such a market (cited at Opp. 18) in fact noted that "the market for
physician referrals may not, standing alone, constitute a recognizable market," and instead treated
referrals as part of a broader market for physician and hospital services. *Santa Cruz Med. Clinic v.
Dominican Santa Cruz Hosp.*, 1995 WL 150089, at *3 (N.D. Cal. Mar. 28, 1995).

Additionally, PMC does not "draw the market's boundaries to encompass the product at
issue as well as all economic substitutes." *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 22
(D.D.C. 2025). Despite acknowledging that direct navigation and social media traffic can be
monetized just like SRT, PMC excludes them from the market because they are not as "uniquely
valued by publishers." Opp. 17. But "unique[] value[]" is not the test. The standard is reasonable
interchangeability, not a particular consumer's preference. *Queen City Pizza*, 124 F.3d at 438.

Alternatively, PMC argues that these other sources of traffic are not "economic substitutes"
because they "cannot compensate for the drastic traffic reduction" if a publisher opted out of SRT

entirely. Opp. 17. But reasonably interchangeable alternatives need not *fully* replace a product under a hypothetical all-or-nothing withdrawal; again, they are sufficiently substitutable if they "constrain any anticompetitive … pricing." *Aetna*, 240 F. Supp. 3d at 20.

PMC also argues that SRT bears some of *Brown Shoe*'s "practical indicia." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Again, those indicia cannot replace allegations of reasonable interchangeability. *Ky. Speedway*, 588 F.3d at 918. Still, PMC's use of them makes no sense. For example, the supposed "industry recognition" PMC cites is simply that users of Google Search click on SERP links. Opp. 19. That shows, at best, that some users visit the websites Google presents to them, not that there is "industry or public recognition of the submarket as a separate economic entity." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008). Similarly, PMC states that the SRT market has the "peculiar characteristic" of "connect[ing] a user who submits a search query to a web publisher with information that can answer that query." Opp. 18. But AI chatbots that provide links also "perform an information-retrieval function like that performed by GSEs." *United States v. Google LLC* ("*Google Search Remedies*"), 803 F. Supp. 3d 18, 48 (D.D.C. 2025).

### 4.    PMC Fails to Allege Coercion

PMC also fails to plausibly allege coercion. *See* Mot. 28-29. Google cannot have "threaten[ed] to withhold" (Opp. 9) referral traffic from PMC, because PMC does not and cannot plausibly allege that Google promised to deliver any amount of SRT in exchange for PMC allowing Google to index PMC. Mot. 9-10. Google's longstanding practice of indexing publicly available content has not somehow become coercive simply because Google now processes or presents information differently. Moreover, Google does not charge publishers to index their websites, and courts have repeatedly held that "[m]erely accepting something provided for free does not constitute an impermissible tie-in." *Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861,

881 (D. Del. 1987); Mot. 28. PMC claims that the plaintiffs in these cases "fail[ed] to allege coercion" because they were not "'forced'" to purchase anything, Opp. 11, but neither was PMC, which can block Google from indexing its content. AC ¶62.

### C.    PMC Lacks Antitrust Standing On Its Reciprocal Dealing Claims

PMC alleges it was "underpa[id]" for its content, but does not plausibly link that underpayment to any reduction in competition or coercive conduct. Opp. 26. As explained, PMC has not alleged any competitive harm in the Republishing, GAI Training, or RAG Content markets causing this supposed underpayment. *See* Mot. 18-20; *supra* pp.7-8. Instead, Google's decision not to pay for PMC's content is a lawful refusal to deal, Mot. 10-12; *supra* pp.3-5, and thus cannot cause an "injury of the type the antitrust laws were intended to prevent," *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 812 (D.C. Cir. 2001).

PMC's claimed "lost advertising, affiliate, and subscription revenues," Opp. 26, do not suffice for antitrust standing either. Although PMC asserts that AI Overviews lessen its search traffic from Google, the Amended Complaint fails to allege that the supposed coercion of PMC into continuing to allow Google to index its content—as opposed to Google's introduction of AI Overviews—caused any decline. As PMC says: "Studies show that AI Overviews have diminished—and will continue to diminish—search referral traffic." *Id*. at 7. That intervening product-design choice, which PMC concedes is not "a standalone antitrust violation," *id*. at 14, allegedly caused PMC's losses, not any supposed restraint in the content markets. That breaks the causal chain and independently defeats antitrust standing. *See Andrx*, 256 F.3d at 812. PMC does not (and could not) allege that AI Overviews would not exist or be unappealing absent its content.

Moreover, PMC concedes these losses occur in the supposed SRT market, where PMC does not allege harm to competition. Opp. 26. This injury thus arises in a different market than the alleged competitive harm, rendering it non-cognizable. *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992

(9th Cir. 2020); Mot. 30.

## II.    PMC FAILS TO PLEAD UNLAWFUL MONOPOLY MAINTENANCE (COUNT IV)

### A.    PMC Has Not Alleged Any Exclusionary Conduct In The GSS Market

PMC's exclusionary conduct theories amount to an argument that Google Search has become too efficient, but "product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999-1000 (9th Cir. 2010). As PMC admits, AI Overviews improve users' ability to find answers to their queries. *See, e.g.*, AC ¶¶8, 161. And this Court found that AI Overviews have led to "an increase in both consumer satisfaction and volume of queries" on Google Search. *Google Search Remedies*, 803 F. Supp. 3d at 47. This is not a factual dispute; the Amended Complaint shows that AI Overviews are a bona fide product improvement and therefore non-actionable. Mot. 31; *Power Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005, 1016-1018 (Fed. Cir. 2020) (affirming dismissal of Section 2 claim challenging product improvement); *Crowder v. LinkedIn Corp.*, 2023 WL 2405335, at *7 (N.D. Cal. Mar. 8, 2023) (similar).

PMC also argues that Google's alleged "coercion [of PMC] is anticompetitive conduct." Opp. 29. But as explained, the supposed coercion is actually a lawful refusal to deal. Mot. 10-12; *supra* pp.3-5. Moreover, it relates solely to conduct occurring outside of the alleged GSS market, and did not prevent rival search engines (or any other firm) from obtaining the same PMC content or obstruct PMC from dealing with Google's GSS rivals. Mot. 19. It therefore does not "foreclose[] competition on the merits" in GSS and accordingly is not exclusionary. *FTC v. Meta*, 775 F. Supp. 3d at 54. PMC's speculative assertions of reduced output and quality are likewise implausible and would not establish anticompetitive harm in GSS even if the challenged conduct could be exclusionary (which it cannot). Mot. 23, 32; *supra* p.12.

17

Ultimately, PMC's coercion-based theory is that Google can obtain content for use in AI applications at a lower price than its GSS rivals. Mot. 31; Opp. 30-31. But PMC fails to allege that GSS competitors like Bing or Yahoo do not or cannot similarly obtain freely offered "Search Index Data" from publishers for use in AI. And either way, PMC analogizes Google's conduct to "charging supracompetitive prices," AC ¶241, which is not exclusionary, *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022).

### B.    PMC Lacks Antitrust Standing To Bring An Unlawful Monopoly Maintenance Claim

PMC argues that it "participates" in the GSS market as an "input provider" in the search "Input Market" and a recipient of GSS "outputs" in the Search Referral Traffic Market. Opp. 31-32. These theories of GSS market participation contradict the central contentions underlying its other claims that these three markets are distinct, and the court should therefore disregard them. At bottom, PMC has failed to plausibly allege the existence of either an "input market" or an SRT "output market" for GSS. Mot. 20-21, 26-28; *supra* pp.10-11, 14-15. It also alleges no competitive harm in SRT and thus has no basis to allege antitrust injury there. *See* Mot. 30; *supra* p.10. Moreover, not every "input" supplier to a monopolist is thereby a victim of monopsony. Mot. 33. The existence of monopsony power in the input market, along with exclusionary conduct creating or maintaining that monopsony (as opposed to a mere monopoly in an adjacent market), is required. PMC has failed to plead either, instead choosing to rely on this Court's previous findings in *Google Search* about a completely separate GSS market. *See id.* at 33-34.

The rarely applied principle from *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), does not provide PMC with standing. PMC's theory depends entirely on accepting its contention that Google's supposed "underpayment" to publishers for their content is exclusionary conduct. Opp. 33. As explained, it cannot be. Mot. 31-32; *supra* p.17. Moreover, PMC is not a

"conduit to harm [Google's] competitors" or otherwise "indispensable" to the supposedly exclusionary conduct. *Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 47 (D.D.C. 2024). PMC need not provide its content to Google at all (at any price) and may provide its content to an unlimited number of Google's GSS rivals. Mot. 19, 33. Further, the competitive harm alleged in the GSS market allegedly flows from an output reduction in publisher content because of reduced SRT. AC ¶261. As explained, that alleged reduction in SRT is caused by Google's concededly lawful introduction of AI Overviews, and not any coercive conduct directed towards PMC or other publishers. Opp. 7, 14; *supra* p.16.

Finally, PMC's alleged injuries remain too indirect and speculative to support antitrust standing. Mot. 34. PMC's argument that there are no "intermediate steps between Google's coercion and its failure to pay" misses the point. Opp. 34. To have standing for a monopoly maintenance claim, PMC needs to allege a plausible causal connection between the unlawful maintenance of Google's GSS monopoly and PMC's underpayment injury. Mot. 34. It has not because it makes no factual allegations suggesting that, absent its supposed GSS monopoly, either Google or any other search engine operator would have paid PMC for its content. *Id.*

## III.    PMC FAILS TO PLEAD A VALID CLAIM FOR UNLAWFUL TYING (COUNT V)

### A.    PMC Does Not Plausibly Allege The Existence Of A Tie

PMC bases its tying claim almost exclusively on a single district court's motion to dismiss decision in *Yelp Inc. v. Google LLC*, 2025 WL 2978394 (N.D. Cal. Oct. 22, 2025). *See* Opp. 35. There, the court concluded that Yelp plausibly alleged Google tied its local "OneBox" to its general search engine. *Id.* at *4. In the court's view, because some users perform "zero-click searches," it was "reasonable to infer that at least some … users do not engage further with the contents of the SERP because they have had their need satisfied by Google's OneBox." *Id.* This was deemed sufficient to plead users were "coerced into consuming local search content via the OneBox." *Id.*

That decision is of no use to PMC. For one, PMC's allegedly tied market for "Online Publishing" is wholly implausible, Mot. 21-22; *supra* pp.11-12, which is dispositive of its tying claim regardless of the mode of analysis applied, Mot. 15-16; *Cavalleri v. Hermes Int'l*, 2025 WL 2662897, at *3 (N.D. Cal. Sept. 17, 2025). Further, unlike here, *Yelp* involved a supposed tie between what that court concluded were plausibly alleged to be separate products. And on coercion, the *Yelp* court's reasoning is unpersuasive and should not be followed.

### 1.    AI Overviews And Google Search Are Not Separate Products

PMC's theory that AI Overviews and Search are separate products ignores this Court's detailed factual findings—incorporated into PMC's Amended Complaint—that the single "product delivered to consumers on a GSE … is a search engine results page" that contains both "links … to other websites" and "information that is accessible to users without leaving the SERP." *Google Search*, 747 F. Supp. 3d at 42, 110-111. AI Overviews contain both: the generated text is visible to users on the SERP, and the references to sources are links to other websites. AC ¶¶158, 164-165. However conceived, AI Overviews fall squarely within the bounds of the single General Search Engine product this Court identified.

In response, PMC argues that AI Overviews and Search purportedly have "contrasting purposes" because search engines show "results that require users to travel to other webpages" whereas AI Overviews present responsive information to users on the SERP. Opp. 36. But PMC does not explain how those purposes "contrast," let alone why the distinction it seeks to draw would indicate "that consumers seek these products separately." *Id.* AI Overviews and other search results undisputedly serve the same purpose: answering user queries through a mixture of on-SERP content and links. *E.g.*, AC ¶161-166. Indeed, the "ten blue links" results that Google has long provided, and that PMC claims to accept, contain significant information in the form of titles and snippets—third-party content that users can review directly on the SERP. *Id.* ¶69. And this Court

already found that links and informational content directly on the SERP are part of a single product.

PMC also argues that firms "provide these products separately," pointing to the fact that Google Search lacked AI Overviews before GenAI existed, that Google allegedly provides a *different* GenAI feature (AI Mode) "separate from the SERP," and that non-GSS providers offer GenAI features. Opp. 36. Why that is relevant is never said, particularly given PMC's allegation that "Google does not offer users its search engine separately from … AI Overviews." *Id.* at 37. And regardless of whether there is supposedly a separate market for "GenAI products," *id.* at 36— a market not alleged in PMC's Amended Complaint—that does not mean there is separate demand for an AI Overview *shown on the SERP* such that they are separate from Google Search, *Rick-Mik Ents., Inc. v. Equilon Ents. LLC*, 532 F.3d 963, 975 (9th Cir. 2008).

The Amended Complaint sets forth no facts alleging "consumer demand for [AI Overviews] separate from [General Search Engines]," so the tying claim fails. *Microsoft*, 253 F.3d at 86. Any amendment to add such facts would contradict PMC's incorporation of this Court's factual findings that both links and informational content on the SERP are part of a single product.

### 2.    There Is No Coercion Alleged

PMC insists that users' inability to opt out of seeing AI Overviews combined with "the fact that a higher percentage of Google searches are zero-click when AI Overviews" are shown demonstrates users must be coerced into using AI Overviews. Opp. 38. That conclusion does not follow. PMC provides no facts tending to rule out the "obvious alternative explanation" that users engage with AI Overviews because they find them helpful. *Twombly*, 550 U.S. at 567. That some users perform zero-click searches does not establish—or even make it plausible—that they were forced into doing so. PMC's coercion theory "is akin to alleging that a store owner requires that a customer, when picking up an item he has purchased, walk through the store and be exposed to other potential products." *Yelp Inc. v. Google LLC*, 2025 WL 1168900, at *15 n.10 (N.D. Cal. Apr.

22, 2025). That is not coercive or tying because there is no allegation that "additional products must also be *accepted*." *Id.* PMC does not allege that Google Search users are *required* to engage with AI Overviews. To hold otherwise would contradict the fundamental principle that "merely offering two products in a single package, allowing each to enhance the appeal of the other, is not itself coercive." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016).

**B.    The Tying Claim Is Subject To The Rule Of Reason, Which It Fails**

PMC's tying claim is brought under Section 2 and is therefore subject to the rule of reason, Mot. 38, a legal rule which PMC's opposition completely ignores. Its opposition asserts that the alleged tie harms competition in the Online Publishing market—a theory nowhere expressly alleged in its Amended Complaint. *Id.* at 39. But even assuming that had been properly pled, its competitive harm theories fail for the same reasons as its other claims: The Online Publishing market is massively and implausibly overbroad, and the supposed harms to competition PMC identifies in that market are hopelessly speculative and legally insufficient. *See supra* pp.11-12.

**C.    PMC Lacks Antitrust Standing To Bring A Tying Claim**

PMC asserts that the alleged tying injured it by causing "reduced traffic." Opp. 39. That injury occurs in the SRT market (pertaining to "distribution" of content, AC ¶212), not the Online Publishing market (defined to include content, not traffic to or clicks on links to content, *id.* ¶80). PMC's conclusory assertion in its opposition that its injury occurred in the Online Publishing market contradicts its Amended Complaint and cannot be credited. PMC also claims an injury in the GSS market. But as explained, tying can harm competition and cause injury only in the tied product market. Mot. 15; *supra* pp.8-10. Moreover, PMC does not participate in the GSS market and thus lacks antitrust standing to bring a claim based on alleged harms to competition in that market. Mot. 33-34; *supra* p.18. Whatever harms PMC suffered there are "secondary to the anticompetitive conduct" and "cannot support antitrust injury." *Fotobom*, 719 F. Supp. 3d at 47.

## IV. PMC FAILS TO PLAUSIBLY PLEAD MONOPOLY LEVERAGING (COUNT III) AND ATTEMPTED MONOPOLIZATION OF THE ONLINE PUBLISHING MARKET (COUNT VI)

### A. There Is No Claim For Monopoly Leveraging Under The Sherman Act

There is no independent "monopoly leveraging" claim available under Section 2 of the Sherman Act. Mot. 40. In response, PMC cites *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126 (D.D.C. 2018), as supposedly recognizing such a claim. Opp. 40. But *M Cinema* did not include a standalone leveraging claim. 342 F. Supp. 3d at 132-135, 138-139. The other authorities on which PMC relies from the Second and Tenth Circuits are even further afield. The Second Circuit questioned its own precedent recognizing a leveraging claim but declined to revisit the issue "since [the plaintiff] lack[ed] the requisite proof." *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001). And the Tenth Circuit rejected the existence of a standalone leveraging claim, noting that "a monopoly leveraging claim does not demonstrate a violation of Sherman Act section 2, absent proof of some other anticompetitive conduct in the allegedly monopolized market." *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1173 (10th Cir. 2021).

### B. PMC Fails To Plausibly Plead Attempted Monopolization

PMC's attempted monopolization claim fails because the alleged Online Publishing market is implausible. Mot. 21-22; *supra* pp.11-12. It also has not pled the other elements of this claim.

*First*, PMC has not plausibly alleged competitive harm in the Online Publishing market. PMC bases its argument on the same facts supporting the alleged reciprocal dealing, which do not show harm to *competition* in Online Publishing. Google's conduct does not exclude publishers, prevent publishers from licensing, or affect publishers relying on non-search traffic. Mot. 19, 23.

*Second*, PMC fails to allege specific intent to monopolize. PMC alleges only that the challenged conduct was supposedly exclusionary and that Google purportedly knew it was putting

publishers into a challenging position. Opp. 41-42. Even accepting that description of the allegations, the alleged conduct had a "legitimate business justification": making Google's results more responsive to user queries, which precludes any inference of specific intent. *See City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 42-43 (D.D.C. 2007).

*Third*, PMC's opposition confirms that it lacks sufficient allegations to support a dangerous probability of monopolization. PMC does not allege there are any entry barriers in Online Publishing. Opp. 42-43; Mot. 42-43. Instead, PMC invokes dicta in *Microsoft* to argue that a requisite probability of success exists if a party "would likely erect significant barriers to entry upon acquisition of a dominant market share." 253 F.3d at 84. That misreads the *Microsoft* court's decision, which noted only that the plaintiff did not adduce evidence establishing likely future entry barriers, not that such evidence would be sufficient. Regardless, it is difficult to imagine a category with *fewer* barriers to entry (both actual and potential) than online textual content, Mot. 42, and PMC offers nothing to counter this common-sense conclusion.

What's more, PMC has not plausibly alleged that Google, by virtue of its market power, has a dangerous probability of monopolizing this alleged market. PMC claims to allege Google's share of the Online Publishing market, but the cited allegations only purport to show usage rates for AI Overviews, not Google's comparative share of the Online Publishing market. *See* Opp. 43; *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 342-43 (3d Cir. 2018).

## V.    PMC FAILS TO PLEAD A VIABLE UNJUST ENRICHMENT CLAIM (COUNT VII)

"California law is clear: 'Unjust enrichment is not a cause of action.'" *Abuelhawa v. Santa Clara Univ.*, 529 F. Supp. 3d 1059, 1070 (N.D. Cal. 2021). PMC's argument to the contrary relies on a misreading of *Hartford Casualty Insurance Co. v. J.R. Marketing, LLC*, 61 Cal. 4th 988 (2015), and an application of *Bruton v. Gerber Products Co.*, 703 F. App'x 468 (9th Cir. 2017)— a now-repudiated, unpublished Ninth Circuit decision. *See* Opp. 43-44. As one California district

court has noted, "*Hartford* 'raised a narrow question' limited to 'the facts of th[at] case,'" and "published post-*Hartford* decisions" have rejected the existence of such a claim. *Abuelhawa*, 529 F. Supp. 3d at 1071. *Bruton* is not binding and has been repudiated by the Ninth Circuit itself, by California Courts of Appeal, and by nearly every federal district court to consider the question. *See, e.g.*, *Baiul-Farina v. Lemire*, 804 F. App'x 533, 537 (9th Cir. 2020); *City of Oakland v. Oakland Raiders*, 83 Cal. App. 5th 458, 477 (2022); *In re Theos Dark Chocolate Litig.*, 750 F. Supp. 3d 1069, 1091-1092 (N.D. Cal. 2024).

PMC argues it has sufficiently pleaded a quasi-contract claim for restitution based on coercion, yet it points to no allegations supporting such a claim. Opp. 44. Setting aside its implausibility, PMC's theory of antitrust coercion is insufficient for unjust enrichment, which requires "no reasonable alternative but to succumb" because the "only other alternative is bankruptcy or financial ruin." *Uniwill v. City of Los Angeles*, 124 Cal. App. 4th 537, 545 (2004).

## VI.   AMENDMENT WOULD BE FUTILE

PMC's counsel again seeks leave to amend for collectively its *fifth* complaint, pointing vaguely to "new information" about the supposed "impact" of the challenged conduct and the continued "matur[ation]" of content markets. Opp. 44-45. But PMC does not explain how these allegations would salvage its legally flawed theories. Google's arguments rest on settled law, and PMC identifies no missing factual predicate. *See Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 131 (D.C. Cir. 2012) (dismissal with prejudice appropriate where plaintiff did not "indicate[] that she will be able to plead sufficient facts to state a claim for relief"). If there were any facts that could cure the deficiencies in these claims, PMC would have already long-ago alleged them. The same is true for PMC's tying claim, which is based on the same predicate facts as its other claims. Dismissal should be with prejudice because a fifth attempt to plead this case is clearly futile.

Dated: March 5, 2026

Respectfully submitted,

By: */s/ Sonal N. Mehta*
Sonal N. Mehta*
Chris Johnstone*
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
sonal.mehta@wilmerhale.com
chris.johnstone@wilmerhale.com
*Admitted Pro Hac Vice*

David Gringer (Bar No. 1001200)
Paul Vanderslice (Bar No. 888314605)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
david.gringer@wilmerhale.com
paul.vanderslice@wilmerhale.com

*Counsel for Defendants Google LLC &
Alphabet Inc.*